# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BANNEKER VENTURES, LLC                          :
5 Choke Cherry Road, Suite 378                  :
Rockville, MD  20850                            :
                                                :
        Plaintiff,         :
                                                :
v.                                              :    Case No.: 1:13-CV-00391 (RMC)
                                                :
JIM GRAHAM,                                     :
In His Official and Personal Capacities         :
1350 Pennsylvania Avenue, NW, Suite 105         :
Washington, DC  20004                           :
                                                :
JOSHUA A. ADLER                                 :
In His Official and Personal Capacities         :
4328 8th Street NW                              :
Washington, DC  20011                           :
                                                :
ROBB M. LAKRITZ                                 :
In His Official and Personal Capacities         :
4328 8th Street NW                              :
Washington, DC  20011                           :
                                                :
LAKRITZ ADLER DEVELOPMENT, LLC                  :
4328 8th Street NW                              :
Washington, DC  20011                           :
                                                :
Serve:  Registered Agent                        :
     Joshua A. Adler             :
     4328 8th Street NW          :
     Washington, DC  20011       :
                                                :
and                                             :
                                                :
WASHINGTON METROPOLITAN                         :
AREA TRANSIT AUTHORITY                          :
600 Fifth Street, N.W.                          :
Washington, DC 20001                            :
                                                :
Serve:  Registered Agent                        :
 Carol O'Keefe, Esquire                       :
 General Counsel                              :
 WMATA                                        :

600 Fifth Street, N.W.                              :
Washington, DC 20001                               :
                                                   :
                Defendants.                        :

---

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

BANNEKER VENTURES, LLC ("Banneker"), by and through their attorneys, Brian K. McDaniel, Esq., McDaniel and Associates, P.A. and Jerry L. Malone, Esq., bring this action against Defendants JIM GRAHAM ("Graham"), JOSHUA A. ADLER ("Adler"), ROBB M. LAKRITZ ("LaKritz"), WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY ("WMATA") and on the following grounds: 1.) Breach of Contract; 2.) Breach of Implied Covenant of Good Faith and Fair Dealing; 3.) Tortious Interference With a Prospective Economic Advantage; 4.) Tortious Interference with a Contract; 5.) Unjust Enrichment; 6.) Fraud and 7.) Civil Conspiracy.

### I.      NATURE OF THE ACTION

1.      This action involves a contract for the exclusive right to negotiate and a contract to improve real property owned by WMATA and located in the District of Columbia along the 700 and 800 blocks of Florida Avenue, NW, in the District of Columbia (the "Site").  The property at issue is located above the Shaw-Howard/Florida Avenue Metrorail train station and is commonly referred to as the "Jazz at Florida Avenue Project" (hereinafter the "Project").

2.      Banneker, after an exhaustive, year-long bid process, was selected by WMATA as the Site developer.  Prior to selection, Banneker was required to post One Hundred Thousand Dollars ($100,000.00) as a Proposal Deposit and did post such deposit.  Thereafter, in June 2008, having been selected as the developer of the Site (the "Selected Developer"), Banneker was required to and did post an additional One Hundred Thousand Dollars ($100,000.00) in order to

obtain the exclusive rights to negotiate with WMATA for the development of the Site.  One of these deposits, along with other delineated expenditures, was not recovered by Banneker.

3.       From June 2008 until March 31, 2010, in accordance with the exclusive negotiation agreement as extended by WMATA on three separate occasions, Banneker participated in protracted negotiations with WMATA to finalize a Joint Development Agreement ("JDA"), which would allow Banneker to proceed with the construction of a mixed-use residential and retail project, including more than one hundred (100) new residential units and ground floor retail space (the "Project").

4.       Beginning in the fall of 2007, Graham, then both a member of the WMATA Board of Directors[1] and the Council of the District of Columbia, unlawfully, maliciously and purposefully interfered with Banneker's attempts to finalize the JDA, the pertinent lease and other relevant agreements with WMATA.  Graham's activities were coordinated with public officials and private individuals with a vested interest in the Project.  Graham's affirmative and egregious misconduct was in violation of his ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council rules.

5.       Graham, both privately and publicly, repeatedly and vociferously from April 2008 until March 31, 2010, objected to Banneker's selection as the developer of the Site, the completion of the original and modified Term Sheet, JDA and ultimately Banneker's servicing of the JDA in favor of LaKritz Adler Development ("LaKritz Adler").  LaKritz Adler, another development company that has close ties to Graham and is a major contributor to Graham's D.C. Council

---

[1] Graham served as a voting member of the WMATA Board of Directors for 11 years, from 1999 – 2010.

campaigns and constituent services fund, had participated in the original bid process for the Site but had not been selected by WMATA as the Selected Developer of the Site.[2]

6.      Both before and all-during the period of exclusivity that WMATA bound itself to with Banneker per the Term Sheet contract (as extended on three occasions), Graham participated in at least a dozen meetings with Banneker, and specifically, with Warren J. Williams, Jr., one of its then-principals ("Williams"), Adler, LaKritz and Rosalyn Doggett ("Doggett") where he attempted to improperly influence this competitively awarded project and modify both the terms of and participation in the Project for the purpose and intent of depriving Banneker of both its right to negotiate exclusively and its prospective economic advantage while at the same time financially benefitting LaKritz Adler at Banneker's expense and detriment.  Graham's statements and actions during these meetings demonstrate his express intent to frustrate the efforts of WMATA's staff and WMATA's Board of Directors (the "Board") in order to advance LaKritz Adler's financial interest, while maligning Banneker, and preventing WMATA's approval and implementation of its relationship with Banneker.  This misconduct was in violation of the WMATA Code of Conduct, the DC Code of Conduct and DC Rules of Council.

7.      In May 2008, Graham actively and repeatedly engaged in bid suppression and bid rigging efforts when he offered one of Banneker's then-principals an illicit quid pro quo.  Specifically, *Graham offered his vote as a member of the D.C. Council to approve a lucrative D.C. lottery contract, in exchange for Banneker withdrawing from the above referenced WMATA Project.* His goal was to replace Banneker with LaKritz Adler as the Selected Developer for the WMATA Project.  This could only be accomplished if Graham thwarted Banneker's project, if Banneker

---

[2] Graham's improper conduct and repeated, questionable interference with this competitively awarded contract to Banneker represented a proverbial second bite at the apple for LaKritz Adler, which actually turned into eight bites at the apple (see footnote 60).  It is now clear that Graham's actions were in violation of Graham's ministerial duties under the D.C. criminal and civil codes, D.C. Council's Ethics Code, WMATA Code of Ethics and DC Council Rules.

withdrew from the WMATA project or the period of exclusivity expired without a JDA.  Graham actively and overzealously (using affirmative and egregious misconduct tactics to do so), sought to derail Banneker's contract throughout this protracted period after Graham's quid pro quo effort failed to bring about Banneker's withdrawal from the WMATA project as directed to do so by Graham.

8.      Upon information and belief, after Graham's offer of a quid pro quo failed because Williams refused to participate in the illegal bid suppression and bid rigging scheme, Graham sought to (and did) involve other public officials in his efforts in June 2008, when he actively colluded with the District of Columbia's Office of the Chief Financial Officer's ("OCFO") staff and WMATA staff and Board to retaliate against Banneker for its refusal to acquiesce to his improper demands.

9.      In June 2008, according to a long-suppressed internal OCFO investigative report[3] (the "Andary Report"), Graham met with the District's Chief Financial Officer Natwar Gandhi ("Gandhi") and requested a criminal investigation of the OCFO's then Director of Contracts, Eric W. Payne ("Payne").  Graham's investigation request was pre-textually motivated by a desire to report "wrongdoing."  The Andary Report revealed otherwise and confirmed that the true purpose of Graham's false criminal allegation was to place additional pressure on the OCFO's Director of Contracts, the decision maker on the lucrative lottery contract of which one of Banneker's then-principals, Williams, was a party, to either remove Williams from the lottery contract or to cause the contract to be rebid.

---

[3] The Andary Report concluded that "[t]he investigation revealed . . . inappropriate actions by Mr. Graham with respect to the Council's consideration of the Lottery contract;" "Mr. Graham was not candid…"; and that "… Graham was trying to negotiate with Williams to back off the WMATA contract so Graham could re-bid the contract and another one of the bidders, who was Graham's favorite contractor, could get the contract."

10.     Graham used his WMATA Board position to derail the WMATA project with Banneker.
He began (in June 2008) by convincing the WMATA Board to add affordable housing
requirements to the Project, which materially changed the financial terms of the Initial Term
Sheet that Banneker had with WMATA and decreased the value of the Project that Banneker had
negotiated with the Staff.  The WMATA Board acquiesced in Graham's misconduct even though
WMATA had no guidelines or standards for affordable housing and notwithstanding the fact that
the WMATA staff charged with the responsibility of negotiating these components of the
transaction had no knowledge how to implement the Board's vague requirement of some
unspecified amount of affordable housing.  Knowing this given his almost 10 years on the
WMATA Board, this was one significant part of Graham's illicit plan, scheme and agreement to
interfere with Banneker's period of exclusivity and to interfere with Banneker's prospective
economic advantage.

11.     Afterwards, when Banneker refused to include LaKrtiz Adler in the Project even though
Graham had pressured Banneker to do so, and despite WMATA staff's continued
recommendations to approve a joint development agreement or revised Term Sheet with
Banneker which included the financial impact that the affordable housing units had on the
Project, Graham convinced the Board to *not* approve the joint development agreement or revised
Term Sheet.

12.     Instead, the Board intentionally and unlawfully allowed the time period of Banneker's
exclusive right to lapse, in bad faith and without any explanation in an attempt to reopen the
project to bids from two other developers, including LaKritz Adler, whose original submission
had been rejected in favor of Banneker's.  The Board, led by Graham in an orchestrated manner
with the District's other Principal Director, and in an Executive Session of the Board, simply

tabled its decision regarding Banneker's development of the Site, as agreed between and among them. The Board's failure to consider, in good faith, the terms negotiated by Banneker and WMATA violated the approved Term Sheet between Banneker and WMATA regarding implementation of the Project. Further, WMATA violated Banneker's rights, and effectively breached its agreement to negotiate exclusively with Banneker when WMATA Board Member Graham engaged in a continuous course of conduct both before and all-during the continuous period of exclusivity which expired on March 31, 2010, to interfere for the financial benefit of LaKritz Adler. Finally, it breached its implied covenant of good faith and fair dealing under that Term Sheet contract, particularly since Banneker had bargained for and tendered monetary consideration, in reasonable reliance on WMATA's agreement to a period for the exclusive right to negotiate and implement the WMATA-approved Project--- which period of exclusivity was never accorded by WMATA as it was bound by contract to so provide.

## II.     JURISDICTION AND VENUE

13.     This Court has original jurisdiction in this matter pursuant to D.C. Code § 9-1107.01(81).

14.     This Court has personal jurisdiction over Defendants Graham, Adler, LaKritz, LaKritz Adler and WMATA under D.C. Code §§ 9-1107.01(81).

15.     Venue is proper in this Court because the acts and omissions of Defendants all occurred in the District of Columbia.

## III.     PARTIES

16.     Plaintiff, BANNEKER VENTURES, LLC, is a limited liability company formed pursuant to the laws of the District of Columbia, and maintains offices in the District of Columbia. Banneker is a real estate firm that specializes in providing construction and

development services to government and commercial clients.  Banneker's principal owner is Omar A. Karim.

17.     At the time of the claims involved in this case, Defendant WMATA was the owner of the Site.  At all times relevant to this case, WMATA employees (including its Board Members) were acting within the course and scope of their employment or as agents of WMATA.

18.     WMATA was created by an Interstate Compact between Virginia, Maryland and the District of Columbia.  WMATA has the power to sue and be sued, and has waived sovereign immunity with respect to the subject matters of this suit because: 1) Banneker and WMATA executed a Term Sheet contract where WMATA bound itself to provide Banneker a period of exclusivity (which WMATA extended on three separate occasions with the last period of exclusivity expiring on March 31, 2010) and, 2) the tortious acts and actions of Graham (WMATA's agent) and WMATA which are at issue were ministerial acts and actions in violation of the WMATA Code of Ethics, the DC Code of Ethics and DC Council Rules.

19.     Among other things, the Compact gives WMATA the authority to enter into contracts to sell or lease property that it owns.  The Compact further requires that WMATA establish policies and procedures relating to its contracting and procurement practices.  Section 80 is the relevant section of the Compact for WMATA's waiver of immunity for contracts and certain torts.

20.     At the time of the claims involved in this case, Defendant Graham was a District of Columbia Councilmember and a member of the WMATA Board of Directors.  He is also a resident of the District of Columbia.  Graham's actions herein occurred both in his individual personal capacity and as an agent of WMATA and the D.C. Council, and as such he is being sued accordingly.

21.     Upon information and belief, at the time of the claims involved in this case, Defendants Joshua A. Adler ("Adler"), Robb LaKritz ("LaKritz") and LaKritz Adler Development ("LaKritz Adler") all conducted business in the District of Columbia.  Adler's and LaKritz's actions herein occurred both in their individual capacities and as principals and agents of LaKritz Adler, and they are being sued accordingly.

## IV.     FACTS

**Solicitation Stage:  Pre-Selection of Banneker by WMATA**

22.     In the Spring of 2007, WMATA issued a Request for Expressions of Interest ("REOI") for the redevelopment of three (3) WMATA-owned parcels located on the 700 and 800 blocks of Florida Avenue, NW, in the District of Columbia (the "Site").

23.     On May 31, 2007, Banneker and eleven (11) other developers submitted Responses to WMATA regarding the REOI.[4]

24.     As part of its efforts to develop the rest of the 700 block of Florida Avenue, Banneker contacted Howard University, which owned the adjacent property to one of WMATA's parcels (which currently sits a CVS store).  Banneker's objective was to expand the Banneker development project to either include the Howard-owned parcel as part of the WMATA project, or develop a complementary project adjacent to the WMATA project.

25.     On August 24, 2007, WMATA issued a Joint Development Solicitation to six (6) of the twelve (12) developers that responded to the REOI, including one development team led by Banneker and one development team led by LaKritz Adler.

26.     Upon information and belief, LaKritz Adler is and has been a major financial contributor to Graham's D.C. Council campaigns, constituent services fund and other Graham projects.  In one D.C. Campaign Finance Report alone, during the time in which Banneker was the Selected

---

[4] Bondi report, p.11.

Developer of the Site, the principals of LaKritz Adler (LaKritz and Adler) individually as well as 10 other firms that they control made maximum campaign contributions totaling more than $10,000.00 to Graham.  Eight (8) of these firms as well as Lakritz and Adler share the same address (4328 8th Street NW, Washington, DC).[5]

27.     Karim was provided information from Graham by the then-other principal Director of WMATA from the District that it was ***Graham's expectation that before approval of the joint development agreement by WMATA, Banneker and Karim would host a fundraiser for Graham's D.C. Council race and contribute to his Council campaign.***  Karim never agreed to participate in such an endeavor and to date, neither Banneker, nor any of its employees (including Karim), made financial contributions to Graham's campaigns for D.C. Council, constituent services fund or other Graham projects.

28.     The JDS provided that upon approval of a Term Sheet between the Selected Developer and WMATA, a JDA would be negotiated and completed within 150 days following the WMATA Board's designation of the Selected Developer and approval of the Term Sheet.[6]  The JDS also indicated that proposals were due on October 5, 2007.

29.     Banneker and its development team was one (1) of three (3) development teams to timely respond to the JDS to become the selected developer of the Site.

30.     Banneker's development team included 1) Banneker (Developer); 2) District Development Group, LLC (Co-Developer); 3) Donatelli Development, Inc. (Co-Developer); 4)

---

[5] The entities that Lakritz Adler wrote Graham checks from in this one instance include:  Robb Lakitz, Josh Adler, Lakritz Adler Development , Lakritz Adler Construction, Lakritz Adler Investments, 81 Kettering LLC, 1335 Fairmont LLC, 8415 Fenton LLC, 1525 9th Street NW and Lot 24 LLC.  Government of the District of Columbia Office of Campaign Finance, Report of Receipts and Expenditures for Candidates/Principal Campaigns or Political Campaigns, Re-Elect Jim Graham 2010, January 31, 2010.
[6] Section 3.2C of JDS.

Torti Gallas & Partners, Inc. (Project Architect); 5) MacFarlane Partners (Equity Partner); and 6) Tompkins Builders (General Contractor) (collectively, the "Banneker Development Team").

31.     On September 18, 2007, Advisory Neighborhood Commission ("ANC") 1B, which governs the area where the Site was located, hosted a community Town Hall meeting to allow the WMATA short-listed development teams to present their vision for redeveloping the Site. Banneker was one of the teams that presented its vision for the Site.

32.     On October 4, 2007, ANC 1B wrote a letter to WMATA (copying the two WMATA principal-Directors from the District—Jim Graham and Emeka Moneme) providing its exclusive support of the Banneker Development Team to develop the Site.

33.     Between October 2007 and March 2010, Banneker met with several national institutional investors who expressed an interest to Banneker in providing equity and debt for the Jazz project, including MacFarlane Partners, New Boston Fund, JP Morgan Asset Management/JP Morgan Urban Fund, Goldman Sachs, and CalSTRS (the largest educator-only pension fund in the world with $161 billion under management as of January 2013).  Banneker did have the financial wherewithal to undertake the Project and, at all times up to March 31, 2010, was capable of obtaining the financial wherewithal to undertake the Project.

34.     Between October 19, 2007 and October 24, 2007, Chris Donatelli ("Donatelli") of Donatelli Development, Inc., a then-member of the Banneker Development Team, contacted Graham about setting up a meeting for the purpose of informing him about its proposed development proposal to WMATA.

**Graham's Bid-Rigging Scheme:  The Start**

35.     On November 14, 2007, Donatelli emailed the Banneker Development Team and stated that Graham cancelled the scheduled-meeting between him and the Banneker Development Team.

36.     Two (2) days later, on November 16, 2007, Derrick Woody, a staff member with the District of Columbia Office of the Deputy Mayor for Planning and Economic Development ("DMPED") "recommended that Metro select LaKritz Adler to develop the Florida Avenue Property".[7]

37.     On December 4, 2007, Donatelli emailed Banneker and District Development Group ("DDG") indicating that he would not be able to attend a team meeting.

38.     On December 6, 2007, Rosalyn Doggett ("Doggett"), a WMATA employee charged by WMATA to lead the review of the responses to the JDS and lead its negotiations for the Site, invited Banneker to meet with WMATA staff to present its proposal and participate in an Oral Interview to be held on December 17, 2007.  Later that day, Karim sent an email to the Banneker Development Team informing them of the Oral Interview with WMATA.

39.     On December 13, 2007, Banneker received letters of interest to provide financing for the Project from MacFarlane Partners, a $1.45 billion investment company, Bank of Georgetown, and the District of Columbia Housing Finance Agency. Banneker provided these letters to WMATA.

40.     Upon information and belief, on or about December 14, 2007, Graham told Donatelli that he would not support the Banneker Development Team's proposal.  Believing that Graham would not oppose the Banneker Development Team if Banneker became a non-majority member thereof, on December 14, 2007, Banneker met with DDG and Donatelli and agreed to become a

---

[7] Bondi Report, p. 15, FN 10.

silent minority partner and not participate in the Oral Interview with WMATA scheduled three (3) days later.  Later that evening (at 7:45pm), Banneker sent DDG and Donatelli all of the presentation materials needed for the Oral Interview, including the project schedule, financials, letters of interest from lenders, etc.

41.     On December 16, 2007 at 1:22pm, Williams emailed Karim and inquired:  "Has Chris [Donatelli] confirmed that us dropping out will get Graham's support?"[8]

42.     Later the same day (3:46pm), Josh Kern ("Kern") of DDG, emailed Karim, Williams and Donatelli stating that Banneker, DDG and Donatelli "should present to the WMATA staff on Monday . . . and that not presenting seems unprofessional and the worst possible option for us." Kern then recommended that "as part of the presentation, we respectfully request allowing Banneker to withdraw and to allow Donatelli [to] assume the role of managing member.  This approach seems to address everyone's concerns.  We can spend today revising the presentation according to this new strategy."  At the end of his email, Kern states that "[w]e should reach out to . . . Graham to let him know our plans and we should immediately begin revising the presentation."[9]

43.     Later the same day, Kern contacted Karim to inform him that Donatelli was withdrawing from the Project and would not be leading or participating in the next day's Oral Interview with WMATA.  Upon information and belief, Graham convinced Donatelli to wait until the last minute to drop out of the Project so that LaKritz Adler's bid would be accepted.

44.     In addition to telling DDG that it was withdrawing from the Project, Larry Clark, Donatelli's Vice President, also contacted Banneker's other development partners, including Norman Glasgow, Jr. ("Glasgow"), of the law firm of Holland & Knight LLP (and one of the top

---

[8] Email from Williams to Karim dated December 16, 2007.
[9] Email from Kern to Karim and Williams dated December 16, 2007.

zoning attorneys in Washington, DC) who was supposed to take part in the Oral Interview at Banneker's request, to inform Glasgow that the Banneker Development Team and Donatelli were withdrawing and not to come to the Oral Interview the next day.

45.    On the morning of Monday, December 17, 2007, Glasgow called Karim to confirm that Banneker was in fact dropping out of the bid for the Site.  Karim told Glasgow that Banneker was still moving forward with the Oral Interview and that he hoped that he could still attend to which Glasgow agreed.

46.    Despite Graham's direction to Donatelli to withdraw from the bid and effectively from the Banneker Development Team, Banneker and DDG decided to move forward with participating in the Oral Interview, without the active support, presence or participation of Donatelli.

47.    Despite having only a few hours to update its presentation to remove Donatalli and any reference to its participation, Banneker and DDG were able to revise the presentation in time.

48.    On the morning of December 17, 2007, Graham contacted Buwa Binitie ("Binitie"), another DMPED staff member, and informed Binitie that "Banneker was not supposed to attend the Oral Interview" and that he should contact Williams to let him know that Banneker should not attend and to withdraw from consideration.  Immediately thereafter, Binitie called Williams and informed him to not attend the Oral Interview as Graham had directed.  Minutes later, Williams came into the lobby of the WMATA Headquarters and informed the members of the Banneker Development Team of his phone call with Binitie and apprised the team of Graham's demands.

49.    The Banneker Development Team nevertheless decided to proceed with the presentation of its proposal and Oral Interview with WMATA staff and WMATA's real estate consultant.

50.     The presentation and Oral Interview were well received.  The Banneker Development Team proposed a project that would be known as "The Jazz at Florida Avenue" or "The Jazz" and also proposed a project that would create 103 new residential units and 11,750 square feet of retail space on the Site.

51.     The proposal was based on a 60-year ground lease of the Site with a base lease payment of $500,000.00 per year.

52.     On January 28, 2008, Metropolis Development Company, a local development company, provided Banneker with a letter agreeing to serve as a co-developer of the Site.

**Banneker's Selection by WMATA**

53.     On January 29, 2008, Doggett and her team sent a memorandum to Nathaniel Bottigheimer ("Bottigheimer"), WMATA's then-Assistant General Manager of Planning and Joint Development, recommending that the WMATA Board of Directors select Banneker to develop the Site.[10]

54.     On February 15, 2008, Banneker received an exclusive letter from Howard University expressing Howard's interest in partnering with Banneker in the development of the Howard-owned parcel and WMATA-owned parcels.  When providing Banneker with the letter, Howard's Associate VP of Real Estate Development told Karim that Adler had informed her that WMATA had already selected LaKritz Adler to develop the Site, when in fact it had not selected LaKritz Adler.  The Associate VP did not believe Adler and provided Banneker with the letter.

55.     In February 2008, Banneker began meeting with development and finance partners in connection with the development of a hotel on the Howard-owned parcel.

56.     On February 29, 2008, Doggett notified Karim by phone that WMATA's staff had recommended to the Board that Banneker be designated as the Selected Developer of the Site.

---

[10] Bondi Report, p. 16.

She also informed Karim that WMATA and Banneker needed to negotiate an expedited term sheet.

57.     Five days later, on March 4, 2008, Doggett sent Banneker a draft term sheet (the "Term Sheet") indicating that Banneker had been selected as the developer of the Site and again advised Banneker over the phone and through emails that the Draft Term Sheet needed to be finalized within two weeks—an incredibly accelerated timeline for this complex, multi-million dollar public-private development.

58.     On March 10, 2008, just six days after Doggett sent Karim the Draft Term Sheet, Doggett emailed Karim writing that she needed to know that the Term Sheet is acceptable.

59.     Over the next few days, Banneker and WMATA negotiated the Term Sheet that became finalized on March 18, 2008.  The Term Sheet indicated a base rent increase to $597,000.00 per year ($97,000.00 more than what Banneker proposed in its response to the JDS).  Doggett informed Banneker that the increase in the base rent that Banneker would pay WMATA was due to the removal of the 10% of affordable housing units which Banneker included in its 2007 offer.

**Graham's Bid-Rigging Scheme:  The Interference Tactics**

60.     On or about April 2008, when Graham learned that Metropolis had agreed to be a co-developer with Banneker of the Project, he called Metropolis' principal Merrick Malone and told him not to partner with Banneker.[11]

61.     On or about April 17, 2008, Doggett called Karim and informed him that Graham had raised concerns about the participation of Williams in the development of the Project. Specifically, Doggett suggested that Banneker state in writing that Williams would not participate in the project if Banneker's proposal was approved by the Board.  Incidentally, this is

---

[11] Bondi Report, p. 30.

the same date that Graham raised concerns about Williams' involvement in the D.C. lottery

contract with Gandhi and initiated his campaign to stop the lottery contract award.

62.     By letter dated April 23, 2008, Banneker responded to Graham's concerns. While the

letter addressed Graham's substantive concerns, Banneker did not agree to disassociate Williams

from the Project.  The representations that Graham made about Williams were false, Graham

knew that they were false and Graham intended for WMATA staff to rely on those false

representations to cause WMATA staff to investigate the Banneker team and, possibly, dismantle

the Banneker development team—all in an effort to improve the standings of Graham's favored

development team (LaKriz Adler) in being chosen as the Project's Selected Developer.

**Graham's Bid-Rigging Scheme:  Delay Tactics**

63.     On April 24, 2008, the Agenda of the WMATA Board of Directors Planning,

Development and Real Estate Committee (the "PDRE Committee") included the approval of

Banneker as the Selected Developer and approval of the negotiated-Term Sheet between

Banneker and WMATA.

64.     During this meeting, Graham requested that Banneker's designation as the Selected

Developer be discussed in an Executive Session of the Board, which meant that the discussion

would not be held in public.  Based on reasonable information and belief, the Board's Executive

Session discussions (as on many occasions throughout Banneker's period of exclusivity)

included matters beyond the proper bounds for such closed door discussions by a public body

under DC law.

65.     During the Executive Session, Graham attempted to discredit Banneker by indicating that

it did not have the financial capabilities to develop the Site, with the hopes of diminishing

Banneker's qualifications and, thereby, improving LaKritz Adler's chances of becoming the

Selected Developer of the Site.  He also requested to review the proposals of all three (3) finalists, which included Banneker, LaKritz Adler and MTC.

66.     On the same day, after the public reconvening of the PDRE Committee, Graham moved to defer the WMATA Board's approval of Banneker to serve as the developer of the Site and approval of the Term Sheet for a period of not less than sixty (60) days.  The Board did so and its actions were unprecedented.

67.     What began as an expeditious Project implementation schedule soon slowed when Graham's political calculus and personal animus began to permeate the Project.  And in the context of WMATA joint development projects, the Board rarely voted contrary to a Metro joint development staff recommendation.[12]  To do so here, as orchestrated by Graham, was an extraordinary event.

68.     In response to the deferral of the Term Sheet ratification, Karim contacted several WMATA staff and Board members in an effort to address any issues which may have affected the Board's consideration of the negotiated Term Sheet.

69.     On or about May 1, 2008, one week after the PDRE's vote to defer the approval of the Term Sheet, Karim called Graham to request a meeting to discuss the postponement of Banneker's selection as the developer of the Site and to further understand the basis of Graham's concerns.

70.     Graham told Karim that he would agree to meet with him only if they met at Ten Penh restaurant, Graham's "favorite restaurant."  During the course of the lunch meeting, Karim asked Graham why he moved to defer Banneker's approval as the developer and approval of the Term Sheet by the WMATA Board and what he could do in order to advance the Project. Graham responded by saying that Karim "need[ed] to add LaKritz Adler" to his development team before

---

[12] Bottigheimer Interview Memo referenced in Bondi Report, p. 18, FN 33.

he could expect approval of the Term Sheet.  Now that Graham realized that the WMATA staff preferred Banneker, Graham was now looking for another way to financially benefit LaKritz Adker in the Project--- pursuant to Graham and LaKritz Adler's illicit agreement and understanding.

*71.*     As evidence of the agreement between Graham, Adler, LaKritz and LaKritz Adler to obtain a financial benefit for LaKritz Adler from the Project at Banneker's expense, immediately following this lunch meeting between Graham and Karim, Karim received a series of unsolicited telephonic and email communications from Adler proposing the "transfer of [their] ground lease and purchase option of an adjacent site, at 1920 8th Street, NW, to [Banneker] for inclusion in [Banneker's] proposed project."  ***In order for Adler to initiate these communications seeking a financial benefit for LaKritz Adler that was not before on the table as a part of Banneker's proposal, he had to receive direction and confirmation when and how to proceed from the recipient of his campaign contributions, Graham—following Graham's edict to Karim during their lunch meeting.***

72.     On May 9, 2008, Joel Washington ("Washington"), WMATA's then-Director of the Office of Station Area Planning and Asset Management, which oversees all WMATA development projects, contacted Karim and informed him that Graham wanted him (Washington) to have Banneker address alleged financial obligations to the District by Banneker's then principal, Williams.  Banneker provided a written letter to Washington confirming that Williams did not have any financial obligations to the District.  These representations by Graham regarding the financial responsibility of a then-Principal of the Banneker Team were false and Graham knew they were false.  However, these false representations concerned a material matter (the financial responsibility of a potential vendor)

and were made with the intent to deceive WMATA regarding the Banneker Team's

qualifications to be the Selected Developer.  In reliance on these false representations, WMATA

required the Banneker Team to dispel the false accusations by the letter it provided to WMATA.

73.     In an email dated June 17, 2008 (one week before the PDRE Committee was to re-

consider Banneker's selection as the Developer of the Site and approve the Term Sheet which

had been negotiated by WMATA's staff with Banneker almost three months prior), Adler

included in a proposal to Banneker, the following language:

> Upon Seller's (LaKritz Adler) nonrefundable receipt of the Assignment Option
> Fee, Seller would notify WMATA of its intention to withdraw from competition
> for the adjacent WMATA parcels.

This communication from LaKritz Adler is consistent with and provides further evidence of the
plan, scheme and illicit agreement that Graham, Adler, LaKritz and LaKritz Adler had to obtain
a financial benefit for LaKritz Adler, at Banneker's expense, from the Project.

74.     Through this proposal to Banneker, the LaKritz Adler defendants attempted to use their

influence over Graham to facilitate the forbearance of Banneker's pursuit of a prospective

economic advantage that Banneker had ostensibly already secured in the form of the exclusive

right to negotiate the Term Sheet and Joint Development Agreement for the Site—a right that

Banneker had already reasonably relied on by providing $100,000.00 and significant tangential

expenses to advance.

**75.**     In accordance with the plan, scheme and agreement between Graham, Adler, LaKritz and

LaKritz Adler, the LaKritz Adler defendants continued to attempt to negotiate the transfer of the

1920 8th street parcel through October of 2008.

## Graham's Bid-Rigging Scheme:  The Sordid Quid Pro Quo

76.     On May 29, 2008, Graham met with Banneker's then-principal, Williams, and three

others associated with Williams' separate bid to run the D.C. Lottery which was pending before

the D.C. Council.  (Neither Banneker Ventures nor Karim was a party to the effort to secure the D.C. Lottery contract.)  A few months earlier, the Office of the Chief Financial Officer for the District of Columbia ("OCFO") awarded W2I, a joint venture between W2Tech, a company that involved Williams, and Intralot, an international lottery vendor, a lucrative contract to administer the D.C. lottery.  Since the contract was a multi-year contract valued at over $1,000,000.00 annually, it was subject to the approval of the D.C. Council, of which Graham was and is a member.

77.     During the meeting, *Graham unlawfully offered his official support as a member of the D.C. Council in the ratification of the D.C. Lottery contract in return for Williams' agreement to withdraw Banneker as the Selected Developer of the Florida Avenue WMATA Project.*[13]

78.     On June 3, 2008, a Draft Agenda of the PDRE Committee for June 12, 2008 appeared on WMATA's website which showed that the Florida Avenue Developer Selection was on the Committee's agenda.

79.     On June 11, 2008, James Link ("Link"), a lobbyist for Williams (with no responsibility with respect to Banneker or Karim), sent an email to Graham stating in part:

> I know you are out of town, but hopefully you are checking email?
> We looked into the questions you asked. As you know, Warren Williams spoke emphatically that he had absolutely no involvement in paying for, producing or promoting the . . . posters that were painted of you. [Moreover, t]he Williams family confirmed with me again that no family member ever made a contribution to the campaign of Chad Williams, who challenged your seat.
>
> *As for Metro, there are a number of factors that make it impossible for us to even consider accommodating your request.* [Emphasis added].
>
> I wanted you to also be aware that our communications person, Crystal Wright, received a call from a reporter from the DC Examiner who was asking questions about our meeting and seemed to know a great deal about what was said. Since I don't talk to reporters, I would suggest that you contact Crystal directly if you would like to know more about this. *Please know that no one from our team*

---

[13] Bondi Report p. 40.

*contacted the media as it would not be in our interest or your interest to publicize what was discussed.* [Emphasis added].

80.     Graham responded to Link on the same day by email which read:

> I would rather not continue this on email
> I will check on the examiner. I know I did not speak to them.
> **The rejection of your application at Metro (which has not been approved) is necessitated not by any of this but by other factors relating to the application. (emphasis added)**

## Graham's Bid-Rigging Scheme:  Additional Delays

81.     A October 11, 2012 recently-released report prepared by Cadwalader, Wickersham & Taft LLP (the "Bondi Report"), that was initiated at the request of WMATA after *The Washington Post* and other news outlets began writing about Graham's bid suppression scheme, allowed Banneker to discover the behind-the-scenes and closed-door actions that had been perpetrated by Graham, Adler, LaKritz and LaKritz Adler in furtherance of their plan, scheme or illicit agreement to interfere with Banneker's economic expectancy for the financial benefit of LaKritz Adler.  In fact, it was only upon the release of the Bondi Report that these "other factors" to which Graham referred to in his email were mentioned *only after* it had been communicated to Graham that Williams would not be willing to facilitate Banneker's withdrawal from the WMATA project.

82.     The pre-textual nature of these "other factors" mentioned by Graham is also evident when one considers that they did not preclude Graham from attempting to use his official influence in the Lottery consideration in affecting Banneker's interest in the WMATA contract."

83.     One day after Graham's June 11, 2008 email exchange with Williams' lobbyist (who did not represent either Banneker or Karim), Banneker's designation as the Selected Developer was removed from the Final Agenda of the June 12, 2008 PDRE Committee.  As Banneker had not agreed to forgo its designation by WMATA as the Selected Developer, or include LaKritz Adler

on its development team, this extension of time allowed Graham and the LaKritz Adler

defendants additional time to attempt to create leverage against Banneker's position to become

the Project's Selected Developer--- to the financial benefit of LaKritz Adler.

84.    On June 17, 2008, the LaKritz Adler defendants contacted Karim and informed him that

the "*word he's (LaKritz Adler) getting is that they [WMATA] are waiting until we work out

something out before they [WMATA] approve our deal.*"   Adler then presented a thirty minute

offer to Karim for Banneker to purchase LaKritz Adler's option to an adjacent parcel.  Minutes

later, Adler sent Karim a three-page detailed term sheet which expounded further on how Adler

wanted Banneker to purchase its option.  This representation by the LaKritz Adler defendants

was false, they knew that the representation was false at the time it was made, but the LaKritz

Adler defendants intended Banneker to rely on the false representation to its detriment by,

among other ways, executing a deal with LaKrtiz Adler.

85.    Leading up to the June 26, 2008 meeting of the PDRE Committee, the WMATA staff

again requested that the Board approve the Term Sheet previously agreed to by WMATA and

Banneker.

86.    On June 24, 2008, two days prior to the June 26, 2008 PDRE Committee meeting,

Bottigheimer, in an email exchange with Graham regarding the resolution to approve Banneker's

selection as the Selected Developer, stated:

> Thinking out loud about **how to accommodate your request** [Emphasis added], I
> don't think we could go as far as to specify roles for team members in the
> resolution language by team member name. Should a team member with required
> expertise elect to resign its role on the winning team, I imagine we'd want to have
> the flexibility to substitute a new team member with equal expertise. If I'm
> thinking correctly, the resolution language should anticipate that possibility. As I
> understood it this morning, the desired language would emphasize that the firm
> doing the construction would have to have a well demonstrated capability for a
> project of this type, and would have to be in control of the construction process.

That is the sense that I am -- hopefully correctly -- trying to capture. If incorrect, please do advice.

87.     The very same day, Banneker received more pressure to execute a deal with LaKritz Adler if Banneker wanted Graham's support for Banneker to become Selected Developer. Specifically, Adler emailed Karim stating that "[w]e were expecting some feedback on our proposal last Friday?  Have your people reviewed it yet?"

88.     On June 26, 2008, the PDRE Committee again met to consider approval of Banneker as the Selected Developer and the Term Sheet.  At the beginning of the PDRE meeting, Graham again moved that the consideration of Banneker and the Term Sheet be done in Executive Session, and thus out of the public's view.  Given Graham's undue influence over the WMATA PDRE Committee and Board with respect of the need for Executive Session, Banneker was unaware of most of the representations made and actions taken by Graham behind closed doors during this session (as well as all of the other Executive Sessions during the period of exclusivity) until the issuance of the Bondi Report.  Thus, Banneker, even with due effort, had been unable to discover Graham's affirmative and egregious misconduct and false representations until the Bondi Report was issued and the Board of Ethics and Government Accountability (BEGA) investigation was released.  However, based on reasonable information and belief, Graham knowingly made false representations about Banneker, its financial wherewithal and its capabilities during this and other closed door sessions.  Given that this information is totally within the defendants possession, custody and control until Banneker is allowed to engage in meaningful discovery, Banneker can't plead with specificity regarding these false representations.  Suffice it to say, Graham's comments and representations were intentional, false, specious, malicious and without basis in fact or reality.  Graham knew that these representations were false, but it was his intent for WMATA to rely upon his false

representations to require that more stringent requirements be imposed upon the Banneker development team. The WMATA PDRE Committee and the WMATA Board did rely upon these false representations and did, in fact, impose more stringent requirements on the Banneker team than had been negotiated and recommended by the WMATA staff charged with the responsibility of negotiating such terms and conditions. As planned by Graham, these additional requirements proved to be more onerous and detrimental to the Banneker development team in its subsequent negotiations with WMATA staff. For instance, by adding Graham's requirement of some unspecified amount of affordable housing as a Board-required addition, after his nearly 10 years as a WMATA Board Member, Graham knew (or should have known) that the practical effect of this addition, where WMATA did not have any standards or guidelines for affordable housing and where the WMATA staff charged with the responsibility to negotiate this requirement did not know how to implement such a vague requirement, the impact would be to delay, interfere with or otherwise scuttle Banneker's efforts during the period of exclusivity.

89.     After more than an hour of closed door meetings in Executive Session, the Committee re-convened and one of the PDRE Committee members moved to approve Banneker's designation as the Selected Developer and the negotiated Term Sheet. After the motion was seconded, Graham then made a motion which, "direct[ed] the staff to negotiate an affordable housing set aside in this proposal". The PDRE Committee voted unanimously in favor of the motion, which materially changed and fundamentally altered the terms of the negotiated Term Sheet, to Banneker's detriment in accordance with Graham's scheme, which seconds earlier, had been approved by the PDRE Committee.

90.     All PDRE Committee members, except Graham, voted to approve Banneker's selection and the Term Sheet; Graham abstained.

**Graham's Bid-Rigging Scheme:  The Vendetta**

91.     Following the PDRE Committee meeting, the full WMATA Board reconvened on the same day to review and vote on matters that had been approved by the various Board Committees. During the full meeting of the Board, Graham stepped down from the dais and sat next to Karim who was sitting on the front row of the Auditorium where the WMATA Board was meeting. At this time, Graham informed Karim that he would vote for Banneker's selection to perform the Project, but that Karim "need[ed] to meet" with him to "discuss the Project".

92.     Minutes later, on June 26, 2008, the Board (including Graham) voted to approve the Term Sheet and Banneker as the Selected Developer --- with Graham's illicit amendment requirements.

93.     On June 26, 2008, in a *Washington Business Journal* story announcing that WMATA had picked Banneker to develop the Site, Graham continued to discredit Banneker by stating that there is a serious question as to whether this deal is financially viable, even going so far as to moving unsuccessfully to require an updated appraisal.

94.     When Graham's misconduct of the quid pro quo did not cause Banneker's withdrawal from the bid for the WMATA Site, Graham went on a vendetta as described by the *Washington Business Journal* on July 14, 2008, just three weeks after the PDRE Committee voted to approve Banneker as the Selected Developer.  The article stated that Graham "was so wary of Williams that he tried to derail efforts to award him the Florida Avenue lot."

**The District of Columbia Lottery Contract**

95.     On January 24, 2008, the OCFO awarded a joint venture that involved Williams a lucrative contract to administer the D.C. lottery.  (Neither Banneker nor Karim had any interest in the D.C. Lottery proposal.)

96.     Beginning in April 2008, Graham publicly led the D.C. Council's opposition to the proposed lottery contract.  Publicly, he repeatedly sought to have the lottery contract re-competed, a favored tactic employed by Graham to exercise undue influence on bid processes in which he was involved.  Privately, he told Williams and others that he would vote for Williams' lottery contract if Williams withdrew Banneker from the Florida Avenue WMATA project.

97.     According to the Andary Report, Payne, who was the OCFO's Director of Contracts and the decision maker on the lucrative lottery contract, was directed to meet with Graham on April 24, 2008.  During this meeting, Graham alluded to "a bone" he had to pick with Payne and repeatedly raised concerns about the selection and/or involvement of Williams in the Lottery contract.[14]

98.     In the May 29, 2008 meeting at Graham's office between Graham, Williams and three others associated with the lottery joint venture, Graham unlawfully offered his official support as a member of the D.C. Council in the ratification of the D.C. Lottery contract in return for Williams' agreement to withdraw Banneker as the Selected Developer of the Florida Avenue WMATA Project.  In this meeting, Graham: a) expressed concern that members of Banneker's development team had made monetary contributions to Graham's political opponents; b) indicated that Banneker had been winning too many projects; c) stated that he wanted another developer to win the WMATA Project; and d) offered that if Williams agreed to secure the withdrawal and forbearance of Banneker from the WMATA Project, he would support W2I's then-pending bid for the D.C. Lottery contract which was awaiting ratification by the D.C. Council.[15]

---

[14] See generally Andary Report.
[15] Bondi Report, p. 40.

99.     The next day, May 30, 2008, Link, sent an email to Graham thanking him for the May

29th meeting which read:

> I wanted to let you know that I greatly enjoyed and appreciated meeting you
> yesterday and for the opportunity you gave the Williams to engage with you in
> reconciliation.
>
> I found the meeting to be productive and I look forward to discussing next steps.
> Please feel free to contact me any time…

100.    On June 2, 2008, Graham responded:

> Thanks. ***Do you think they will do anything?***[Emphasis added].

101.    On June 2, 2008, Link responded:

> Yes. Wheels are in motion. Everyone took your concerns seriously. I would like
> to discuss with you and/or Calvin at a time convenient for you. Thanks much.

102.    Later on the same day, Williams sent an email to Crystal Wright (W2I's communication

consultant), Link, Alaka Williams and A. Scott Bolden ("Bolden"), an attorney with Reed

Smith LLP, stating:

> We should discuss with the councilmember, the fact that, even though I don't like
> it to prove to him that I'm "onboard" and "non-threatening" I would give him the
> [WMATA] project.
>
> The legal realities are that I can't do that. Banneker Ventures own 35% of the
> rights to develop the sites. Two other companies have much more to lose. If we
> tried to drop out they would sue us. We've got six figures of expenses as well as a
> six figure deposit being held by [WMATA].
>
> Is this something Omar and I go in with Jim and Crystal to discuss with the
> councilmember? Our [WMATA] board meeting where this gets voted on is this
> [T]hursday.

103.    On the same day (June 2, 2008) Link responded by email to Williams stating:

> Warren, I think we should be upfront with Graham about why this piece of his
> request cannot be accommodated. Its pretty clear that you are unable for very
> strict legal reasons to unilaterally make that decision….

104.    On June 2, 2008, voicing his objection and disgust with the propositions advanced by

Graham, Bolden responded by email to Williams, Link and Wright stating:

> I have made my thoughts on this nonsense very clear to [W]arren. *[T]his is*
> *complete bs and we are getting very close to corruption, bid rigging and other*
> *inappropriate conduct and I am not going to be a part of it. [P]erhaps the us*
> *atty should make the call on this by speaking with Graham about his request.*
> Am I clear on this. To even consider it is placing each of us at risk. Period.
> [Emphasis added].

105.    In a following email to the same parties five minutes after his previous email, Bolden
stated:

> [A]ny follow up discussions and meeting with [M]r. Graham, please [be] sure I
> attend. [T]he political stuff, we can negotiate. The bid withdrawal is off the table.

106.    On June 5, 2008, Graham met with Gandhi and raised concerns about the D.C. Lottery

contract and Payne.

107.    Robert G. Andary, the then-Director of the Office of Integrity and Oversight ("OIO") of

the OCFO then initiated a criminal investigation of Payne at the behest of Graham, and Graham

sought confidentiality in order to shield his identity as the catalyst of the OIO investigation.

108.    On the same date that Graham told Karim to come see him following a vote to approve

Banneker's designation as the Selected Developer of the Site—June 26, 2008—Graham met with

Andary in order to articulate his lottery concerns.

109.    Andary's investigation concluded that "Graham met with W2I representatives and tried

to get Williams to withdraw from a WMATA contract in exchange for Graham's support on the

Lottery contract" and that Gaham told several people in a meeting held on May 29, 2008 that if

"Williams would step off the WMATA contract, then Graham would be willing to get on board

with the lottery contract."[16]  This constituted an illegal quid pro quo act and attempted bid

suppression.

---

[16] See generally Andary Report.

110.    Upon information and belief, Graham had the OCFO modify and then suppress the damaging Andary Report.

**Graham's Bid-Rigging Scheme:  The Squeeze**

111.    On July 2, 2008 (less than a week after Graham approached Karim in WMATA's Auditorium), Graham and Karim met at Graham's D.C. Council office.  In furtherance of his scheme to sabotage the efforts of Banneker and to provide a financial benefit to LaKritz Adler from the Project, Graham indicated that he wanted 20% of the Site's residential units to be set aside as affordable housing. Graham also informed Karim that he wanted him to participate in a U Street Business Improvement District ("BID") program that he was spearheading. In response to Karim's inquiry regarding the monetary commitment for the BID, Graham represented that it would be the cost of "one of those tables at one of those events."  Karim believed this to be a reference to the cost associated with a ticket to a building industry association event.  Karim told Graham that he would give it some thought but did not commit to the payment.  Graham also renewed his request that Karim "find a way to" add LaKritz Adler to the Banneker Development Team.  Karim later came to know that the cost of the participation would be between $30,000 and $40,000 in yearly dues payment to Graham's BID program.

112.    In a deposition with the Bondi investigative team, Graham did not deny that this meeting took place and recalled that he "may have suggested that Banneker Ventures add LaKritz Adler to the development team when Banneker Ventures' former development partner withdrew from the project. ***However, Metropolis informed Bondi that the only reason it withdrew from the project was because Graham told its principals to withdraw and not partner with Banneker***— splintering the door open for Graham's campaign donor, LaKritz Adler, to join the team.

113.    On July 15, 2008, two weeks after Banneker had been designated the Selected Developer by WMATA's Board (and granted a period of exclusivity), the LaKritz Adler defendants emailed Karim a revised term sheet reducing the price for the option that LaKritz Adler held in the adjacent site from $3.5 million to $2.3 million, a reduction of $1.2 million from the previous weeks' offer.

114.    On July 16, 2008, Karim traveled to Atlanta, Georgia to participate in a hotel conference and met with perspective hotel partners about developing a hotel on the Howard-owned parcel.

115.    On July 17, 2008, Banneker received a letter from Washington informing Banneker that on June 26, 2008, the WMATA Board selected Banneker as the developer of the Site, approved the term sheet and authorized his office to negotiate a joint development agreement with Banneker.  Washington requested that Banneker return the signed Term Sheet to Washington and provide a check for $100,000.00—in addition to the previous $100,000.00 that Banneker provided WMATA when it submitted its response to the Joint Development Solicitation.

116.    On July 17, 2008, WMATA and Banneker signed the term sheet memorializing that Banneker had the exclusive right to negotiate a Definitive Agreement with WMATA as per the vote of the WMATA Board on June 26, 2008 (thus formally memorializing Banneker's period of exclusivity).

117.    On July 22, 2008, Banneker held a call with JP Morgan to discuss JP Morgan providing Banneker with debt and equity financing for the Jazz Project.  Later that day, Banneker met with several debt and equity partners (including Wells Fargo and Enterprise), a major retail tenant and Marriott about partnering with it to develop the Howard-owned parcel into a hotel.

118.    On July 25, 2008, Banneker met with WMATA about the Project.  During the meeting, Doggett informed Banneker that WMATA intended to send Banneker a draft of the Joint

Development Agreement and Lease by August 2, 2008, that WMATA expected to finalize the JDA and Lease between WMATA and Banneker by October 2008 in time for the Board to approve the JDA and Lease at its December 2008 Board meeting.  Doggett (the person with whom Banneker should be negotiating about the terms and conditions of the JDA) also informed Banneker that it should speak with Graham regarding Graham's adding an affordable housing component to the Project.  During the same meeting, Banneker paid the $100,000 Option Fee required by the JDS and thus, further solidified its exclusive right to negotiate with WMATA for development of the Site.

119.    In August 2008 (during the period of exclusivity), Banneker and LaKritz Adler continued to negotiate the sale of LaKritz Adler's option to purchase the Adjacent Site --- as Banneker was pressured to do by Graham and the LaKritz Adler defendants pursuant to their illicit agreement to gain a financial benefit for LaKritz Adler from the Project at Banneker's expense.

120.    On August 27, 2008, Banneker met with Goldman Sachs to discuss Goldman providing Banneker with equity financing for the Jazz Project and on August 29, 2008, Banneker met with CapMark, a large debt provider, to discuss CapMark providing debt financing to Banneker for the Jazz Project.

121.    On September 19, 2008, Kern sent Karim an email about an article that appeared in the *Washington Business Journal* indicating that a U Street Improvement District was being planned. Karim's email responding to Kern stated that Graham mentioned the BID when Karim and Graham met a few weeks prior and that Graham tried to get Karim to join the BID and after Karim inquired about the cost to join, Graham told him that "it would cost about the price of a table at one of these events".  Karim told Graham that he could not commit although Karim initially thought that it would only be $1,000.  Karim later learned that the cost for Banneker to

join the BID would be $40,000 per year.  ***Given the pending nature of the joint development agreement approval by the PDRE Committee and Board, Graham's request that Karim participate in his BID program was a clear attempt at extortion.***  Further, Graham's representation regarding the cost to participate in the BID was false, Graham knew that it was false and Graham intended it as a material factor in gaining his favorable approval of Banneker's continued involvement in the Project.  Graham's intent was to deceive Banneker regarding the substantial cost of participating in the Bid in order for Banneker to rely on the false representation by committing to join the BID to Banneker's detriment of shouldering the substantial annual cost.

122.    In the summer of 2008, Banneker was tentatively awarded between $12 million and $16 million in Tax Increment Financing ("TIF") from the District of Columbia in connection with the Jazz Project, pending final negotiations with the District and approval of the JDA with WMATA.

123.    Between September and October 2008, Banneker provided WMATA with an analysis of the impact that the WMATA-Board ordered (Graham-orchestrated) inclusion of affordable housing would have on the Project.

124.    On October 7, 2008, WMATA provided Banneker with a draft of the JDA and Lease for the Site.

125.    By the end of October 2008, when it became clear that the cost to purchase the underlying land of the 8th Street parcel, that LaKritz Adler had an option to purchase, was exorbitantly high, Banneker chose not to move forward with the purchase of the option as Graham had pressured and Banneker ended those negotiations with the LaKritz Adler defendants.

126.    Between October 2008 and December 2008, Banneker and WMATA negotiated the terms of the JDA and Lease coming to an agreement on most of the terms of these agreements. This progress threatened to frustrate Graham's intention to derail the ratification of an agreement between WMATA and the Banneker Development Team.

127.    Upon information and belief, ***when Graham became aware that Banneker did not want to purchase LaKritz Adler's option on the adjacent parcel, Graham directed WMATA's staff to stop or delay negotiations of the JDA and Lease.*** In order to delay or destroy Banneker's ability to fully realize the benefit of its period of exclusive negotiation, Graham further directed WMATA staff to go back to negotiate a revised Term Sheet and represented that only after a revised Term Sheet was approved by the Board would the Board consider approving the JDA and Lease. Given Graham's undue influence over WMATA's actions with regard to the Project by virtue of the jurisdictional vote process under WMATA's Compact, the WMATA staff was overly-motivated to take all of his concerns very seriously even though he was just a single Board Member.

128.    In November 2008, Banneker met with Goldman Sachs where Goldman informed Banneker that it was interested in providing equity to Banneker for the Jazz Project.

129.    On December 2, 2008, Stone & Youngburg, Banneker's equity partner in connection with the TIF, and a national leader in tax increment financing, provided the District with a letter expressing its interest in providing financing to Banneker for the Jazz Project.

130.    On December 10, 2008, Banneker met with Banc of America Community Development Company ("BoA"), the nation's most productive Bank-owned community development corporation, where BoA expressed a strong interest in becoming Banneker's development partner on the Project. Between January and March 2009, Banneker and BoA met several times

to discuss details of the Project resulting in BoA providing Banneker with confirmation letter of interest to become co-developer of the Jazz Project on March 6, 2009.

**Graham's Bid-Rigging Scheme:  Graham's Chairman Year**

131.    On or about January 29, 2009 (during Banneker's period of exclusivity), Graham became Chairman of WMATA's Board of Directors.  Upon the issuance of the Bondi Report on October 11, 2012, Banneker discovered that one of Graham's very first acts as Chairman was to meet with WMATA's staff to pressure the WMATA Staff to find a way for LaKrtiz Adler to be included in the Project, a blatant abuse and misuse of this position of public trust and a violation of Banneker's exclusive period of negotiation, a violation of Graham's ministerial duties under WMATA's Code of Ethics which forbade Graham (and all Board Members) from, among other things, acting in a partial manner and instructed them to avoid any actions which might result in favored treatment or the appearance of favored treatment toward any individual, private organization or potential contractor.  It also violated Graham's ministerial duty to place the public interest foremost in any dealings involving WMATA.  All of these were ministerial duties regarding activities that were NOT quintessentially governmental.  Further, the standards to which Graham was to adhere were clearly spelled out in the WMATA Code of Conduct (as well as the DC Code of Conduct and DC Council Rules) and, therefore, they did not require any discretionary actions on Graham's part to properly implement them.

132.    Unbeknownst to Banneker until the issuance of the Bondi Report, on January 29, 2009, "almost a full year after Metro selected Banneker Ventures, . . . Graham expressed his support for LaKritz Adler to be involved in the Florida Avenue Project to Ms. Doggett . . . at a meeting regarding the Florida Avenue Project."[17]

---

[17] Bondi Report, p. 58.

133.    Five "days later, on February 3, 2009 . . . Adler, called [Doggett] to say that . . . Graham

had asked him to "make a deal" with Banneker Ventures."[18]  This call provides further evidence

of the illicit agreement, scheme and plan between and among Graham, Adler, LaKritz and

LaKritz Adler to interfere with Banneker's exclusive right to negotiate and Banneker's

prospective economic advantage to the financial benefit of LaKritz Adler.

134.    During the period that Banneker had the right to be in exclusive negotiations with

WMATA for the Site, Graham provided confidential Board information to LaKritz Adler about

Banneker's proposal in order to provide LaKritz Adler with a competitive advantage.

135.    In her interview with the Bondi investigative team, Doggett explained that during a

February 3, 2009 call with Adler, "Adler spoke with specificity about Banneker's . . . proposal,

and that she did not know how he obtained the information."[19]  This, too, was a violation of

Graham's ministerial duties under the WMATA Code of Conduct (as well as the DC Code of

Conduct and DC Council Rules) which forbade allowing others to use information not generally

available to the public.

136.    Between January 2009 and March 2009, based on information that was known to it at the

time, Banneker informed WMATA that Metropolis' principal had learned that he had cancer,

that Banneker did not think that Metropolis would be able to continue working on the Project and

that it was replacing Metropolis with BoA.  On March 6, 2009, Banneker provided WMATA

with a copy of the letter of interest from BoA to serve as the co-developer of the Project.  On

March 11, 2009, Banneker provided additional information to WMATA on BoA, including an

overview of local projects that BoA had or were currently developing; a biography of BoA's

Senior Development Manager, who was the point person for the Jazz project, and information on

---

[18] Bondi Report, p. 58.
[19] Bondi Report, p. 58.

Banneker's construction management experience.  Again, this demonstrates that notwithstanding Graham's misconduct to cause it to be otherwise, Banneker (at every step of the process) put forth a development team with unquestioned capabilities and expertise.

137.    On April 23, 2009, even though Banneker and WMATA had negotiated a final deal for the Site, and WMATA's staff recommended to the Board that it approve the deal, Graham delayed approval of the deal, pushing approval back at least 120 days, and directed WMATA's staff to obtain a new appraisal for the Site.  While seemingly an effort by Graham to solely look out for the interests of WMATA, Graham's actions were designed in reality (at least partially), as they had been for over a year now, to allow Graham additional time to find a way to financially benefit LaKritz Adler at the expense of Banneker.

138.    On May 29, 2009, Doggett sent Banneker and BoA an email stating that "while there was agreement that we have a possible framework for a deal, WMATA (meaning Graham) wanted to get an outside appraisal from an independent contractor, which would take "60 days at best."

139.    On August 7, 2009, Banneker received a letter from the District of Columbia Department of Housing and Community Development ("DHCD") informing Banneker that it had been selected to receive Low Income Housing Tax Credits to finance the Project.  The amount of equity that Banneker was going to be able to generate from the DHCD-awarded tax credits was between $5 million and $9 million.

140.    On August 19, 2009, Banneker received a letter from United Bank confirming the bank's "interest in providing funding for the TIF note that may be issued to [Banneker] for [the Jazz Project]."

141.    On September 10, 2009, despite WMATA staff and Banneker being in agreement to the terms of a deal, Graham again led the Board's delay of this deal, while couching it in language which "granted the parties an additional 120 days to negotiate the terms of a final agreement."

142.    After orchestrating this delay, on September 10, 2009, Graham is quoted in the *Washington Business Journal* as stating: "I know that the developer [Banneker] is dealing with a recovering real estate market, but we either have to move forward now, or take another look at who will do this job."  By the time of Graham's statement, Banneker had lined up significant private and public financing to develop the project.  In fact, in the same *Washington Business Journal* story, the article indicated that Banneker had been selected to receive tax credits by DHCD for the Project.  Notwithstanding Banneker's readiness (both financially and capability-wise) to perform the Project, Graham's comments evidenced his continued and ever-present aim to work to Banneker's detriment and for the financial benefit of LaKritz Adler in clear violation of the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules.

143.    On September 17, 2009, Banneker and WMATA met to discuss the Jazz Project.  During the meeting, Bottinheighmer (WMATA's agent) "offered to sell [the] property to [Banneker]".[20]

144.    Between September 17, 2009 and October 16, 2009, WMATA and Banneker negotiated terms that included Banneker purchasing the Site from WMATA versus leasing it which it had previously negotiated with WMATA.

145.    On October 16, 2009, Banneker emailed WMATA attaching the revised Term Sheet which now included a purchase of the Site, indicating that "we believe this concludes our negotiations of the Term Sheet and we are prepared to sign the Term Sheet upon the Board's Approval."  Banneker asked that WMATA confirm that the "Term Sheet will be submitted for Board consideration at the October 22nd meeting".

---

[20] Omar Karim's written notes from meeting.

146.     On October 20, 2009 at 8:18pm, Banneker emailed WMATA indicating that it was fine with all of the changes proposed a few hours earlier (6:05pm) by WAMTA except for the change in time to review the designs.  Banneker stated that "any additional extensions would delay our construction start and completion date, which would cause us to lose our tax credits."  Banneker further stated that "as discussed previously, we have to complete 10% of construction by October 2010 and 100% of construction by December 31, 2011."

147.     On October 22, 2009, Karim, Graham, Graham's then-Chief of Staff, and Banneker's then-Chief Financial Officer ("Banneker's CFO"), met for lunch at Busboys and Poets restaurant at 14th and V Street, NW, Washington, DC to discuss Graham's continued opposition to WMATA finalizing the Joint Development Agreement with Banneker.  At the outset of the meeting, Graham told Karim and Banneker's CFO that *"Banneker should not have bid on the WMATA project"* and that he *"will not allow the sale of the Florida Avenue site."*

148.     Attempting once again to insert his campaign contributor LaKritz Adler into the Project, Graham told Karim and Banneker's CFO that he recommended that Banneker select another partner to work with Banneker on the Project versus BoA, whom Banneker was then working with.  During the meeting, Graham promised that if Banneker agreed to change the terms of the Project from a sell back to a lease agreement, he would hold a special committee of the Board within two weeks and that they could finalize terms of the JDA in a month.  Karim told Graham that it had expended a great deal of money to change from a lease to a sale and that going back to a lease would cause it to expend a lot more money.  Graham told Karim that WMATA would reduce the security deposit required of Banneker to cover the monies that it expended going back to a lease.  Graham then gave Karim the cell phone number of John Catoe ("Catoe"), WMATA's

then-General Manager, and told him to call Catoe to inform him of the terms that he and Karim

had worked out.

149.     Within 5 minutes of the meeting, Karim called Catoe and informed him of what had been

worked out with Graham.  About an hour after this call, Steve Goldin, WMATA's new Director

of Station Area Planning and Asset Management (who replaced Joel Washington), sent an email

to Graham, Catoe, Karim and several others indicating that "as per direction from our Board, we

are preparing a term sheet for the lease of our property" and that "the matter is to be taken up by

the full Board in a special meeting in two weeks."  Goldin then asked Graham's staff to "confirm

that Chairman Graham is in agreement".

150.     Twelve minutes later, at 3:20pm, on October 22, 2009, Goldin sent another email stating

that "additionally, as per Board direction, there will be a $100,000.00 reduction in the amount of

the security deposit required."  Of note, between Karim's lunch meeting with Graham, Karim's

call to Catoe as per Graham's direction and the receipt of the two emails from Goldin confirming

the terms which Graham and Banneker had discussed, there had been no meeting of the

WMATA Board.  Rather, WMATA staff immediately took these substantive and material steps

and actions at Graham's direction as an individual Board Member.

151.     On November 4, 2009, a staffer supporting Neil Albert, who replaced Omeka Moneme as

the other principal- DC Director of WMATA, emailed Bottigheimer and staff from WMATA's

Office of General Counsel asking them to "confirm whether both parties (Banneker and

WMATA) are in agreement and that WMATA staff is prepared to recommend approval of the

term sheet during the committee meeting and special board meeting tomorrow."

152.     On November 4, 2009, WMATA staff and Banneker agreed to final terms of a

development agreement for the Site.  That agreement was subject to final approval by the Board.

153.    On November 10, 2009, Banneker received an engagement letter from Love Funding setting forth their understanding and agreement concerning the preparation and filing of an application to obtain a $26,648,000 loan for the Jazz Project.

154.    On November 16, 2009, Doggett emailed Banneker to inform it that "once again the term sheet was sent out to the Board on Friday for its consideration on Thursday, November 19." This same day, she submitted a revised Term Sheet to the Board for approval.

155.    On or about November 17, 2009, Banneker and WMATA held a call to discuss the Project.  During the call, Goldin informed Banneker that he had been instructed by the PDRE Committee (meaning Graham) to among other things, obtain Best and Final Offers from Banneker and the two other firms who WMATA considered before selecting Banneker, including Graham's major campaign donor, LaKritz-Adler.

156.    On November 19, 2009, Goldin emailed Banneker informing it that "[t]he Board took no action today after discussing the matter.  Following the meeting, staff has been directed to submit a memo to the Board on Wednesday, 11/25/09, addressing issues dealing with increasing the initial capitalized lease payment and lack of payment reset."

157.    Between November 19, 2009 and November 25, 2009, Banneker and WMATA negotiated an increase in the capitalized lease amount whereby Banneker would pay WMATA an additional $750,000 in an upfront payment.

158.    On November 25, 2009, Bottigheimer sent the Board a memo addressing the issues raised at the November 19, 2009 meeting and indicated that Banneker had agreed to increase the capitalized lease payment by $750,000.  At the conclusion of the memo Bottigheimer stated that *"Based on the improved offer presented to Metro by the developer, I recommend this item be*

*returned to the Planning, Development and Real Estate Committee for consideration at the earliest possible date."* [Emphasis added].

159.    Even though every level of WMATA's staff continued to recommend that the Board move forward with the approval of a Joint Development Agreement with Banneker, Graham, with the acquiescence of the members of the PDRE Committee and full WMATA Board, continued to unlawfully stall Banneker's project with the intent of running out the clock on its contract period of exclusive negotiations with WMATA for the financial benefit of LaKritz Adler and in interference with the prospective economic advantage of Banneker.

160.    Upon information and belief, at the direction of Graham, on November 30, 2009, Carol O'Keefe ("O'Keefe"), WMATA's then General Counsel, provided WMATA's General Manager and the Board with a *Confidential Memorandum* the subject of which is "Can Metro Request a Best and Final Offer from Other Proposers on the Florida Avenue Project?"  O'Keefe's conclusion was "that option is not available until the current negotiation period has expired." This memorandum provides clear evidence of Graham's continued interest in thwarting the economic interests of Banneker and provided Graham the road-map that he needed to successfully destroy Banneker's exclusive rights to negotiate and, thereby, open up yet another opportunity for LaKritz Adler to submit a proposal to WMATA for the Project.

161.    In January 2010, WMATA's staff again recommended that the Board approve the terms of the agreement between WMATA and Banneker.

162.    In January 2010, days before the PDRE Committee meeting in which the agreement between Banneker and WMATA was to be considered and the last month in which Graham would serve as WMATA's Chairman, LaKritz, Adler and Graham upped the ante when LaKritz

Adler's two principals and 8 other entities that they control wrote checks of the maximum legal amount to Graham's D.C. Council race.

163.    Not once during the years that Graham attempted to steer the Project to LaKritz Adler did he disclose to WMATA that LaKritz Adler was a major financial donor to him and his D.C. Council campaigns, constituent services fund or other Graham controlled entities.

164.    On January 14, 2010, the PDRE Committee informed the WMATA staff that it wanted Banneker to pay additional funds to develop the Site and provided a time extension to complete negotiations to March 31, 2010.

165.    From January 14, 2010, through March 25, 2010, WMATA staff and Banneker engaged in negotiations to reach a final agreement with regard to the amended Term Sheet for the Project, which included an upfront Capitalized Lease Payment from Banneker to WMATA in compliance with the PDRE Committee's direction.

166.    In March 2010, all material terms of the Revised Term Sheet, including price, were agreed to by Banneker and WMATA staff at which time the WMATA staff, for the final time, recommended that the WMATA Board approve the agreement between WMATA and Banneker.

167.    According to Bottigheimer during an interview with the Bondi investigative team, "the Metro Board rarely voted contrary to a Metro joint development staff recommendation."[21] Despite this fact, the PDRE Committee and Board, on nearly a half-dozen occasions between 2008 and 2010, led by Graham, continued to vote to delay the approval of either the JDA and Lease or Revised Term Sheet – all contrary to WMATA staff recommendation.

168.    On March 18, 2010, "Graham instructed the Secretary for the Metro Board to remove the Florida Avenue Project from the March 25, 2010 PDRE" Committee agenda."[22]

---

[21] Bondi Report, p. 18, FN33, Bottigheimer Interview Memo.
[22] Bondi Report, p. 13.

169.    On the March 25, 2010, 1pm Working Agenda 7 of the Board, under "Report by Joint Development and Real Estate Committee", Item C listed "Florida Avenue Term Sheet and Time Extension to Negotiate a Joint Development agreement (pending Executive Session).

170.    On Working Agenda 7 later that day, Item C was removed.

171.    On the March 25, 2010 Agenda of the Executive Session of the Board, under Legal Matters, it lists "Discussion of Florida Avenue Joint Development Proposal".

172.    When Karim learned that the Term Sheet had been removed from the Committee's agenda, he contacted O'Keefe and Albert about what had taken place.

173.    Sometime thereafter, the consideration was put back on the Board's agenda, but under "Legal Matters" of the Board as opposed to on the Committee's agenda.

174.    During the March 25, 2010 Executive Session of the Board, attended by WMATA Principal Directors Jim Graham, Peter Benjamin, Mortimer L. Downey, Catherine Hudgins, Neil O. Albert, Elizabeth Hewlett and Christopher Zimmerman, WMATA Alternate Directors Michael Brown, William D. Euille, Tony Giancola, Gordon Linton, Jeffrey McKay and Marcell Solomon, WMATA General Counsel Carol O'Keefe, WMATA Secretary of the Board Loyda Sequeira-Castillo, and others, WMATA's Board members, in breach of the duty under the exclusive negotiation contract to negotiate in good faith and with fair dealing, unlawfully and indefinitely tabled approval of the executed amended Term Sheet and negotiated JDA and Lease for the purpose of allowing Banneker's exclusive right to "time out" as suggested in the aforementioned O'Keefe Confidential Memorandum to the Board; and did so knowing (or should have known) that it was Graham's desire, brought about in violation of Graham's ministerial duties under the WMATA Code of Conduct (as well as the DC Code of Conduct and

DC Council Rules), to have the project re-bid to allow his favored developer, Lakritz Adler, a second opportunity at selection as Selected Developer.

175.    Upon information and belief, following this March 25, 2010 Board meeting (around August 2010), LaKritz Adler submitted an unsolicited proposal to WMATA to purchase or lease the Site.  Again, this fact provides further evidence of the illicit agreement, plan and scheme between Graham, Adler, LaKritz and LaKritz Adler, as orchestrated over a period almost two years (most of which was during Banneker's contracted period of exclusive negotiation with WMATA for the Project) to interfere with Banneker's prospective economic advantage for LaKritz Adler's financial benefit.

176.    On April 26, 2010, Goldin sent Banneker a letter informing it that Banneker's exclusive negotiation period for the Project expired on March 31, 2010 and that "Metro has no plans to revisit this matter either at the staff or Board level."

177.    On April 27, 2010, Banneker's then-counsel at Reed Smith LLP sent a letter to WMATA responding to the April 26th letter indicating, among other things, that WMATA's actions were unlawful.  Shortly after Graham's receipt of a copy of this letter placing WMATA and the District on notice of Banneker's claim for unliquidated damages based on the breach that occurred by the March 31, 2010 expiration of Banneker's period of exclusivity, Graham wrote a response letter dated May 10, 2010, to Banneker's then-counsel at Reed Smith LLP (with a copy to the District's then Attorney General Peter Nickles) acknowledging receipt of the letter and informing Banneker's then-counsel that he (Graham) was referring the matter to the Attorney General of the District for "review and action".

178.    Although O'Keefe responded to the Reed Smith letter on May 28, 2010, she "did not interview witnesses, did not collect and review documents from the parties involved, and did not

examine allegations of Board Member misconduct when formulating her response."[23]  Instead,
her letter simply attempted to defend WMATA's actions by stating that she regrets that "the
faltering real estate market made it difficult for your client to adhere to the original terms which
prompted the Board's initial selection of Banneker as the developer of the Site" even though
Graham's amendment at the June 26, 2008 PDRE Committee Meeting changed the terms of the
Term Sheet when he required, among other things, that the Project include an unspecified
affordable housing component that WMATA staff did not know how to implement since
WMATA did not have any affordable housing guidelines in place.

179.    O'Keefe further attempted to defend WMATA by arguing that the changing composition
of Banneker's development team was one of WMATA's reasons for tabling Banneker's
negotiations.  However, this falls flat in the face of recently uncovered facts (through the Bondi
Report and the BEGA Report) that Graham told two of Banneker's former development partners
(Donatelli and Metropolis) to withdraw from the project, and by preventing the sale of the Site
(as proposed by WMATA staff), Graham forced BoA from participating in the project as well.
Nor does O'Keefe's position account for the myriad of Graham directed changes or
modifications to the Project, which materially impacted the Project and significantly impacted
the financial terms and composition of the Banneker Development Team, all of which were
primarily designed not be benefit WMATA's interests (or only partially benefit WMATA's
interests) but, rather, to benefit the financial interests of LaKritz Adler pursuant to Graham's
agreement, scheme and plan with the LaKritz Adler defendants.

180.    O'Keefe's position that it is WMATA's long standing institutional preference for a lease
is inconsistent with the fact that immediately after tabling the negotiation with Banneker,

---

[23] Bondi Report, p. 7, FN 1. Memorandum from Cadwalader, Wickersham & Taft LLP to Investigation File, Re:
Carol O'Keefe Interview Memorandum (June 21, 2012).

WMATA issued a solicitation for the sale of the Site versus a lease of the Site, and on July 21, 2011, did in fact sale the Site to another developer, JBG Associates.

**Cadwalader Investigation of WMATA, its Board and its former Chairman Jim Graham**

181.    On February 7, 2012, WMATA's Board announced that it would launch an independent review into WMATA's, the Board's and Graham's actions involving the Site.  In May 2012, the Audits and Investigations Committee of WMATA's Board hired Cadwalader to perform the investigation.

182.    The investigation was led by Bradley J. Bondi.  Bondi issued a report of his findings on October 11, 2012 (the "Bondi Report").  The "allegations about Graham center on whether he improperly tried to get [Banneker], which had won an open competition, to withdraw from the Metro deal by offering to support the separate bid of a Banneker principal for the D.C. government's lucrative lottery contract."[24]

183.    During its five-month investigation, "Bondi questioned thirteen current and former Metro Board Members, six current and former Metro employees and fourteen other involved persons, in some instances under oath and using a court reporter."

184.    The Bondi Report, at a cost to WMATA of more than $800,000.00, included more than 18,000 pages of sworn testimony and documents.[25]

185.    In announcing the Report's findings, Alvin J. Nichols, Chair of the Special Working Group of the Audits and Investigations Committee of WMATA's Board stated that "*[u]nblinkingly, it reveals wrongdoing on the part of a former Board member.*" [Emphasis added].

---

[24] Washington Post editorial.
[25] Memorandum Opinion of the Board of Ethics and Government Accountability, In Re: Jim Graham, Case No. AI-002-12, p. 2 (the "Ethics Report").

186.    LaKritz Adler refused to cooperate with the Cadwalader investigation and only "partially

cooperated with the investigation . . . after months of negotiations."[26]

187.    A "subpoena was issued to LaKritz Adler on June 29, 2012, calling for it to produce

documents required for the investigation.  After initially refusing to produce documents and

questioning Bondi's legal authority, LaKritz Adler produced a small number of documents on

July 25, 2012, and later produced more documents on September 7, 2012 and September 12,

2012 after extensive and time-consuming negotiations."[27]

188.    LaKritz Adler's counsel "was unwilling to make Adler available for testimony under

oath, but did allow him to be interviewed."[28]

189.    Graham refused to answer questions from the Bondi investigative team asserting

legislative immunity, although his actions fell well outside the scope of his official legislative

duties.[29]

190.    The Bondi Report found that Graham, in performing his ministerial duties under the

WMATA Code of Conduct, failed to remain impartial, showed favoritism toward a competing

vendor over Banneker and advocated to WMATA staff (during Banneker's period of exclusivity)

his preference for LaKritz Adler over Banneker.  The Bondi Report specifically found, among

other things, that Graham:

-    "[A]ppear[ed] to barter a Metro joint development project with a matter
     before the D.C. Council."

-    "[C]ircumvented the Metro Board by attempting to single-handedly persuade
     [Banneker] to withdraw from the Florida Avenue Project by using the
     lucrative D.C. lottery contract as leverage."[30]

---

[26] Bondi Report page 8, FN 2.
[27] Bondi Report, p. 8, FN 2.
[28] Bondi Report, p. 8, FN 2.
[29] Bondi Report, p. 17, FN 25.
[30] Bondi Report, p. 6.

- "[S]uggested . . . that [Graham] would consider supporting W2I's bid for the lottery before the D.C. Council only if Banneker Ventures withdrew from the Florida Avenue Project."

- "[U]ndermined the integrity of [WMATA's] joint development process."

- "[D]isregarded his duty to Metro when he explicitly conditioned his consideration of his support for W2I's lottery bid on Banneker Ventures's withdrawal from the Florida Avenue Project during the May 29, 2008 meeting between . . . Graham, Mr. and Mrs. Williams and two lobbyists for W2I."[31]

- "[T]he weight of the evidence supports that . . . Graham bartered the Florida Avenue project in exchange for his support of the D.C. lottery contract."[32]

- "Instead of working to bring the Florida Avenue Project to fruition, . . . Graham attempted to undermine the selected developer, Banneker Ventures, and tried to promote LaKritz Adler or to orchestrate the composition of the development team in favor of LaKritz Adler."

- "Graham's actions created an appearance that he was not impartial and thereby were contrary to Metro's Standards of Conduct."

191.    In Bondi's interview with Doggett, Doggett stated that "Mr. Malone [of Metropolis] informed her that his firm withdrew because it did not want to anger Councilmember Graham by working on the Florida Avenue Project with Banneker Ventures."[33]

**Findings of District of Columbia Board of Ethics and Government Accountability**

192.    In October 2012, the District of Columbia Board of Ethics and Government Accountability (the "Government Accountability Board" or "BEGA") initiated a preliminary investigation of possible violations of the District of Columbia Code of Conduct by Graham.

193.    The Government Accountability Board initiated the preliminary investigation *sua sponte* following the public release of the Bondi Report.

194.    On February 7, 2013, the Government Accountability Board issued an Order regarding its investigation (the "Ethics Report").

---

[31] Bondi Report, p. 55.
[32] Bondi Report, p. 55.
[33] Bondi Report, p. 27.

195.    Among other things, the Ethics Report established that Graham failed to implement his

ministerial duties under the DC Code of Conduct when BEGA concluded:

- "[That] Councilmember Graham's actions created an appearance that he was not impartial and thereby were contrary to Metro's Standards of Conduct."

- "[T]here to be sufficient evidence to conclude that Councilmember Graham committed one or more violations of the District of Columbia Code of Conduct, justifying a formal investigation and the issuance of Notice of Violation."[34]

- "At different points in [Graham's deposition in front of the Cadwalader investigative team], Graham, through counsel, asserted legislative immunity regarding decision-making about the lottery contract.  Accordingly, Councilmember Graham refused to answer questions about the lottery contract."[35]

- Graham "did not explicitly deny offering a quid pro quo to Williams regarding Banneker dropping out of the WMATA project in exchange for Graham's vote for the D.C. lottery contract."[36]

- "Councilmember Graham was trying to avoid an explicit discussion of the quid pro quo conversation that had occurred on May 29, 2008" in a series of emails that followed days later between lobbyists for Williams and Graham.[37]

- That "evidence further reflects a likely motive for Councilmember Graham to seek the withdrawal of Banneker Ventures; he wanted the project to go to another development company, LaKritz Adler."[38]

- That "Councilmember Graham suggested that Banneker Ventures partner with LaKritz Adler or purchase the interest LaKritz Adler held in the adjacent property, *a move that would serve the financial interest of LaKritz Adler.*"[39] [Emphasis added].

- "[T]here is significant evidence that Councilmember Graham had a strong preference for LaKritz Adler and exerted pressure on the principals of Banneker Ventures to abandon its bid or partner with LaKritz Adler.  Each of these outcomes could provide a financial benefit to LaKritz Adler, a Graham campaign contributor.[40]

---

[34] Ethics Report, p. 4.
[35] Ethics Report, p. 6, FN 13 (citing Graham Deposition 63:5-8).
[36] Ethics Report, p. 9 (citing Graham Deposition 64:1-8).
[37] Ethics Report, p. 12.
[38] Ethics Report, p. 13.
[39] Ethics Report, p. 15.
[40] Ethics Report, p. 16.

- "By pressuring Banneker to partner with LaKritz Adler during the period of exclusive discussions between WMATA and Banneker, Councilmember Graham was offering a lifeline to LaKritz Adler *which otherwise would see its financial stake in its property diminished.*"[41] [Emphasis added].

- Graham "lost the complete independence and impartiality expected in the decision-making process."[42]

- There is "overwhelming evidence before the Board that Councilmember Graham had a clear inappropriate preference for LaKritz Adler in the WMATA development deal. In addition to his communications with WMATA staff, he used his legislative office to exert pressure on the principals of Banneker Ventures to withdraw from the project (paving the path for LaKritz Adler) and include LaKritz Adler as a development partner.[43]

- The "fact that LaKritz was a *campaign contributor was a significant factor in Councilmember Graham's efforts.*"[44] [Emphasis added].

- That "offering to support Williams on the lottery contract as a quid pro quo for withdrawing from the WMATA project is evidence of [Graham's] efforts to benefit LaKritz Adler. In doing so, Councilmember *Graham went well beyond the contract approval process and sought to steer a benefit to LaKritz Adler, a campaign contributor.*"[45] [Emphasis added].

- Graham's "actions adversely affected the confidence of the public in the integrity of the legislative process."

- There is "a substantial body of evidence that Councilmember Graham violated at least three provisions of the District of Columbia Code of Conduct."[46]

- Graham argued that the statute of limitations had run on much of his problematic behavior.[47]

196. Finally, the Ethics Report found that "[t]he weight of the evidence supports a finding by *substantial evidence* [emphasis added] that Councilmember Graham did, in fact, offer to support

---

[41] Ethics Report, p. 16, FN18.
[42] Ethics Report, p. 17.
[43] Ethics Report, p. 19.
[44] Ethics Report, p. 19.
[45] Ethics Report, p. 19.
[46] Ethics Report, p. 26.
[47] Ethics Report, p. 22 (citing Graham Letter, p. 15).

Williams and W2I if he and Banneker Ventures withdrew from the WMATA development

project:

> Mr. and Ms. Williams, Mr. Link and Ms. Wright all understood that a quid pro
> quo offer had been made (Link Depo. 35:21-22; 36:1-13);
>
> That offer was discussed among the non-government participants immediately
> following the meeting (Link Dep. 35:21-22; 36:1-13);
>
> Mr. Williams consulted with counsel because he was troubled by the
> Councilmember's request; counsel was similarly troubled; and
>
> In an email exchange between Councilmember Graham and Mr. Link who had
> lobbying responsibility only for the lottery contract, there is an explicit discussion
> of Councilmember Graham's "request" and the rejection of the Metro deal.[48]

## Graham's Reprimand by D.C. Council

197.    On February 25, 2013, the Council of the District of Columbia, for only the second time

in its 38-year history under Home Rule, adopted a resolution reprimanding one of its members,

Graham.

198.    In a Press Release issued by the Council's Chairman, Phil Mendelson, Mendelson stated

that Graham's actions constitute a clear violation of Council Rules and that the "Council finds,

from two years of controversy, the three investigations, and widespread public comments, that

Councilmember Graham's actions have adversely affected the confidence of the public in the

integrity of the District government."[49]

199.    During the February 25th meeting to reprimand Graham, Council members voted to

publicly reprimand Graham and punish him by stripping him of his power to oversee District

liquor licenses and alcohol issues as head of the Human Services Committee.

---

[48] Ethics Report, p. 13.
[49] Press release from D.C. Council Chairman Phil Mendelson dated February 21, 2013 entitled
Council to Discipline Councilmember Jim Graham.

200.    The Council agreed with the Bondi investigation, Ethics Board and OIO Investigation, all which found that "Graham offered to support Banneker Ventures bid on a 2008 lottery contract in exchange for the company withdrawing its bid on a WMATA contract."[50]

201.    The conduct amounted to a *quid pro quo* offer.[51]  Chairman Mendelson described Graham's conduct as "behind closed doors bartering a vote on one contract with the vote on another contract. This was a barter not between councilmembers but between potential contractors."  He further stated that "[p]rocurement is an area in which there is a long history in the United States and in many jurisdictions, federal, state and local, of corruption," and [a]s a result, we have procurement rules that require that the process is shielded from political influence [and] from undue influence from behind closed doors."[52]

202.    Finally, Mendelson stated that: "[t]he law, which the Council adopted 35 years ago, makes it clear that elected officials are required to hold themselves in such a manner as to not adversely affect the public's confidence in the integrity of the government."

## V.    CAUSES OF ACTION

## COUNT I – BREACH OF CONTRACT
## (WMATA)

### A.  THE TERM SHEET CONTRACT

203.    Banneker re-alleges and incorporates ¶¶ 1-202, inclusive, as if set forth fully herein.

204.    On June 26, 2008, pursuant to the vote of the WMATA Board of Directors, Banneker entered into an contract with WMATA, whereby WMATA agreed, among other things, that Banneker would be the Selected Developer for the Site, that Banneker would have the exclusive

---

[50] Baxter, Jim, *The Washington Examiner*, D.C. Council reprimands Jim Graham, removes oversight of alcohol regulation, Feb. 25, 2013.

[51] Id.

[52] Id. (quoting Mendelson at February 25, 2013 meeting of the D.C. Council held to vote on a reprimand of Graham).

right to negotiate and enter into a Joint Development Agreement with WMATA to develop the Site, and that Banneker would have the right to lease or purchase the Site from WMATA.

205.    The contract with WMATA, known as the "WMATA Joint Development Term Sheet Shaw-Howard/Florida Avenue Sites" ("Term Sheet"), was completely executed by WMATA and Banneker as of July 17, 2008.

206.    Pursuant to the Term Sheet contract, WMATA agreed that Banneker, as the Selected Developer for the Project, would have the exclusive right to negotiate for the Project with WMATA.  The period of exclusivity initially ran for a period of 5 months (approximately 150 days), but was extended on subsequent occasions by WMATA, with the last extension expiring on March 31, 2010.

207.    The Term Sheet contract included the identity of the parties to the contract (WMATA and Banneker as reflected by the parties signatures), all of the material terms of the contract including, but not limited to:  1) a description of the real property to be conveyed;  2) a term of 60 years for the ground lease; 3) a description of the Project  (improvements) to be constructed on the real property; 4) the consideration to be paid (including the base annual rent) over the 60 year term of the lease and, very importantly; 5) an intent of the parties to be bound to the requirement that Banneker would have the exclusive right to negotiate with WMATA during the period of exclusivity under the contract and as later extended by WMATA.

208.    In violation of the contract's duty of good faith and fair dealing, WMATA and Graham breached the contract WMATA had with Banneker by failing to honor the requirement of exclusivity.  In fact, as Banneker discovered upon the issuance of the Bondi Report in October 2012, both before and continuously throughout the period of exclusivity, Graham engaged in an orchestrated course of conduct and dealings which included, but was not limited to, efforts

designed to: 1) interfere with Banneker's period of exclusivity; 2) to prevent Banneker from being able to successfully negotiate a Definitive Agreement with WMATA; 3) execute a bid-suppression scheme to get Banneker out of the WMATA Project in exchange for a pay-off of an unrelated D.C. Lottery contract award to a then Banneker Principal; 4) require Banneker to include Graham's favored development company (LaKritz Adler) as a member of Banneker's development team in order to provide a financial benefit to LaKrtitz Adler at Banneker's expense;  5) require Banneker to purchase property from Graham's favored development company (LaKritz Adler) in order to provide a financial benefit to LaKritz Adler at Banneker's expense; 6) add components to the Project (such as an affordable housing requirement for which WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA; 7) interference with Banneker Development Team composition (i.e. Donatelli and Metropolis); 8) unilaterally orchestrating the change of WMATA's later preference for a sale of the real property back to a lease after the passage of time negotiating and the expenditure of substantial resources; 8) provide the LaKritz Adler defendants with access to information not available to the public to enahance LaKritz Adler's competitive advantage and reduce or destroy Banneker's competitive advantage; 9) continue to advocate (as a WMATA Board Member, Chair of the PDRE Committee or Chair of the WMATA Board) and demonstrate his preference for LaKritz Adler to either become the Selected Developer or to otherwise gain a financial benefit from the Project with the very same WMATA staff charged with negotiating exclusively with Banneker under the contract; 10) using his jurisdictional vote (either voting "no" or "abstaining") as both his capacity as a PDRE Committee Member and WMATA Board Member to exercise undue influence over the terms and conditions that WMATA staff was authorized to and responsible for negotiating

with Banneker; 11) instructing WMATA's then General Counsel (during Banneker's period of exclusivity) to provide a legal roadmap how, when and under what circumstances Graham could request "Best and Final Offers" so that his favored developer (LaKritz Adler) would have another opportunity to financially benefit from the Project—which legal roadmap was provided on November 30, 2009; 12) entering into an agreement, scheme or plan with LaKritz, Adler and the LaKritz Adler defendants to engage in a continous course of conduct both before and all-during Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense; 13) violating the WMATA Code of Conduct by losing his impartiality with respect to Banneker as a vendor in favor of LaKritz Adler as found by the WMATA Board of Directors following the issuance of the Bondi Report; 14) violating the District's Code of Conduct by failing to act in the public interest as found by the District's Board of Ethics and Government Accountability in its Report issued on February 7, 2013;15) violating the DC Council's Rules as found by the DC Council at the time it publicly reprimanded DC Council Member Graham on February 25, 2013; and, 16) orchestrating and achieving the end goal (which culminated on March 25, 2010) of sowing enough delay, obstacles and interference such to allow Banneker's period of exclusivity expire on March 31, 2010.

209.    The actions of WMATA and Graham in breach of the contract with Banneker caused Banneker injuries and damages including, but not limited to, the loss of the value of the costs and expenses it had incurred over the almost three years that it pursued the Project; the loss of the value of the costs and expenses it incurred over the period of exclusivity as extended by WMATA; the loss of the prospective economic advantage  and profits that Banneker would have

enjoyed from the Project; and all other damages naturally caused by and flowing from the breach of the contract by WMATA.

WHEREFORE, Banneker respectfully requests that this Court enter judgment in Banneker's favor and against WMATA and to:

a)     Award compensatory damages to Banneker, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00;

b)     Determine the extent to which WMATA's material breach of contract relieves Banneker from performance of other obligations for WMATA; and

c)     Award further legal and proper relief as justice may require.


## B.  THE DEFINITIVE AGREEMENT CONTRACT

210.   Banneker re-alleges and incorporates Paragraphs 1-209, inclusive, as if set forth fully herein.

211.   Banneker and WMATA executed and entered into the Term Sheet Contract granting Banneker the 5 month period of exclusivity pursuant to the WMATA Board's vote on June 26, 2008, which contract was formally memorialized with its signing by the parties as of July 17, 2008.

212.   After being extended by WMATA on three occasions, the period of exclusivity under the Term Sheet contract ran through and including March 31, 2010.

213.   During the period of exclusivity, notwithstanding the continuous and unrelenting efforts of Graham and the LaKritz Adler defendants to interfere with and thwart the negotiations, Banneker and WMATA staff (after exhaustive back-and-forth efforts to deal with issues

brought about by Graham's ever-changing tactics to delay and block) negotiated all of the material terms and conditions of the agreement for the Project as of March 25, 2010.

214.   In accordance with WMATA's policy, practice and procedure, the WMATA staff submitted its Project package to the WMATA Board for the Board's March 25, 2010 Board meeting with the staff's recommendation that the Board approve the terms and conditions that had been negotiated by the staff with Banneker.

215.   As found by the Bondi Report, in the context of joint development projects such as the Project at issue in this matter, the WMATA Board rarely voted contrary to a Metro joint development staff's recommendation.

216.   The terms and conditions as negotiated by WMATA staff with Banneker included all of the material terms necessary to form a contract in the District of Columbia including, but not limited to, the identity of the parties (Banneker and WMATA), the description of the real property being leased, the description of the Project (improvements) to be constructed on the real property, the consideration (including the base rent, upfront payment and other remunerations), the duration/term of the lease, and time for performance of the construction activities.

217.   WMATA agreed that the Board would only decline to approve development of the Site under certain conditions.

218.   None of those conditions were present in this case, and further, the Board stated no rationale for its tabling of negotiations with Banneker.

219.   Banneker agreed to be the Selected Developer of the Site and did expend enormous financial and personal efforts to both become the developer and to negotiate with WMATA.

220.    Banneker performed its obligations, at considerable expense, in accordance with the terms of the parties' agreements, expectancies and understanding, and WMATA's express instructions.  Specifically, Banneker paid WMATA two deposits totaling $200,000.00 and engaged and incurred extensive expenses for various architectural firms, engineering firms, surveyors, land use attorneys, contract attorneys, investors, development partners and others to work on the Project in efforts to satisfy WMATA.

221.    Banneker is entitled to the benefit of its bargain, which includes the right to obtain legal title to the Site and/or to obtain the options and other rights as alleged in the alternative in this lawsuit.

222.    WMATA and the Board's refusal to formally memorialize the JDA without reason and lease or sale the Site to Banneker is a material breach of the agreement between the parties, and Banneker has been damaged thereby.

223.    As a direct and proximate cause of WMATA's breach, Banneker has not been able to finalize the JDA to develop the Site and has thereby been prevented from developing the Site.

224.    WMATA has failed and refused, without justification and despite demand therefore, to perform as it is obligated.

225.    WMATA's actions were calculated and not inadvertent, flagrant, with indifference to the consequences to Banneker, committed as part of a proprietary function and in disregard of obligations of trust.

226.    Under these circumstances, WMATA is barred by estoppel, waiver or otherwise from disclaiming the existence of Banneker's rights and interests as alleged in this lawsuit.  Namely, because Graham (as WMATA's agent) engaged in a continuous and unrelenting course of affirmative and egregious misconduct both before (i.e. the bid-suppression effort) and all-during

Banneker's period of exclusivity through and including March 31, 2010, WMATA is prohibited under the doctrine of equitable estoppel from invoking the Statute of Frauds to prevent Banneker's claim for breach of contract.

227.   Some of the affirmative and egregious misconduct in which Graham engaged both before and during Banneker's period of exclusivity included, but is not limited to, efforts to:

1) interfere with Banneker's period of exclusivity; 2) to prevent Banneker from being able to successfully negotiate a Definitive Agreement with WMATA; 3) execute a bid-suppression scheme to get Banneker out of the WMATA Project in exchange for a pay-off of an unrelated D.C. Lottery contract award to a then Banneker Principal; 4) require Banneker to include Graham's favored development company (LaKritz Adler) as a member of Banneker's development team in order to provide a financial benefit to LaKrtitz Adler at Banneker's expense;  5) require Banneker to purchase property from Graham's favored development company (LaKritz Adler) in order to provide a financial benefit to LaKritz Adler at Banneker's expense; 6) add components to the Project (such as an affordable housing requirement for which WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA; 7) interference with Banneker Development Team composition (i.e. Donatelli and Metropolis); 8) unilaterally orchestrating the change of WMATA's later preference for a sale of the real property back to a lease after the passage of time negotiating and the expenditure of substantial resources; 8) provide the LaKritz Adler defendants with access to information not available to the public to enahance LaKritz Adler's competitive advantage and reduce or destroy Banneker's competitive

advantage; 9) continue to advocate (as a WMATA Board Member, Chair of the

PDRE Committee or Chair of the WMATA Board) and demonstrate his preference

for LaKritz Adler to either become the Selected Developer or to otherwise gain a

financial benefit from the Project with the very same WMATA staff charged with

negotiating exclusively with Banneker under the contract; 10) using his jurisdictional

vote (either voting "no" or "abstaining") as both his capacity as a PDRE Committee

Member and WMATA Board Member to exercise undue influence over the terms and

conditions that WMATA staff was authorized to and responsible for negotiating with

Banneker; 11) instructing WMATA's then General Counsel (during Banneker's

period of exclusivity) to provide a legal roadmap how, when and under what

circumstances Graham could request "Best and Final Offers" so that his favored

developer (LaKritz Adler) would have another opportunity to financially benefit from

the Project—which legal roadmap was provided on November 30, 2009; 12) entering

into an agreement, scheme or plan with LaKritz, Adler and the LaKritz Adler

defendants to engage in a continous course of conduct both before and all-during

Banneker's period of exclusivity designed to interfere with the rights of Banneker and

provide a financial benefit to LaKritz Adler at Banneker's expense; 13) violating the

WMATA Code of Conduct by losing his impartiality with respect to Banneker as a

vendor in favor of LaKritz Adler as found by the WMATA Board of Directors

following the issuance of the Bondi Report; 14) violating the District's Code of

Conduct by failing to act in the public interest as found by the District's Board of

Ethics and Government Accountability in its Report issued on February 7, 2013;15)

violating the DC Council's Rules as found by the DC Council at the time it publicly

reprimanded DC Council Member Graham on February 25, 2013; and, 16) orchestrating and achieving the end goal (which culminated on March 25, 2010) of sowing enough delay, obstacles and interference such to allow Banneker's period of exclusivity expire on March 31, 2010.

228.   WMATA either knew or should have known of this egregious conduct by its agent (Graham) but failed to take steps to terminate Graham's misconduct and should now be estopped from asserting that no binding contract was formed because these affirmative, aggressive and egregious actions by Graham led to or contributed to WMATA's tabling of the transaction between the Banneker and WMATA on March 25, 2010, and constituted a breach by WMATA of its contract with Banneker and a breach of WMATA's duty of good faith and fair dealing under both the Term Sheet contract and the definitive agreement contract, thereby causing injuries and damages to Banneker.

229.   To the extent that this Court does not find an express agreement as contended by Banneker, as an alternative ground for relief, this Court should find the existence of an enforceable preliminary agreement, implied agreement, oral contract or other enforceable obligation on the part of WMATA to Banneker with respect to the disposition of the Site.

WHEREFORE, Banneker respectfully request this Court enter judgment in Banneker's favor and against WMATA and to:

a)   Award compensatory damages to Banneker, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00;

b)   Determine the extent to which WMATA's material breach of contract relieves Banneker from performance of other obligations for WMATA; and

c)   Award further legal and proper relief as justice may require.

## COUNT II – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND
## FAIR DEALING
## (WMATA)

230.    Banneker re-alleges and incorporates ¶¶ 1-229, inclusive, as if set forth fully herein.

231.    Banneker agreed to become the Selected Developer of the Site by providing WMATA

with $200,000.00 and executing a Term Sheet with WMATA.

232.    Banneker then negotiated a joint development agreement, and other associated

documents, with WMATA with the ultimate intention of developing the Site.

233.    In every contract, there is an implied covenant of good faith and fair dealing that

prohibits a party to a contract or agreement from taking any action that deprives the other party

of its benefits and rights under the contract or prevents the other party's performance of its

obligations under the contract.

234.    WMATA was bound by the implied covenant of good faith and fair dealing in

performing its contractual obligations to Banneker under the Term Sheet, JDA and other

documents.

235.    WMATA's actions of stopping the negotiations of the joint development agreement

(which would bind WMATA and Banneker to the Project) and forcing Banneker to enter into

negotiations for a Revised Term Sheet, ultimately not approving the Revised Term Sheet or joint

development agreement, interfered with Banneker's rights to develop the Site.

236.    Additionally, by telling Banneker in November 2009 that the Board had instructed the

WMATA staff to go out and get Best and Final Offers from the non-designated Selected

Developers, WMATA deprived Banneker of its benefits and rights under the Term Sheet and

negotiated joint development agreement.

237.    Banneker has performed each and every act, condition, and covenant incumbent upon him in accordance with the terms of the Agreement, except as excused, waived, or prevented by the acts of WMATA.

238.    In contrast, at all times relevant hereto, WMATA's agent (Graham) engaged in an affirmative, aggressive, continuous, on-going and unrelenting course of misconduct (in violation of his ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules) designed to injure Banneker and financially benefit LaKritz Adler, in violation of WMATA's Code of Conduct, the District of Columbia's Code of Conduct and DC Council Rules.

239.    Some of Graham's intentional misconduct (in violation of his ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules) which led to WMATA's breach of its duty of good faith and fair dealing includes, but is not limited to, Graham's efforts to:

    1)    interfere with Banneker's period of exclusivity; 2) to prevent Banneker from being able to successfully negotiate a Definitive Agreement with WMATA; 3) execute a bid-suppression scheme to get Banneker out of the WMATA Project in exchange for a pay-off of an unrelated D.C. Lottery contract award to a then Banneker Principal; 4) require Banneker to include Graham's favored development company (LaKritz Adler) as a member of Banneker's development team in order to provide a financial benefit to LaKrtitz Adler at Banneker's expense;  5) require Banneker to purchase property from Graham's favored development company (LaKritz Adler) in order to provide a financial benefit to LaKritz Adler at Banneker's expense; 6) add components to the Project (such as an affordable housing requirement for which

WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA; 7) interference with Banneker Development Team composition (i.e. Donatelli and Metropolis); 8) unilaterally orchestrating the change of WMATA's later preference for a sale of the real property back to a lease after the passage of time negotiating and the expenditure of substantial resources; 8) provide the LaKritz Adler defendants with access to information not available to the public to enahance LaKritz Adler's competitive advantage and reduce or destroy Banneker's competitive advantage; 9) continue to advocate (as a WMATA Board Member, Chair of the PDRE Committee or Chair of the WMATA Board) and demonstrate his preference for LaKritz Adler to either become the Selected Developer or to otherwise gain a financial benefit from the Project with the very same WMATA staff charged with negotiating exclusively with Banneker under the contract; 10) using his jurisdictional vote (either voting "no" or "abstaining") as both his capacity as a PDRE Committee Member and WMATA Board Member to exercise undue influence over the terms and conditions that WMATA staff was authorized to and responsible for negotiating with Banneker; 11) instructing WMATA's then General Counsel (during Banneker's period of exclusivity) to provide a legal roadmap how, when and under what circumstances Graham could request "Best and Final Offers" so that his favored developer (LaKritz Adler) would have another opportunity to financially benefit from the Project—which legal roadmap was provided on November 30, 2009; 12) entering into an agreement, scheme or plan with LaKritz, Adler and the LaKritz Adler defendants to engage in a continous course of conduct both before and all-during

Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense; 13) violating the WMATA Code of Conduct by losing his impartiality with respect to Banneker as a vendor in favor of LaKritz Adler as found by the WMATA Board of Directors following the issuance of the Bondi Report; 14) violating the District's Code of Conduct by failing to act in the public interest as found by the District's Board of Ethics and Government Accountability in its Report issued on February 7, 2013;15) violating the DC Council's Rules as found by the DC Council at the time it publicly reprimanded DC Council Member Graham on February 25, 2013; and, 16) orchestrating and achieving the end goal (which culminated on March 25, 2010) of sowing enough delay, obstacles and interference such to allow Banneker's period of exclusivity expire on March 31, 2010.

240    As a direct result of the foregoing material acts of misconduct by WMATA's agent, WMATA breached its contractual duties to Banneker and Banneker has suffered monetary damages, with interest.

WHEREFORE, Banneker respectfully requests that this Court enter judgment in Banneker's favor and against WMATA and to:

a)    Award compensatory damages to Banneker, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00;

b)    Award further legal and proper relief as justice may require.

## COUNT III – TORTIOUS INTERFERENCE WITH A PROSPECTIVE ECONOMIC ADVANTAGE
### (GRAHAM, ADLER, LAKRITZ, AND LAKRITZ ADLER)

241    Banneker re-alleges and incorporates ¶¶ 1-240, inclusive, as if set forth fully herein.

242    Banneker had a validly executed contract with WMATA (the Term Sheet Contract) whereby WMATA bound itself to allow Banneker to have an exclusive period of negotiation with WMATA for the Project.

243    The WMATA Board voted to approve that contract on June 26, 2008, and the parties memorialized that agreement on July 17, 2008.

244    WMATA later granted three extensions to Banneker's period of exclusivity through and including March 31, 2010.

245    Graham, Adler, LaKritz and LaKritz Adler were individually and collectively aware that Banneker and WMATA had so contracted given that it was a public procurement action in which LaKritz Adler was a competitive entity until WMATA granted Banneker the period of exclusivity. Thus, Graham, Adler, LaKritz and LaKritz Adler were fully aware of the period of exclusivity to which WMATA had agreed to be bound to Banneker. Further, as experienced developers on other WMATA (and non-WMATA) projects, Adler, LaKritz and LaKritz Adler understood what the period of exclusivity represented in industry terms.

246    Once it became clear to Adler, LaKritz and LaKritz Adler (collectively referred to as the "LaKritz Adler defendants") and Graham around April 2008 that the WMATA staff was recommending to WMATA that Banneker be designated as the Selected Developer for the Project and that it was probable that WMATA would approve that designation, Graham (in violation of his ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules) and the LaKritz Adler defendants entered into an agreement, plan or scheme to either block Banneker from successfully undertaking the Project so that LaKritz Adler could become the Selected Developer or, at a minimum, require Banneker to include LaKritz Adler in some fashion (either as a member of Banneker's development team or by requiring

Banneker to purchase property from LaKritz Adler) such to financially benefit LaKritz Adler at the expense of Banneker.

247    Some of the actions taken by Graham (in violation of his ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules) and the LaKritz Adler defendants either individually or collectively toward their common scheme included, but was not limited to, efforts to:

1)   interfere with Banneker's period of exclusivity; 2) to prevent Banneker from being able to successfully negotiate a Definitive Agreement with WMATA; 3) execute a bid-suppression scheme to get Banneker out of the WMATA Project in exchange for a pay-off of an unrelated D.C. Lottery contract award to a then Banneker Principal; 4) require Banneker to include Graham's favored development company (LaKritz Adler) as a member of Banneker's development team in order to provide a financial benefit to LaKrtitz Adler at Banneker's expense;  5) require Banneker to purchase property from Graham's favored development company (LaKritz Adler) in order to provide a financial benefit to LaKritz Adler at Banneker's expense; 6) add components to the Project (such as an affordable housing requirement for which WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA; 7) interference with Banneker Development Team composition (i.e. Donatelli and Metropolis); 8) unilaterally orchestrating the change of WMATA's later preference for a sale of the real property back to a lease after the passage of time negotiating and the expenditure of substantial resources; 8) provide the LaKritz Adler defendants with access to information not available to the public to enahance LaKritz Adler's competitive advantage and reduce or

destroy Banneker's competitive advantage; 9) continue to advocate (as a WMATA Board Member, Chair of the PDRE Committee or Chair of the WMATA Board) and demonstrate his preference for LaKritz Adler to either become the Selected Developer or to otherwise gain a financial benefit from the Project with the very same WMATA staff charged with negotiating exclusively with Banneker under the contract; 10) using his jurisdictional vote (either voting "no" or "abstaining") as both his capacity as a PDRE Committee Member and WMATA Board Member to exercise undue influence over the terms and conditions that WMATA staff was authorized to and responsible for negotiating with Banneker; 11) instructing WMATA's then General Counsel (during Banneker's period of exclusivity) to provide a legal roadmap how, when and under what circumstances Graham could request "Best and Final Offers" so that his favored developer (LaKritz Adler) would have another opportunity to financially benefit from the Project—which legal roadmap was provided on November 30, 2009; 12) entering into an agreement, scheme or plan with LaKritz, Adler and the LaKritz Adler defendants to engage in a continous course of conduct both before and all-during Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense; 13) violating the WMATA Code of Conduct by losing his impartiality with respect to Banneker as a vendor in favor of LaKritz Adler as found by the WMATA Board of Directors following the issuance of the Bondi Report; 14) violating the District's Code of Conduct by failing to act in the public interest as found by the District's Board of Ethics and Government Accountability in its Report issued on February 7, 2013;15) violating the DC Council's Rules as found by the DC Council at the time it publicly reprimanded DC Council Member Graham on

February 25, 2013; and, 16) orchestrating and achieving the end goal (which culminated on March 25, 2010) of sowing enough delay, obstacles and interference such to allow Banneker's period of exclusivity expire on March 31, 2010.

248     In these actions and as more specifically outlined below, Graham, Adler, LaKritz, and LaKritz Adler intentionally and willfully interfered with Banneker's contract with WMATA to develop the Site.  These actions were not in good faith and not customary tactics by competitors because Graham, Adler, LaKritz and LaKritz Adler all knew that:  1) WMATA staff had reviewed the competitive proposals for the Project and recommended that Banneker become the Selected Developer (April 2008); 2) the WMATA Board voted to accept the recommendation that Banneker be the Selected Developer for the Project (June 26, 2008); 3) WMATA and Banneker memorialized the selection and the binding nature of the period of exclusivity by signing the Term Sheet contract (July 17, 2008): 4) WMATA on three separate and highly public occasions extended Banneker's period of exclusivity with the last one expiring on March 31, 2010.

249     In early 2008, Graham and Adler knew that WMATA's staff had recommended to the Board that Banneker become the Selected Developer for the Site.

250     On at least a dozen occasions both before and all-during the period of exclusivity, Graham met with WMATA staff, Board members and others to interfere with Banneker's rights.

251     Specifically, Graham intentionally interfered by directing Banneker's first development partner (Donatelli) to drop out of the Project and not be Banneker's co-development partner.

252     Immediately after Graham learned that Banneker's second development partner (Metropolis) had agreed to partner with Banneker on the Project, he called Merrick Malone, one

of Metropolis's then-principals, and intentionally interfered by directing him to drop out of the partnership with Banneker, which Metropolis ultimately did, thus interfering with Banneker's prospective economic advantage.

253    Additionally, in April 2008, after WMATA's staff recommended that WMATA's Board approve Banneker as the Selected Developer for the Site, Graham, in a more than one-hour closed Executive Session of the WMATA Board, convinced the Board to push back consideration of Banneker's selection for no less than sixty (60) days in order for LaKritz Adler to attempt to either sale its interest to Banneker in an adjacent property or to allow LaKritz Adler to join Banneker's development team as the Graham-preferred development partner.

254    In May 2008, Graham used his position as a member of the D.C. Council to push Banneker's then-principal Williams to have Banneker drop out of the Florida Avenue WMATA project in exchange for Graham's support for Williams' D.C. lottery contract.

255    After Banneker's then-principal refused to agree to Graham's May 2008 quid pro quo and bid suppression scheme, in June 2008, and after WMATA's staff again recommended that WMATA's Board approve Banneker as the Selected Developer for the Site, Graham, in another closed Executive Session of the WMATA Board, attempted to convince the Board to push back Banneker's selection.

256    In May or June 2008, Graham required that Karim meet with him where Graham directed Karim to add LaKritz Adler to the Banneker Development Team, even though Banneker already had development partners.

257    In June 2008, after Graham, during a closed door Executive Session of the PDRE Committee, failed in his attempt to prevent Banneker's designation as the Selected Developer, made a motion (which the Board approved) that added an affordable housing component to the

Florida Avenue deal, which dramatically decreased the value of Banneker's previously negotiated Term Sheet with WMATA.

258     Upon information and belief, after the Board approved the Initial Term Sheet between WMATA and Banneker, and upon learning that Banneker chose not to move forward with purchasing LaKritz Adler's rights to an adjacent parcel, in the fall of 2008, Graham, directed WMATA's staff to stop negotiations of the joint development agreement between WMATA and Graham.

259     And on the first day that Graham became Chairman of the Board (January 29, 2009), almost a full year after WMATA designated Banneker as the Selected Developer, Graham called a meeting with WMATA staff regarding the Project and informed WMATA staff members, including Doggett, that it wanted LaKritz Adler to be involved in the Project[53] Ironically, this occurred just a few weeks after WMATA (in December 2008) purported to extend Banneker's period of exclusivity.  Thus, it is irrefutable that WMATA's representation of exclusivity was false at the time that WMATA made the representation because WMATA knew (or should have known) of Graham's misconduct during the period of exclusivity to achieve his illicit agreement with the LaKritz Adler defendants and, therefore, WMATA knew (or should have known) that its representation of exclusivity was false and, in accordance with WMATA's purposes in making the deceptive representation, Banneker continued to reasonably rely upon it to its detriment to make expenditures.

260     Five "days later, on February 3, 2009 (during Banneker's period of exclusivity), Adler called Doggett and stated that Graham had asked him to "make a deal" with Banneker whereby LaKritz Adler would join the Banneker Development Team as co-developer.[54]

---

[53] Bondi Report, p. 58
[54] Bondi Report, p. 58.

261     Upon information and belief, during Banneker's negotiations with WMATA, Graham unlawfully provided confidential Board information to LaKritz Adler about Banneker's proposal with the intention of allowing LaKritz Adler to negotiate a deal with WMATA instead of Banneker.[55]  Specifically, during a February 3, 2009 call with Adler, Doggett stated in a deposition with Bondi that "Adler spoke with specificity about Banneker['s] proposal, and that she did not know how he obtained the information."[56]

262     During Banneker's designation as the Selected Developer (the period of exclusivity), LaKritz Adler's principals (Adler and LaKritz) called Doggett "every few months to discuss the Florida Avenue Project."[57]  During "these discussions, the principals of LaKritz Adler usually took the opportunity to promote their proposal for the Florida Avenue Property and provide negative information about Banneker Ventures."[58]

263     Finally, based on reasonable information and belief, in March 2010, Graham conspired with the other members of the Board, including Principal Directors Peter Benjamin, Mortimer L. Downey, Catherine Hudgins, Neil O. Albert, Elizabeth Hewlett and Christopher Zimmerman, WMATA Alternate Directors Michael Brown, William D. Euille, Tony Giancola, Gordon Linton, Jeffrey McKay and Marcell Solomon to "stop negotiations with Banneker Ventures during [an] executive session" of the Board.[59]

264     Graham's, Adler's, LaKritz's, and LaKritz Adler's intentional and willful actions were calculated to cause damage to Banneker, which prevented it from developing the Site, and were done with the unlawful purpose to cause damage and loss to Banneker (and financial gain to LaKritz Adler), without right or justifiable cause.

---

[55] See generally Bondi Report, Interview with Doggett.
[56] Bondi Report, p. 58.
[57] Bondi Report, p. 42, FN159.
[58] Bondi Report, p. 42, FN159.
[59] Bondi Report, p. 28, FN101.

264.     As a direct and proximate cause of Graham's, LaKritz's, Adler's and LaKritz Adler's actions, Banneker has not been able to finalize the joint development agreement to develop the Site and has thereby been prevented from developing the Site.

265.     The individual and collective actions of Graham (in violation of Graham's ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and Council Rules) and the LaKritz Adler defendants constituted and led to the breach of Banneker's Term Sheet contract with WMATA which bound WMATA to provide Banneker a period of exclusivity and, as a result thereof, Banneker sustained monetary losses and damages of the resources it had expended to secure the Project as well as the expected profits which would have flowed to it as a result of its ownership of the Project.  Further, these actions by Graham and the LaKritz Adler defendants constituted intentional interference with Banneker's definitive agreement contract with WMATA.

WHEREFORE, Banneker respectfully request this Court enter judgment in Banneker's favor and jointly and severally against Graham, Adler, LaKritz, and LaKritz Adler and to:

a)     Award compensatory damages to Banneker, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00;

b)     Award further relief as justice may require.

### COUNT IV – TORTIOUS INTERFERENCE WITH A CONTRACT (GRAHAM, ADLER, LAKRITZ AND LAKRITZ ADLER)

266.     Banneker re-alleges and incorporates ¶¶ 1-265, inclusive, as if set forth fully herein.

267.     Banneker entered into an agreement with WMATA to allow it the exclusive right to negotiate an agreement to develop the Site.  This agreement was approved by the WMATA

Board on June 26, 2008, and was memorialized by the parties (Banneker and WMATA) on July 17, 2008.  Further, on at least three occasions, WMATA extended the period of exclusivity through and including March 31, 2010.

268.    Graham, Adler, LaKritz and LaKritz Adler were fully aware of the agreement between WMATA and Banneker and they were fully aware of the existence of the period of exclusivity by which WMATA was bound with Banneker. .  Further, as experienced developers on other WMATA (and non-WMATA) projects, Adler, LaKritz and LaKritz Adler understood what the period of exclusivity represented in industry terms.

269.    Graham used the power and influence as a member of the Board, Chairman of the Board, Chairman of the PDRE Committee, and a member of the Council of the District of Columbia to induce the WMATA staff and Board to breach its contract to negotiate with Banneker, by among other things, directing the Staff to either stop negotiations of the joint development agreement and negotiate a revised Term Sheet or to add LaKritz Adler to Banneker's development team.

270.    Adler, LaKritz and LaKritz Adler (collectively referred to as the LaKritz Adler defendants) used their relationship with Graham to induce Graham and WMATA's staff and Board to breach its contract to negotiate exclusively with Banneker.

271.    Graham improperly made these efforts in order to benefit a campaign donor of his and to improperly penalize persons (on the Banneker Development Team) that Graham viewed as his political enemies.  Specifically, on the first day after Graham assumed his responsibilities as the very powerful Chairman of the WMATA Board, Graham informed WMATA staff, including Doggett, that he (Graham) wanted LaKritz Adler to be involved in the Project.  Ironically, this occurred just a few weeks after WMATA (in December 2008) purported to extend Banneker's period of exclusivity.  Thus, it is irrefutable that WMATA's representation of exclusivity was

false at the time WMATA made the representation because WMATA knew (or should have known) of Graham's misconduct during the period of exclusivity to achieve his illicit agreement with the LaKritz Adler defendants and, therefore, WMATA knew (or should have known) that its representation of exclusivity was false and, in accordance with WMATA's purposes in making the deceptive representation, Banneker continued to reasonably rely upon it to its detriment.

272.    During the period that Banneker was the Selected Developer (the period of exclusivity), LaKritz and Adler intentionally called WMATA's real estate staff every few months to disparage Banneker while attempting to convince WMATA to designate it as the Selected Developer of the Site.

273.    In doing so, Graham, LaKritz and Adler acted with malice toward Banneker, its financial interests and its rights to a period of exclusivity with WMATA.

274.    Adler and LaKritz improperly made these efforts in order to benefit their firm, LaKritz Adler and themselves as principal owners of LaKritz Adler, so that they could be awarded the contract by WMATA to develop the Site at Banneker's expense and to Banneker's detriment.

275.    Some of the actions taken by Graham (in violation of his ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules) and the LaKritz Adler defendants either individually or collectively toward their common scheme included, but was not limited to, efforts to:

> 1) interfere with Banneker's period of exclusivity; 2) to prevent Banneker from being able to successfully negotiate a Definitive Agreement with WMATA; 3) execute a bid-suppression scheme to get Banneker out of the WMATA Project in exchange for a pay-off of an unrelated D.C. Lottery contract award to a then

Banneker Principal; 4) require Banneker to include Graham's favored development company (LaKritz Adler) as a member of Banneker's development team in order to provide a financial benefit to LaKrtitz Adler at Banneker's expense;  5) require Banneker to purchase property from Graham's favored development company (LaKritz Adler) in order to provide a financial benefit to LaKritz Adler at Banneker's expense; 6) add components to the Project (such as an affordable housing requirement for which WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA; 7) interference with Banneker Development Team composition (i.e. Donatelli and Metropolis); 8) unilaterally orchestrating the change of WMATA's later preference for a sale of the real property back to a lease after the passage of time negotiating and the expenditure of substantial resources; 8) provide the LaKritz Adler defendants with access to information not available to the public to enahance LaKritz Adler's competitive advantage and reduce or destroy Banneker's competitive advantage; 9) continue to advocate (as a WMATA Board Member, Chair of the PDRE Committee or Chair of the WMATA Board) and demonstrate his preference for LaKritz Adler to either become the Selected Developer or to otherwise gain a financial benefit from the Project with the very same WMATA staff charged with negotiating exclusively with Banneker under the contract; 10) using his jurisdictional vote (either voting "no" or "abstaining") as both his capacity as a PDRE Committee Member and WMATA Board Member to exercise undue influence over the terms and conditions that WMATA staff was authorized to and

responsible for negotiating with Banneker; 11) instructing WMATA's then General Counsel (during Banneker's period of exclusivity) to provide a legal roadmap how, when and under what circumstances Graham could request "Best and Final Offers" so that his favored developer (LaKritz Adler) would have another opportunity to financially benefit from the Project—which legal roadmap was provided on November 30, 2009; 12) entering into an agreement, scheme or plan with LaKritz, Adler and the LaKritz Adler defendants to engage in a continous course of conduct both before and all-during Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense; 13) violating the WMATA Code of Conduct by losing his impartiality with respect to Banneker as a vendor in favor of LaKritz Adler as found by the WMATA Board of Directors following the issuance of the Bondi Report; 14) violating the District's Code of Conduct by failing to act in the public interest as found by the District's Board of Ethics and Government Accountability in its Report issued on February 7, 2013;15) violating the DC Council's Rules as found by the DC Council at the time it publicly reprimanded DC Council Member Graham on February 25, 2013; and, 16) orchestrating and achieving the end goal (which culminated on March 25, 2010) of sowing enough delay, obstacles and interference such to allow Banneker's period of exclusivity expire on March 31, 2010.

276.    As a direct and proximate result of Graham's, Adler's, LaKritz's and LaKritz Adler's intentional and wrongful interference, WMATA breached its contractual obligation to negotiate

exclusively with Banneker and Banneker suffered monetary losses and damages as a result of the intentional and malicious actions of Graham and the LaKritz Adler defendants.

277.    These actions by Graham, Adler, LaKritz and LaKritz Adler were not in good faith and not customary tactics by competitors because Graham, Adler, LaKritz and LaKritz Adler all knew that:  1) WMATA staff had reviewed the competitive proposals for the Project and recommended that Banneker become the Selected Developer (April 2008); 2) the WMATA Board voted to accept the recommendation that Banneker be the Selected Developer for the Project (June 26, 2008); 3) WMATA and Banneker memorialized the selection and the binding nature of the period of exclusivity by signing the Term Sheet contract (July 17, 2008): 4) WMATA on three separate and highly public occasions extended Banneker's period of exclusivity with the last one expiring on March 31, 2010.

WHEREFORE, Banneker respectfully requests that this Court enter judgment in Banneker's favor and jointly and severally against Graham, LaKritz, Adler and LaKritz Adler and to:

a)    Award compensatory damages to Banneker, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00;

b)    Award further relief as justice may require.

## COUNT V – UNJUST ENRICHMENT
## (WMATA)

278.    Banneker re-alleges and incorporates ¶¶ 1-277, inclusive, as if set forth fully herein.

279.    Banneker paid WMATA $100,000.00 upon submission of its response to a joint development solicitation.  Upon executing a Term Sheet with WMATA, Banneker paid WMATA another $100,000.00.

280.    WMATA did accept the deposits paid to it by Banneker.

281.    At the direction of WMATA's staff, Banneker provided WMATA with extensive site plan drawings, exhaustive budgets and projections for the Project, time and other considerations.

282.    After WMATA's Board unlawfully tabled further negotiations of the joint development agreement or term sheet with Banneker, WMATA returned $100,000.00 to Banneker but kept the other $100,000.00 that Banneker had paid to it.

283.    As a direct and proximate result of WMATA's actions, WMATA is unjustly enriched.

284.    More specifically, because of WMATA's commitment to be bound by the period of exclusive negotiation, Banneker reasonably relied upon WMATA's commitment to be so bound and expended significant sums of money, time and efforts to cover the required Option Fee, Security Deposit, extensive site plan drawings, budget and financial projections for the Project. But for WMATA's commitment to be bound by the period of exclusivity, Banneker would not have expended the significant sums that it did expend.

285.    Notwithstanding Banneker's good faith reliance on WMATA's contractual commitment to a period of exclusivity, Banneker suffered monetary losses and damages as a result of the egregious, aggressive and affirmative misconduct by WMATA's agent (Graham) both before and at all times relevant during Banneker's period of exclusivity (which expired on March 31, 2010),

286.    Some of the actions taken by Graham (in violation of his ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules) toward his scheme to deprive Banneker of its rights during the period of exclusivity and to financially benefit LaKritz Adler included, but was not limited to, efforts to:

1)  interfere with Banneker's period of exclusivity; 2) to prevent Banneker from being able to successfully negotiate a Definitive Agreement with WMATA; 3)

execute a bid-suppression scheme to get Banneker out of the WMATA Project in exchange for a pay-off of an unrelated D.C. Lottery contract award to a then Banneker Principal; 4) require Banneker to include Graham's favored development company (LaKritz Adler) as a member of Banneker's development team in order to provide a financial benefit to LaKrtitz Adler at Banneker's expense;  5) require Banneker to purchase property from Graham's favored development company (LaKritz Adler) in order to provide a financial benefit to LaKritz Adler at Banneker's expense; 6) add components to the Project (such as an affordable housing requirement for which WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA; 7) interference with Banneker Development Team composition (i.e. Donatelli and Metropolis); 8) unilaterally orchestrating the change of WMATA's later preference for a sale of the real property back to a lease after the passage of time negotiating and the expenditure of substantial resources; 8) provide the LaKritz Adler defendants with access to information not available to the public to enahance LaKritz Adler's competitive advantage and reduce or destroy Banneker's competitive advantage; 9) continue to advocate (as a WMATA Board Member, Chair of the PDRE Committee or Chair of the WMATA Board) and demonstrate his preference for LaKritz Adler to either become the Selected Developer or to otherwise gain a financial benefit from the Project with the very same WMATA staff charged with negotiating exclusively with Banneker under the

contract; 10) using his jurisdictional vote (either voting "no" or "abstaining") as both his capacity as a PDRE Committee Member and WMATA Board Member to exercise undue influence over the terms and conditions that WMATA staff was authorized to and responsible for negotiating with Banneker; 11) instructing WMATA's then General Counsel (during Banneker's period of exclusivity) to provide a legal roadmap how, when and under what circumstances Graham could request "Best and Final Offers" so that his favored developer (LaKritz Adler) would have another opportunity to financially benefit from the Project—which legal roadmap was provided on November 30, 2009; 12) entering into an agreement, scheme or plan with LaKritz, Adler and the LaKritz Adler defendants to engage in a continous course of conduct both before and all-during Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense; 13) violating the WMATA Code of Conduct by losing his impartiality with respect to Banneker as a vendor in favor of LaKritz Adler as found by the WMATA Board of Directors following the issuance of the Bondi Report; 14) violating the District's Code of Conduct by failing to act in the public interest as found by the District's Board of Ethics and Government Accountability in its Report issued on February 7, 2013;15) violating the DC Council's Rules as found by the DC Council at the time it publicly reprimanded DC Council Member Graham on February 25, 2013; and, 16) orchestrating and achieving the end goal (which culminated on March 25, 2010) of sowing enough delay, obstacles and

interference such to allow Banneker's period of exclusivity expire on March 31, 2010.

287.    Graham's (WMATA's agent) affirmative and egregious misconduct (in violation of Graham's ministerial duties under WMATA's Code of Conduct, the DC Code of Conduct and DC Council Rules), caused a breach of WMATA's contract to grant Banneker a period of exclusivity and, as such, WMATA should now be barred by the doctrine of equitable estoppel from asserting that it has not been unjustly enriched by Banneker's reasonable reliance.

288.    WMATA received benefits as a result of Banneker's expenditures of resources both in terms of the direct monies paid to WMATA by Banneker as well as the thousands of dollars that Banneker expended in good faith reliance on WMATA's false representation that Banneker had a period of exclusivity from June 26, 2008 through and including March 31, 2010.

289.    Given that WMATA knew or should have known of Graham's affirmative and egregious misconduct (during Banneker's period of exclusivity) in his ministerial duties (in violation of the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules), it would constitute and injustice of the highest magnitude for WMATA to knowingly allow and entice Banneker to make all of the monetary expenditures and investments in the Project and not be required to Banneker for those monetary expenditures and investments it made during the period of exclusivity that was thwarted by WMATA's agent (Graham).

WHEREFORE, Banneker respectfully requests that this Court enter judgment in Banneker's favor and against WMATA and to:

a)      Award compensatory damages to Banneker, in an amount to be proven at trial, but believed to be in excess of $100,000.00.

b)      Award further relief as justice may require.

## COUNT VI – UNLAWFUL RESTRAINT OF COMMERCE
## (GRAHAM, ADLER AND LAKRITZ)

290.    Banneker re-alleges and incorporates ¶¶ 1-289, inclusive, as if set forth fully herein.

291.    Pursuant to D.C. Code § 28-4501 *et. seq.* and 15 USC 1 *et. seq.*, Graham, Adler and LaKritz unlawfully sought and did restrain Banneker's right to freely negotiate a final joint development agreement with WMATA.

292.    In doing so, Graham, Adler and LaKritz sought to unlawfully control the outcome of the bid process after Banneker had already been selected as the developer of the Site and Graham did so in order to benefit LaKritz Adler, his favorite developer and a major campaign donor of his.

293.    As a direct and proximate result of Graham's unlawful actions, Banneker suffered losses in the amount of $100,000,000.00.

294.    Some of the actions taken by Graham (in violation of his ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules) and the LaKritz Adler defendants either individually or collectively toward their common scheme included, but was not limited to, efforts to:

> 1) interfere with Banneker's period of exclusivity; 2) to prevent Banneker from being able to successfully negotiate a Definitive Agreement with WMATA; 3) execute a bid-suppression scheme to get Banneker out of the WMATA Project in exchange for a pay-off of an unrelated D.C. Lottery contract award to a then Banneker Principal; 4) require Banneker to include Graham's favored development company (LaKritz Adler) as a member of Banneker's development team in order to provide a financial benefit to LaKrtitz Adler at Banneker's expense;  5) require Banneker to purchase property from Graham's favored development company (LaKritz Adler) in order to provide a financial benefit to

LaKritz Adler at Banneker's expense; 6) add components to the Project (such as an affordable housing requirement for which WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA; 7) interference with Banneker Development Team composition (i.e. Donatelli and Metropolis); 8) unilaterally orchestrating the change of WMATA's later preference for a sale of the real property back to a lease after the passage of time negotiating and the expenditure of substantial resources; 8) provide the LaKritz Adler defendants with access to information not available to the public to enahance LaKritz Adler's competitive advantage and reduce or destroy Banneker's competitive advantage; 9) continue to advocate (as a WMATA Board Member, Chair of the PDRE Committee or Chair of the WMATA Board) and demonstrate his preference for LaKritz Adler to either become the Selected Developer or to otherwise gain a financial benefit from the Project with the very same WMATA staff charged with negotiating exclusively with Banneker under the contract; 10) using his jurisdictional vote (either voting "no" or "abstaining") as both his capacity as a PDRE Committee Member and WMATA Board Member to exercise undue influence over the terms and conditions that WMATA staff was authorized to and responsible for negotiating with Banneker; 11) instructing WMATA's then General Counsel (during Banneker's period of exclusivity) to provide a legal roadmap how, when and under what circumstances Graham could request "Best and Final Offers" so that his favored developer (LaKritz Adler) would have another opportunity to financially benefit from the Project—which legal roadmap

was provided on November 30, 2009; 12) entering into an agreement, scheme or plan with LaKritz, Adler and the LaKritz Adler defendants to engage in a continous course of conduct both before and all-during Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense; 13) violating the WMATA Code of Conduct by losing his impartiality with respect to Banneker as a vendor in favor of LaKritz Adler as found by the WMATA Board of Directors following the issuance of the Bondi Report; 14) violating the District's Code of Conduct by failing to act in the public interest as found by the District's Board of Ethics and Government Accountability in its Report issued on February 7, 2013;15) violating the DC Council's Rules as found by the DC Council at the time it publicly reprimanded DC Council Member Graham on February 25, 2013; and, 16) orchestrating and achieving the end goal (which culminated on March 25, 2010) of sowing enough delay, obstacles and interference such to allow Banneker's period of exclusivity expire on March 31, 2010.

295.    More specifically, as found by the District's Board of Ethics and Accountability ("BEGA"), Graham's actions (which were ministerial in nature and in clear violation of the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules) against Banneker, in favor of LaKritz Adler with respect to the Project, among other things, violated the District's code against "Affecting Adversely the Confidence of the Public in the Integrity of Government", demonstrated that Graham lost complete independence or impartiality and, demonstrated that he gave preferential treatment to LaKritz Adler against Banneker in a competitive, public procurement process.

296.    Graham and the LaKritz Adler defendants, by entering into an agreement and taking steps in furtherance thereof to interfere with, lessen and deny Banneker its rights under its contract with WMATA for a period of exclusivity while seeking to financially benefit LaKritz Adler, these actions were designed to prevent competition in this particular instance and had the even greater negative effects (as found by BEGA and the DC Council), among others, of adversely impacting the public's confidence in the public procurement process and adversely impacting the public's confidence in government —thereby further stifling competition in the marketplace.

297.    These actions by Graham, Adler, LaKritz and LaKritz Adler were not in good faith and not customary tactics by competitors because Graham, Adler, LaKritz and LaKritz Adler all knew that:  1) WMATA staff had reviewed the competitive proposals for the Project and recommended that Banneker become the Selected Developer (April 2008); 2) the WMATA Board voted to accept the recommendation that Banneker be the Selected Developer for the Project (June 26, 2008); 3) WMATA and Banneker memorialized the selection and the binding nature of the period of exclusivity by signing the Term Sheet contract (July 17, 2008): 4) WMATA on three separate and highly public occasions extended Banneker's period of exclusivity with the last one expiring on March 31, 2010.

WHEREFORE, Banneker respectfully requests that this Court enter judgment in Banneker's favor and jointly and severally against Graham, LaKritz, Adler and LaKritz Adler and to:

a)    Award compensatory damages to Banneker, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00.

b)    Award further relief as justice may require.

## COUNT VII – FRAUD (WMATA)

298.     Banneker re-alleges and incorporates ¶¶ 1-297, inclusive, as if set forth fully herein.

299.     WMATA actively sought and obtained the services of Banneker, the benefit of Banneker's labors, Banneker's expenditures and other valuable and significant benefits from Banneker by making various intentional misrepresentations and/or omissions to Banneker.

300.     In doing so, WMATA, by and through its authorized agents acting within the scope of their employment authority and as part of a WMATA proprietary function, continuously before and during Banneker's period of exclusivity under its contract with WMATA, failed to advise or otherwise inform Banneker that WMATA would never approve a joint development agreement between WMATA and Banneker even though WMATA had a duty to so advise Banneker. WMATA, through its agents (i.e. Graham), undertook  an affirmative and egregious course of misconduct (in violation of Graham's ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules) knowing that Banneker was reasonably relying on WMATA's contracted commitment to a period of exclusivity as Banneker labored and expended considerable time, effort, energy, and expense on the understanding that WMATA would exclusively negotiate (in accordance with Banneker's Term Sheet contract with WMATA) a joint development agreement with Banneker to develop the Site.

301.     For example, on July 25, 2008, WMATA informed Banneker that it expected to finalize a joint development agreement by October 2008 in time for the Board to approve it at the December 2008 Board meeting.  Given the misconduct of Graham to delay or prevent Banneker's negotiations with WMATA from successfully concluding and Graham's agreement, plan or scheme with the LaKritz Adler defendants to string the process out long enough to either pressure Banneker to add LaKritz Adler to the Banneker team or to force Banneker out of his position as Selected Developer in order to improve LaKritz Adler's opportunity to replace

Banneker, WMATA either knew or should have known that this representation was false when it was made.  However, this representation was intended to deceive and did, in fact, deceive Banneker Ventures into relying upon the representation to its detriment (i.e. the continued expenditure of time, effort, energy, human and financial resources on the Project).  WMATA also requested that Banneker provide it with regular updates to its site plans for the Project and Banneker, relied to its detriment to do so, with WMATA either knowing or should have known that its agent (Graham) was engaging in a course of misconduct for the purpose of preventing Banneker from ever being able to successfully complete the Project.

302.    The most blatant misrepresentation that WMATA made to Banneker was contained in the Term Sheet contract by which WMATA purported to grant Banneker a period of exclusivity. The Term Sheet contract was approved by the WMATA Board on June 26, 2008, and memorialized by the parties (Banneker and WMATA) on July 17, 2008.  The Term Sheet contract and its period of exclusivity were extended on three separate occasions by WMATA, with the last period of exclusivity expiring on March 31, 2010.  The original agreement and each successive extension thereof by WMATA constituted a separate representation of a period of exclusivity.  Furthermore, every day that the contracted period of exclusivity was in place constituted a continued representation by WMATA to Banneker of the existence of a period of exclusivity.  WMATA never gave Banneker notice to consider it to be otherwise. Notwithstanding, on each day that the contracted exclusivity period was in place, WMATA's representation was false and WMATA either knew or should have known it to be false.

303.    Given the affirmative and egregious misconduct that was already being orchestrated by WMATA's agent (Graham) in violation of his ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules, WMATA either knew or should have

known that this representation of a period of exclusivity was false at the time it was made (and each time that the representation was made through and including March 31, 2010).  However, WMATA intended this representation to deceive Banneker into taking the detrimental actions of expending time, human and monetary resources on the Project—which Banneker did do before and throughout the purported period of exclusivity—through and including March 31, 2010.

304.    At the time of this misrepresentation(s) regarding Banneker having a period of exclusivity (in the Term Sheet contract and the three subsequent extensions thereof), WMATA either knew or should have known that Graham had embarked upon a continuous, aggressive and egregious course of misconduct to prevent Banneker from enjoying the period of exclusivity and to financially benefit LaKritz Adler at Banneker's expense and detriment.

305.    Some of the actions taken by Graham (in violation of his ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules) toward his scheme included, but was not limited to, efforts to:

> 1) interfere with Banneker's period of exclusivity; 2) to prevent Banneker from being able to successfully negotiate a Definitive Agreement with WMATA; 3) execute a bid-suppression scheme to get Banneker out of the WMATA Project in exchange for a pay-off of an unrelated D.C. Lottery contract award to a then Banneker Principal; 4) require Banneker to include Graham's favored development company (LaKritz Adler) as a member of Banneker's development team in order to provide a financial benefit to LaKrtitz Adler at Banneker's expense;  5) require Banneker to purchase property from Graham's favored development company (LaKritz Adler) in order to provide a financial benefit to LaKritz Adler at Banneker's expense; 6) add components to the Project (such as

an affordable housing requirement for which WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA; 7) interference with Banneker Development Team composition (i.e. Donatelli and Metropolis); 8) unilaterally orchestrating the change of WMATA's later preference for a sale of the real property back to a lease after the passage of time negotiating and the expenditure of substantial resources; 8) provide the LaKritz Adler defendants with access to information not available to the public to enahance LaKritz Adler's competitive advantage and reduce or destroy Banneker's competitive advantage; 9) continue to advocate (as a WMATA Board Member, Chair of the PDRE Committee or Chair of the WMATA Board) and demonstrate his preference for LaKritz Adler to either become the Selected Developer or to otherwise gain a financial benefit from the Project with the very same WMATA staff charged with negotiating exclusively with Banneker under the contract; 10) using his jurisdictional vote (either voting "no" or "abstaining") as both his capacity as a PDRE Committee Member and WMATA Board Member to exercise undue influence over the terms and conditions that WMATA staff was authorized to and responsible for negotiating with Banneker; 11) instructing WMATA's then General Counsel (during Banneker's period of exclusivity) to provide a legal roadmap how, when and under what circumstances Graham could request "Best and Final Offers" so that his favored developer (LaKritz Adler) would have another opportunity to financially benefit from the Project—which legal roadmap was provided on November 30, 2009; 12) entering into an agreement, scheme or

plan with LaKritz, Adler and the LaKritz Adler defendants to engage in a continous course of conduct both before and all-during Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense; 13) violating the WMATA Code of Conduct by losing his impartiality with respect to Banneker as a vendor in favor of LaKritz Adler as found by the WMATA Board of Directors following the issuance of the Bondi Report; 14) violating the District's Code of Conduct by failing to act in the public interest as found by the District's Board of Ethics and Government Accountability in its Report issued on February 7, 2013;15) violating the DC Council's Rules as found by the DC Council at the time it publicly reprimanded DC Council Member Graham on February 25, 2013; and, 16) orchestrating and achieving the end goal (which culminated on March 25, 2010) of sowing enough delay, obstacles and interference such to allow Banneker's period of exclusivity expire on March 31, 2010.

306. At or about the time of the making of WMATA's false representations, and as a result of these representations, where WMATA either knew or should have known of the affirmative and egregious misconduct of its agent (Graham), WMATA knowingly obtained and accepted the benefit of services rendered, time and expense incurred, and funds advanced, by Banneker in reasonable reliance upon WMATA's continued representations of purported exclusivity.

307. Banneker incurred time and expense, provided services, and advanced funds in reliance upon those representations.

308. The foregoing representations were false and constituted actionable misrepresentations, and WMATA (through its agent Graham) was acting to further the illegal quid pro quo bid

rigging attempts of WMATA's then-Chairman of the Board of Directors, Graham --- who WMATA knew or should have known was violating in ministerial duties under the WMATA Code of Conduct (as well as the DC Code of Conduct and DC Council Rules) to favor and financially benefit LaKritz Adler at the expense and to the detriment of Banneker—with whom WMATA was under a contract of purported exclusivity.

309.     WMATA did not inform Banneker any time that any of its representations were false, incomplete and/or misleading.

310.     The foregoing misrepresentations and omissions were made intentionally and knowingly. The misrepresentations and omissions made by WMATA were done with knowledge of their falsity.  In the alternative, to the extent that the foregoing misrepresentations and omissions were not intentional, WMATA is subject to liability for constructive fraud and/or negligent misrepresentation in making these misrepresentations and omissions.

311.     The foregoing misrepresentations and omissions were material, since, in reliance on those misrepresentations and omissions, Banneker took actions that it would not otherwise have taken, including but not limited to, incurring time and expense, and advancing funds to and for the benefit of WMATA and the Project.

312.     The foregoing misrepresentations and omissions were intended by WMATA to induce reliance on the part of Banneker, including, among other things, to induce Banneker to take actions that it would not otherwise have taken, to incur time and expense it would not have incurred, to advance and expend funds it would not have advanced and expended, and to provide services that it would not otherwise have provided.

313.     The foregoing misrepresentations and omissions did induce reliance on the part of Banneker.  Therefore, as a direct result of the foregoing misrepresentations and omissions,

Banneker took actions and provided substantial and valuable services that it would not otherwise have provided.

314.    The reliance on the part of Banneker upon the foregoing misrepresentations and omissions was reasonable and/or justifiable under the circumstances given its contract with WMATA (and the successive extensions thereof) binding WMATA to a period of exclusivity. Graham, Adler, LaKritz and LaKritz Adler were able to successfully conceal their illicit agreement and the steps that they were taking in furtherance of the agreement until the issuance of the Bondi Report and the BEGA ruling—especially through the extensive use of Executive Sessions at WMATA PDRE Committee and Board meetings.  As such, Banneker had no way of finding out the wrongful acts that had been taken against it.

315.    Banneker sustained serious damages as a result of its reliance upon the foregoing misrepresentations and omissions, and in an amount to be proven at trial, plus the reasonable attorneys' fees and costs incurred by Banneker in this lawsuit.

WHEREFORE, Banneker respectfully requests that this Court enter judgment in Banneker's favor and against WMATA and to:

a)    Award compensatory damages to Banneker, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00;

b)    Award further relief as justice may require.

### COUNT VIII – CIVIL CONSPIRACY
### (GRAHAM, ADLER, LAKRITZ, LAKRITZ ADLER AND WMATA)

316.    Banneker re-alleges and incorporates ¶¶ 1-315, inclusive, as if set forth fully herein.

317.    Beginning in April 2008 when the WMATA staff recommended that Banneker become the Selected Developer for the Project, Graham conspired with Adler, LaKritz and LaKritz Adler

to either: 1) have Banneker withdraw from being considered by WMATA as the Selected Developer so that LaKrtiz Adler could become the Selected Developer; 2) in the alternative to have Banneker add LaKritz Adler to its team as a co-developer for LaKritz Adler's financial benefit; 3) to have Banneker purchase a piece of property that was adjacent to the Project from LaKritz Adler for the financial benefit of LaKritz Adler; or 4) to allow Banneker's period of exclusivity to expire without Banneker reaching an agreement with WMATA so that LaKritz Adler could make an unsolicited proposal to WMATA for the Project.

318.    This illicit agreement(s) as well as the acts and actions that Graham took in furtherance of this agreement(s) were in violation of Graham's ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules.

319.    This agreement(s) was either unlawful or, if lawful, they was carried out in an unlawful manner (i.e. in violation of Banneker's period of exclusivity under its Term Sheet contract with WMATA and in violation of the ministerial duties under the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules).

320.    From the approval of Banneker as Selected Developer (June 26, 2008) until around Novemeber 2008, Graham conspired with Adler, LaKritz and LaKritz Adler to have WMATA's Board delay Banneker's designation as the Selected Developer while LaKrtiz Adler was attempting to try to sell Banneker its option on an adjacent parcel.

321.    Once negotiations between Banneker and LaKritz Adler ended in October 2008, Graham conspired with Adler and LaKritz to have WMATA's staff cease negotiations of the final joint development agreement and force Banneker to renegotiate another Term Sheet.

322.    Thereafter, in 2009 (still during Banneker's purported period of exclusivity), Graham conspired with Adler, LaKritz and LaKritz Adler to have O'Keefe devise a vehicle by which the project could be re-opened only to LaKritz Adler, another firm and Banneker.

323.    Under circumstances where WMATA either knew or should have known of Graham's intent for further misconduct at Banneker's expense and in violation of WMATA's duty of good faith and fair dealing with Banneker (under its Term Sheet contract with Banneker), O'Keefe did in fact advise Graham and the other Board members (by memorandum dated November 30, 2009, that the bid for the Florida Avenue site could be re-opened once the negotiation period between WMATA and Banneker expired.

324.    In March 2010, Graham, acting on Adler, LaKritz and LaKritz Adler's behalf, devised a plan with the acquiescence of other members of WMATA's Board, in which approval of a revised term sheet or joint development agreement between Banneker and WMATA was indefinitely tabled by WMATA's Board.

325.    The WMATA board either knew or should have known of Graham's scheme or, being previously advised of Graham's intent and desire to facilitate the rebidding of the Project so as to allow his campaign contributor and preferred developer a then-sixth opportunity to gain a financial interest from the WMATA Project[60], was complicit in the conspiracy by agreeing in closed session to table the Banneker agreement for the purpose of allowing Banneker's exclusive

---

[60] The first opportunity was when LaKritz Adler responded to WMATA's Joint Development Solicitation in October 2007.  The second opportunity occurred in April or May 2008 when Graham directed Banneker to add LaKritz as its development partner.  The third opportunity occurred in May 2008 when Graham tried to barter the D.C. lottery contract for Banneker's withdrawal from the WMATA project.  The fourth opportunity occurred when Graham and LaKritz, Adler and LaKritz Adler tried to pressure Banneker to purchase LaKritz Adler's option in an adjacent parcel.  The fifth opportunity occurred (during Banneker's period of exclusivity) when Graham (while serving as Chairman of WMATA's Board) pressured WMATA's staff to go and get Best and Final Offers from the last three bidders (including LaKritz Adler who had more than a year earlier had been eliminated from consideration by WMATA's staff).  Upon information and belief, the sixth consideration occurred when the Board allowed Banneker's negotiation period to expire allowing LaKritz Adler to then submit an unsolicited proposal to WMATA for the Site in August 2010. The seventh occurred occurred in the fall of 2010 when WMATA re-issued the joint development solicitation for the Site.  When Graham was exiting the Board as a Principal Director, the eighth consideration occurred when WMATA issued the solicitation again in 2011.

right to "time out". WMATA also knew (or should have known) based on Graham's pressures to the WMATA staff in January 2009 to find a way to include LaKritz Adler in the Project that Graham had ulterior motives against Banneker and in favor of LaKritz Adler (in violation of the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules).

326.     Banneker sustained serious damages as a result of the civil conspiracy committed by Graham, Adler, LaKritz, LaKritz Adler and WMATA where, on March 25, 2010, WMATA tabled its consideration of WMATA staff's recommendation to approve the transaction with Banneker --- thereby allowing Banneker's period of exclusivity to expire and knowing opening the door for LaKritz Adler (pursuant to and in fulfillment of the illicit agreement) to submit an unsolicited proposal for the Project --- all as foreshadowed by the November 30, 2009, memo to Graham and the WMATA Board.

327.     As a member of WMATA's Board of Director's for over 10 years at the time the period of exclusivity expired on March 31, 2010, having served at least two stints as Chairman of WMATA's Board and having recently completed a stint as Chairman of WMATA's Planning, Development and Real Estate (PDRE) Committee (the relevant committee with jurisdiction over the Project), Graham had full knowledge of the illicit agreement as well as the affirmative and egregious misconduct in which he engaged both before and all-during Banneker's period of exclusivity with WMATA.  Graham's ministerial acts and actions in furtherance of that illicit agreement were in violation of the WMATA Code of Conduct, the DC Code of Conduct and DC Council Rules.

328.     While Graham had a clear and unmistakable motivation and desire to injure Banneker and favor the financial interests of LaKritz Adler, Graham was, at the same time, also motivated, at least in part, by his desire to serve WMATA's interests, among other reasons, because Graham

expected LaKritz Adler to become the Selected Developer and bring the Project to fruition for WMATA's benefit.  Graham was acting within the course and scope of his employment while he was performing his ministerial duties in violation of the WMATA Code of Conduct, DC Code of Conduct and DC Council Rules.  As such, WMATA is vicariously liable for the wrongful acts and actions of Graham which caused injuries and damages to Banneker and should be estopped to assert otherwise.

329.   These actions by Graham, Adler, LaKritz and LaKritz Adler were not in good faith and not customary tactics by competitors because Graham, Adler, LaKritz and LaKritz Adler all knew that:  1) WMATA staff had reviewed the competitive proposals for the Project and recommended that Banneker become the Selected Developer (April 2008); 2) the WMATA Board voted to accept the recommendation that Banneker be the Selected Developer for the Project (June 26, 2008); 3) WMATA and Banneker memorialized the selection and the binding nature of the period of exclusivity by signing the Term Sheet contract (July 17, 2008): 4) WMATA on three separate and highly public occasions extended Banneker's period of exclusivity with the last one expiring on March 31, 2010.

330.   Graham, Adler, LaKritz and LaKritz Adler were able to successfully conceal their illicit agreement and the steps that they were taking in furtherance of the agreement until the issuance of the Bondi Report and the BEGA ruling.

WHEREFORE, Banneker respectfully requests that this Court enter judgment in Banneker's favor and jointly and severally against Graham, LaKritz, Adler, LaKritz Adler and WMATA and to:

a)      Award compensatory damages to Banneker, in an amount to be proven at trial, but believed to be in excess of $100,000,000.00;

b)      Award further legal and proper relief as justice may require.

## VI.      RELIEF REQUESTED

Wherefore, Plaintiff hereby sues Defendants JIM GRAHAM, JOSHUA A. ADLER, ROBB M. LAKRITZ, LAKRITZ ADLER DEVELOPMENT, WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, jointly and severally, in the full amount of One Hundred Million Dollars ($100,000,000.00), plus pre-judgment interest and costs, attorney fees and all other legal and proper relief which Plaintiff may be entitled.

## VII.      JURY DEMAND

Plaintiff respectfully demands a jury trial in the aforementioned matter.

Respectfully submitted,


_____
Brian K. McDaniel, Esq.
D.C. Bar # 452807
McDaniel & Associates, P.A.
1025 First Street, S.E., Suite 1413
Washington, DC 20003
Telephone:  (202) 331-0793
Counsel for the Plaintiff

And

Jerry L. Malone, Esq.
D.C. Bar # 482031
5 Choke Cherry Road
Suite 378
Rockville, MD  20850
Telephone:  202-320-0258
Email:   Jerry@JLMaloneLaw.com
Counsel for Plaintiff

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing First Amended Complaint was electronically transmitted on this 27th day of June, 2013 to the following:

Mr. Bruce P. Heppen, Esq.
Deputy General Counsel
Washington Metropolitan Area
   Transit Authority
600 5th Street, NW
Washington, DC  20001
Email:  bheppen@wmata.com

Mr. Josh Montague, Esq.
Assistant General Counsel
Washington Metropolitan Area
   Transit Authority
600 5th Street, NW
Washington, DC  20001
Email:  jwmontague@wmata.com

Mr. Douglas M. Bregman, Esq.
Bregman, Berbert, Schwartz & Gilday, LLC
7315 Wisconsin Avenue
Suite 800 West
Bethesda, MD  20814
Email:  dbregman@bregmanlaw.com

Mr. Geoffrey T. Hervey, Esq.
Bregman, Berbert, Schwartz & Gilday, LLC
7315 Wisconsin Avenue
Suite 800 West
Bethesda, MD  20814
Email:  ghervey@bregmanlaw.com

Counsel for Defendant WMATA

Mr. John R. Hoellen, Esq.
Council of the District of Columbia
Office of the General Counsel
1350 Pennsylvania Avenue, NW, Suite #4
Washington, DC  20004
Email:  jhoellen@dccouncil.us

Counsel for Defendant Jim Graham

Mr. Abbe David Lowell, Esq.
Chadbourne & Parke LLP
1200 New Hampshire Avenue, NW, Suite 300
Washington, DC  20036
Email:  adlowell@chadbourne.com
Mr. Brian L. Schwalb, Esq.
Venable LLP
575 7th Street, NW
Washington, DC  20004
Email:  blschwalb@venable.com

Mr. Brian L. Schwalb, Esq.
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300
Email: blschwalb@venable.com

Mr. Seth A. Rosenthal, Esq.
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300
Email: sarosenthal@venable.com

Hon. Moxila A. Upadhyaya, Esq.
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004-1601
Telephone: (202) 344-4000
Facsimile: (202) 344-8300
Email: maupadhyaya@venable.com

Counsel for Defendants Adler, LaKrtiz and
    LaKritz Adler