# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

BANNEKER VENTURES, LLC,       )
                                                     )
      **Plaintiff,**                )
                                                     )
      **v.**                         )      **Civil Action No. 13-391 (RMC)**
                                                       )
**JIM GRAHAM, _et al._,**             )
                                                       )
      **Defendants.**            )
_____ )

## OPINION

      Banneker Ventures, LLC, is a developer who, despite an exclusive right to negotiate, failed to reach a final agreement with Washington Metropolitan Area Transit Authority for the lease and development of certain real property. Banneker sues alleging, _inter alia_, breach of contract and fraud. Washington Metropolitan Area Transit Authority moves to dismiss for lack of jurisdiction over the tort and quasi-contract claims due to its sovereign immunity and for failure to state a breach of contract claim. The motion will be granted.

## I. FACTS

      The Amended Complaint sets forth more than fifty pages of alleged facts, summarized here. Washington Metropolitan Area Transit Authority (WMATA) sought to improve certain real property located above the Shaw-Howard/Florida Avenue Metrorail Station (the Site), consisting of three lots located in the 700 and 800 blocks of Florida Avenue, NW, in Washington, D.C. Am. Compl. [Dkt. 18] ¶¶ 1, 22. In the spring of 2007, WMATA issued a Request for Expressions of Interest for development of the Site. _Id._ ¶ 22.

      Banneker Ventures, LLC, (Banneker) is a firm that specializes in construction and property development. Banneker and eleven other developers submitted responses to the

Request for Expressions of Interest. *Id.* ¶ 23. In August 2007, WMATA issued a Joint

Development Solicitation to six of the developers, including Banneker and LaKritz Adler

Development, LLC (LaKritz Adler), requesting that they submit more detailed proposals. The

Joint Development Solicitation provided that a developer would be selected, a term sheet would

be negotiated, and a Joint Development Agreement would be negotiated and completed within

150 days after the WMATA Board's approval of the selected developer and the term sheet. *Id.*

¶ 28.

Banneker proposed a project that would be known as "The Jazz at Florida

Avenue" (Project), *id.* ¶ 50, and Banneker and WMATA staff negotiated a draft term sheet for

presentation to the WMATA Board. *Id.* ¶ 59. On June 26, 2008, the WMATA Board chose

Banneker as the "Selected Developer" for the Project. *Id.* ¶¶ 2, 92, 115. The Board

simultaneously directed its staff to negotiate an affordable housing set aside as part of the

Project. *Id.* ¶ 89.

On July 17, 2008, WMATA and Banneker signed a Term Sheet, which provided

that Banneker had the exclusive right, for a limited period of time, to negotiate a Joint

Development Agreement with WMATA for development of the Site. *Id.* ¶¶ 2, 18, 116; *see*

WMATA Mot. [Dkt. 22], Ex. 3 [Dkt. 22-5] (Term Sheet). The Term Sheet provided: "This

Term Sheet will have no binding effect on the parties except that [Banneker] shall have the

exclusive right to negotiate a Definitive Agreement with WMATA for a period of five (5)

months from the date of this Term Sheet." Term Sheet at 11. Through March 2010, Banneker

and WMATA staff continued to negotiate and revise the Term Sheet, but the WMATA Board

did not approve a revised Term Sheet and the parties never agreed on a final Joint Development

Agreement. Am. Compl. ¶¶ 3, 154–176. Despite three extensions of time, Banneker's exclusive right to negotiate expired on March 31, 2010. *Id*. ¶¶ 12, 18, 176.

Banneker alleges that Jim Graham, a District of Columbia Council member and then a voting member of the WMATA Board of Directors, engaged in "bid suppression and bid rigging," *i.e*., he objected to the decision to choose Banneker as the Selected Developer and interfered with Banneker's attempts to finalize the Term Sheet and a Joint Development Agreement. *Id*. ¶¶ 4–11, 127. Mr. Graham's alleged goal was to designated LaKritz Adler as the Selected Developer for the Project. *Id*. ¶ 7. LaKritz Adler was a major contributor to Mr. Graham's campaign and constituent services fund. *Id*. ¶¶ 5, 26.

Specifically, Banneker alleges that Mr. Graham interfered with Banneker's exclusive right to negotiate a Joint Development Agreement by offering his vote as a member of the D.C. Council to approve a D.C. lottery contract that would benefit one of Banneker's then principals, Warren Williams, in exchange for Banneker's withdrawal as the Selected Developer for the Project. *Id*. ¶¶ 7, 98, 109. Mr. Williams refused. *Id*. ¶ 8. Mr. Graham also allegedly interfered by falsely reporting to the WMATA Board that Banneker did not have the capability to develop the Site, *id*. ¶ 65, and questioning whether the deal was financially viable, *id*. ¶¶ 93, 137. In addition, it was Mr. Graham who allegedly convinced the WMATA Board to add affordable housing requirements to the Project, decreasing the value of the Project to the detriment of Banneker. *Id*. ¶ 10, 89, 111. Further, Mr. Graham allegedly pressured Banneker to include LaKritz Adler on the Project as a co-developer, *id*. ¶¶ 11, 70–71, 111, and to purchase a high-priced option on adjacent property from LaKritz Adler, *id*. ¶¶ 119, 127. Also, Mr. Graham allegedly pressured Banneker to help fund a U Street Business Improvement District. *Id*. ¶¶ 111, 121.

Mr. Graham's actions to frustrate Banneker's efforts and to advance LaKritz

Adler's financial interests were found to have violated the WMATA Standards of Conduct[1] and

the D.C. Code of Conduct. *Id*. ¶¶ 6, 18, 131. In February 2012, the WMATA Board launched an

independent investigation into allegations that Mr. Graham had offered to support Mr. Williams'

bid for the D.C. lottery contract in exchange for Banneker's withdrawal from the Project. *Id*.

¶¶ 181-82. Bradley Bondi, a partner in the law firm of Cadwalader, Wickersham & Taft LLP,

led the investigation. In October 2012, Mr. Bondi issued a Report of Investigation for the Board

of Directors for WMATA, *i.e.*, the "Cadwalader Report." *See* WMATA Mot., Ex. 1 [Dkt. 22-3]

(Cadwalader Report). The Cadwalader Report described why Banneker and WMATA were

unable to negotiate a final contract:

> Metro and Banneker Ventures confronted numerous obstacles to
> finalizing a term sheet, including Banneker's lack of development
> experience, the absence of a clear Metro policy on key aspects of
> the term sheet, concerns and inquiries raised by Metro Board
> Members, and the financial and economic crisis that impacted the
> real estate market. The inability of Banneker and Metro to
> anticipate and solve these problems caused numerous delays that
> ultimately prevented the parties from presenting a final term sheet
> to the Metro Board before Banneker Ventures's exclusive
> negotiation period expired.

Cadwalader Report at 21–22. The Cadwalader Report also explained that after Banneker was

told to include affordable housing in the Project, Banneker reduced its bid from $14 million to

$5.8 million, below the bids of other proposed developers and below the Site's $7.5 million

appraised value. *Id*. at 23. In May 2009, the Site was reappraised at a lower value, which caused

Banneker to reduce its bid even further. *Id*. Banneker was unable to retain an experienced

development partner, as required by WMATA from the outset, and was unable to make a

---

[1] The Amended Complaint mistakenly refers to the WMATA "Code of Conduct." Banneker
corrected its error in its response to WMATA's motion. *See* Opp'n [Dkt. 24] at 4.

financial offer acceptable to the WMATA Board. *Id.* at 51-52. Mr. Bondi concluded that "[i]n the two years that Banneker Ventures spent negotiating with Metro, Banneker Ventures did not adequately address the concerns raised by the Metro Board and did not solve various other problems that it faced." *Id.* at 50.

Despite finding business reasons for the failure of Banneker and WMATA to reach a final contract, the Cadwalader Report also determined that Mr. Graham violated Article III § A of the WMATA Standards of Conduct, which provides:

> Public funds must be expended in a manner which assures the highest degree of confidence and public trust in WMATA. It is imperative that Board Members in their private financial relationships and in their official conduct strictly avoid engaging in actions which create conflicts of interest or the appearance of a conflict of interest. It is likewise imperative that Board Members act impartially in their official conduct by avoiding any actions which might result in favored treatment or appearances thereof toward any individual, private organization, consultant, contractor or potential consultant or contractor. Each Board Member while acting in his/her capacity as a WMATA Board Member, has a duty to place the public interest foremost in any dealings involving WMATA.

*Id.* at 53. Mr. Graham violated Article III § A in two ways: by telling Mr. Williams that he would support his bid for the lottery contract if Banneker withdrew as Selected Developer for the Project, Mr. Graham "pitted the interests" of the D.C. Council against the interests of WMATA, thereby creating a conflict of interest, or at least the appearance of one; and by supporting LaKritz Adler's inclusion in the Project and opposing Banneker's participation in the Project, Mr. Graham breached his duty to remain impartial. *Id.*; *see also* Am. Compl. ¶ 190.

WMATA did not sell or lease the Site to LaKritz Adler. In July 2011, WMATA sold the Site to JBG Construction for $10.2 million. Cadwalader Report at 28. As of October 2012, the Site remained undeveloped and JBG Construction was awaiting the requisite approval from the D.C. Historic Preservation Review Board. Cadwalader Report at 28 n.103.

After the Cadwalader Report was issued, the D.C. Board of Ethics and Government Accountability initiated an investigation and issued an Ethics Report. The Ethics Report allegedly found that Mr. Graham violated the D.C. Code of Conduct by inappropriately favoring his campaign contributor, LaKritz Adler, over Banneker in the negotiation for development of the Site. Am. Compl. ¶ 195. On February 25, 2013, the D.C. Council adopted a resolution reprimanding Mr. Graham for improperly offering to support Mr. Williams' bid for the D.C. lottery contract in exchange for Banneker's withdrawal from the Project. *Id.* ¶¶ 197–202.

As a result, Banneker filed suit against WMATA, Mr. Graham, Mr. LaKritz, Mr. Adler, and LaKritz Adler. The Amended Complaint alleges eight counts:

> Count I–Breach of Contract (against WMATA);
>
> Count II–Breach of Covenant of Fair Dealing (against WMATA);
>
> Count III–Tortious Interference with a Prospective Economic Advantage (against Messrs. Graham, LaKritz, Adler, and LaKritz Adler);
>
> Count IV–Tortious Interference with a Contract (against Messrs. Graham, LaKritz, Adler, and LaKritz Adler);
>
> Count V–Unjust Enrichment (against WMATA);
>
> Count VI–Unlawful Restraint of Trade (against Messrs. Graham, LaKritz, and Adler);
>
> Count VII–Fraud, Constructive Fraud, and Negligent Misrepresentation (against WMATA); and
>
> Count VIII–Civil Conspiracy (against all Defendants).

*Id.* ¶¶ 203-330.

WMATA moves to dismiss the tort and quasi-contract claims against it (Counts V, VII, and VIII), arguing that sovereign immunity bars such claims and, thus, the Court lacks

jurisdiction over them.  *See* WMATA Mot.; WMATA Reply [Dkt. 32].  WMATA also moves to dismiss the contract claims against it (Counts I and II) for failure to state a claim.  *Id*. Banneker opposes.  *See* Opp'n [Dkt. 24].

## II.  JURISDICTION AND LEGAL STANDARDS

### A.  Jurisdiction

The Court has jurisdiction in this case under the Washington Metropolitan Area Transit Regulation Compact.  *See* D.C. Code § 9-1107.01 (formerly D.C. Code § 1-2431) (adopting and amending the Compact).  The Compact provides that "[t]he United States District Courts shall have original jurisdiction, concurrent with the courts of Maryland, Virginia, and the District of Columbia, of all actions brought by or against [WMATA] . . . ."  *Id*., Compact, Title III, Art. XVI (General Provisions) § 81 (Jurisdiction of Courts).  Because WMATA is a defendant here, this Court has original jurisdiction.

### B.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

WMATA contends its sovereign immunity from Counts V, VII, and VIII requires that these Counts be dismissed for lack of subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged.  *Barr v. Clinton*, 370 F. 3d 1196, 1199 (D.C. Cir. 2004).  Nevertheless, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions."  *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).

A court is not limited to the pleadings when deciding whether it has jurisdiction over a claim.  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).  No action of the parties can confer subject matter jurisdiction on a federal court because subject matter

jurisdiction is an Article III and a statutory requirement. *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003). The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (internal citations omitted).

### C. Motion to Dismiss for Failure to State a Claim

WMATA also argues that the contract claims against it (Counts I and II) should be dismissed for failure to state a claim. A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the adequacy of a complaint on its face, testing whether a plaintiff has properly stated a claim. A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The facts alleged "must be enough to raise a right to relief above the speculative level." *Id.* "[A] complaint needs *some* information about the circumstances giving rise to the claims." *Aktieselskabet Af 21. Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 16 n.4 (D.C. Cir. 2008). A complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. But a court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 556 U.S. at 678.

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (internal quotation marks and citation omitted). Generally, when a court relies upon matters outside the pleadings, a motion to dismiss must be treated as one for summary judgment and disposed of pursuant to Rule 56. *See* Fed. R. Civ. P. 12(d). "However, where a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99 (D.D.C. 2008) (citation omitted). The Amended Complaint refers to the Term Sheet and the Cadwalader Report as central to Banneker's claim, and the Court considers these documents, filed by WMATA, in reviewing WMATA's motion to dismiss. *See* Cadwalader Report [Dkt.22-3] & Term Sheet [Dkt. 22-5].

### III. ANALYSIS

#### A. Sovereign Immunity for Tort Claims

WMATA is a quasi-governmental agency created by an Interstate Compact, enacted by Congress and adopted by the District of Columbia, the State of Maryland, and the Commonwealth of Virginia. *See Martin v. WMATA*, 667 F.2d 435 (4th Cir. 1981). State agencies, like the States, are covered by sovereign immunity, and by signing the Compact, the

District of Columbia, Maryland, and Virginia extended sovereign immunity to WMATA. *Beatty*

*v. WMATA*, 860 F.2d 1117, 1126 (D.C. Cir. 1988).

Under Section 80 of the Compact, WMATA is immune from liability for torts

committed by its agents in performing governmental functions and WMATA waives its

immunity from liability for tort claims where the claims arise out of WMATA's proprietary,

non-governmental functions. Section 80 provides:

> [WMATA] shall be liable for its contracts and for its torts and
> those of its directors, officers, employees, and agents committed in
> the conduct of any proprietary function, in accordance with the
> applicable [Compact] signatory (including rules of conflict of
> laws), but shall not be liable for any torts occurring in the
> performance of a governmental function.

D.C. Code § 9-1107.01, Compact, Title III, Art. XVI (General Provisions) § 80 (Liability for

Contract and Torts). Unless the waiver of sovereign immunity applies, a district court lacks

jurisdiction to enter a judgment against WMATA. *Watters v. WMATA*, 295 F.3d 36, 39-40 (D.C.

Cir. 2002).

To determine whether WMATA is qualified for immunity from a particular claim,

a court engages in a two-step process. First, it determines whether the challenged actions were

taken in pursuit of a "quintessential" governmental function; if so, the activities fall within the

scope of WMATA's immunity. *James v. WMATA*, 649 F. Supp. 2d 424, 430 (D. Md. 2009).

That is, even if WMATA performed a quintessential government function negligently, it is

immune from tort liability. *Id.* An example of a quintessential government function is law

enforcement. *Burkhart v. WMATA*, 112, F.3d 1207, 1216 (D.C. Cir. 1997).

If a "quintessential governmental function" is not involved, a court proceeds to

the second step of the inquiry and determines whether the challenged activity was "discretionary

or ministerial," *i.e.*, non-discretionary. *James*, 649 F. Supp. 2d at 430. "[A] duty is discretionary

if it involves judgment, planning, or policy decisions. It is not discretionary if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required." *Beatty*, 860 F.2d at 1127. In other words, if a statute, regulation, or policy specifically prescribes a required course of action, then the action is ministerial. *KiSKA Constr. Corp. v. WMATA*, 321 F.3d 1151, 1159 (D.C. Cir. 2003). Sovereign immunity does *not* bar suits based on WMATA's alleged failure to follow a prescribed course of conduct. *Id*. Sovereign immunity does bar suits based on WMATA's discretionary activities so long as its actions were "grounded in social, economic, or political goals." *Id*. The D.C. Circuit has explained that Congress intended to insulate policy decisions from liability in order to permit governmental entities to govern freely:

> By insulating from liability decisions involving the balancing of social, political, and economic factors . . . Congress presumably *did* intend to allow government to create immunity by carefully considering a question in policy terms. It is true . . . that such immunity could have substantial and even on occasion undesirable impact if those policies are ill-considered. But the hard fact remains that insulating policy determinations, good and bad, is the *raison d'etre* of the discretionary function exception.

*Souders v. WMATA*, 48 F.3d 546, 549 (D.C. Cir. 1995) (internal quotations omitted).

Here, WMATA concedes that the activities at issue in this litigation were not part of any quintessential government function. *See* WMATA Mot. at 11. Thus, the Court must determine (1) if WMATA's actions were ministerial or discretionary and (2) if they were discretionary, whether they were grounded in social, economic, or political goals. As explained below, the Court finds that Banneker's tort claims against WMATA for fraud, constructive fraud, and negligent misrepresentation (Count VII) and civil conspiracy based on the underlying fraud (Count VIII) are barred by sovereign immunity because WMATA's decisions regarding the conveyance and development of real estate were discretionary.

WMATA has discretion in deciding how to dispose of its real property, as exemplified by three recent cases. For example, in *KiSKA*, a contractor on a subway construction project brought suit against WMATA. WMATA had issued an invitation for bid on tunnel construction for expansion of the Green Line, but the invitation did not include information regarding engineering obstacles that might occur on the project. 321 F.3d at 1155. The contractor responded to the invitation for bid and received the contract; it then encountered engineering problems that caused costs to double. As a result, the contractor sued WMATA for fraud. The D.C. Circuit affirmed the district court's dismissal of the fraud claim on sovereign immunity grounds. The contractor pointed to no statute, regulation, or policy that specifically dictated the content of WMATA's invitations for bid and instead argued that (1) WMATA had a non-discretionary duty of good faith to disclose relevant facts and (2) a Federal Transit Administration (FTA) circular required that all contract solicitations must include "a clear and accurate description of the technical requirements for the material, product, or service to be procured." *Id*. at 1160. The court held that the duty of good faith and fair dealing is not a specific dictate rendering WMATA's activity non-discretionary. Similarly, the FTA circular was too general to mandate any particular course of conduct. *Id*. The D.C. Circuit affirmed the finding that sovereign immunity applied because WMATA's discretionary decision regarding the content of the invitation for bid was based on a policy judgment relating to budget constraints and economic expediency. *Id*. at 1161-62.

In another real property case, *Monument Realty LLC v. WMATA*, 535 F. Supp. 2d 60 (D.D.C. 2008), WMATA selected Monument as the "master developer" for a project known as the Navy Yard/Southeast Bus Garage and granted Monument the exclusive right to negotiate a final development agreement. 535 F. Supp. 2d at 65. The project was organized in phases,

whereby Monument purchased the Navy Yard Metro Station and developed that property, and later bid on the purchase of the Bus Garage. WMATA failed to inform Monument that the District of Columbia retained a right of first refusal on all WMATA property sales in the District, and, when the District exercised its right of first refusal to purchase the Bus Garage, WMATA had to reject Monument's bid. *Id*.[2]

Monument sued, alleging that WMATA committed fraud and breached its fiduciary duty by failing to inform Monument that it did not, in fact, have an exclusive right to purchase the Bus Garage since the District of Columbia held a right of first refusal. *Monument*, 535 F. Supp. 2d at 78. However, Monument failed to point to any statute or provision of the Compact that prescribed a course of action for WMATA while engaging in negotiations for the sale of real estate. *Id*. The district court found that sovereign immunity barred Monument's tort claims because WMATA's discretion in deciding how to dispose of its property was grounded in policy considerations regarding cost, expediency, and the interests of residents and businesses in the area. *Id*. at 79.

In *Greenbelt Ventures, LLC v. WMATA*, 481 F. App'x 833 (4th Cir. 2012), the Fourth Circuit also considered the question of WMATA's sovereign immunity from tort claims. There, WMATA entered into a contract with Metroland Developers LLC to develop land owned by WMATA near a metro station in Prince George's County, Maryland. The contract provided that Metroland could not assign its rights under the contract without prior written approval by the WMATA Board. Metroland sought approval for assignment to Greenbelt Ventures LLC. Despite oral approval by WMATA staff, the WMATA Board never approved the assignment.

---

[2] The District, however, ultimately decided not to purchase the Bus Garage, and WMATA issued another invitation for bid for the Bus Garage. The winning bidder was a different contractor, John Akridge Company. *See Monument Realty LLC v. WMATA*, No. 07-cv-1821-EGS (D.D.C. Feb. 28, 2008) (Op. at Dkt. 75) at 8.

Metroland and Greenbelt Ventures sued for fraud and tortious interference based on WMATA's alleged unreasonable withholding of consent to the assignment. The Fourth Circuit held that the contract was not the equivalent of a regulation and it did not compel WMATA to take any particular action. 481 F. App'x at 839-40. Further, the Fourth Circuit agreed with the district court that WMATA exercised discretion in withholding consent and the exercise of such discretion was protected by sovereign immunity because it involved social and economic considerations. *Id*. at 840. Because the project involved the interests of "many stakeholders and governments, representing millions of dollars and tens of thousands of people with a stake in transit oriented development," WMATA was required to "weigh all of these social and economic considerations in the selection of the developer who will be responsible for completing the [p]roject." *Id*. (citation and internal quotations omitted).

The question in the present case is whether WMATA's decisions not to extend Banneker's exclusive negotiating period a fourth time and not to enter a Joint Development Agreement with Banneker were discretionary or ministerial. These activities were discretionary. Banneker points to no statute, regulation, or policy specifying WMATA's actions in negotiating a real estate development contract. Instead, Banneker contends that the WMATA Standards of Conduct specifically prescribe a course of action, *i.e.*, that these Standards render non-discretionary WMATA's activities vis-à-vis Banneker and the failed real estate transaction. *Id*. at 4.[3] Banneker does not cite to any particular section of the Standards of Conduct, but asserts that the Standards required WMATA Board Members to "either do or not do certain designated things" including the following:

---

[3] While the Amended Complaint also alleges that Mr. Graham violated the D.C. Code of Conduct and the D.C. Rules of Council, *see* Am. Compl. ¶¶ 6, 18, 131, in response to WMATA's motion to dismiss, Banneker limits its argument to the WMATA Standards of Conduct, *see* Opp'n at 3-7.

> 1) avoid engaging in actions which create a conflict of interest or the appearance of a conflict of interest; 2) to act in an impartial manner in their official conduct by avoiding any actions which might result in favored treatment or appearances thereof toward any individual, private organization, . . . contractor; 3) not to use or permit others to use information not generally available to the public to further the direct or indirect financial interests of any party to any actual or prospective financial transaction with WMATA; and 4) not disclose or permit others to disclose to anyone outside WMATA information obtained through their official position with WMATA that's [sic] not generally available to the public.

Opp'n at 4-5.[4]  Banneker argues that WMATA had no discretion because the WMATA

Standards "are flat-out prescriptions, leaving no room for Board members to exercise discretion

(i.e. weighing economic considerations) in deciding whether to engage in some conflicting

actions not others."  *Id*. at 5.  Bannker asserts that WMATA had:

> no discretion whether to act in a partial manner or show favoritism (i.e. weighing political considerations) for a favored vendor in some instances but not in others [sic] vendors whom the Board member does not favor; no room to exercise discretion that some situations may call for the sharing of non-public information to further the financial interests of a vendor in some circumstances but not share it with other vendors; and, no room for the exercise of discretion (i.e. weighing social consideration) for deciding to disclose non-public information to persons outside of WMATA in certain circumstances but not others.

*Id*.

This argument incorrectly frames the issue.  The issue is not whether WMATA

had discretion to act impartially or to disclose non-public information, the issue is whether

WMATA had discretion to decide whether or not to extend Banneker's exclusive right to

---

[4] Banneker's first and second points appear to quote Article III § A of the Standards of Conduct. *See* Cadwalader Report at 53 (quoting Standards of Conduct Art. III § A).  The basis for the third and fourth points is unknown.  The WMATA Standards of Conduct have not been filed as part of the record in this case.  Further, Banneker does not allege facts that support its claim that WMATA or Mr. Graham shared non-public information.

negotiate and whether or not WMATA had discretion to decide if the proposed terms were acceptable. Like the federal circular and the duty of good faith cited in *KiSKA*, *see* 321 F.3d at 1160, the Standards of Conduct do not dictate a course of action with regard to a real property transaction. In fact, the Standards of Conduct prescribe ethical conduct and do not prescribe any particular course of action. Decisions such as how long to negotiate a final contract and the terms to include are discretionary.

Further, WMATA's non-ministerial decisions regarding the negotiations with Banneker were based on economic, political, and social considerations. Courts have determined in similar cases that WMATA has discretion in deciding how to dispose of its real property and that the exercise of such discretion requires that WMATA "weigh issues of cost and expediency to determine which alternative would provide WMATA with the best net return." *Monument*, 535 F. Supp. 2d at 79. In *Greenbelt Ventures*, WMATA's decision to withhold consent to assignment of the development contract involved the interests of "many stakeholders and governments, representing millions of dollars and tens of thousands of people with a stake in transit oriented development," requiring WMATA to "weigh all of these social and economic considerations in the selection of the developer who will be responsible for completing the [p]roject." 481 F. App'x at 840 (citation and internal quotations omitted). In the present case, WMATA faced the same considerations. WMATA asserts:

> In the case at bar, the interests of many stakeholders and governments, representing tens of thousands of people with a stake in transit[-]oriented development, will be affected by the decisions regarding the disposition of the Site. The decision regarding how long to give a developer to negotiate a contract and what its terms should be are exactly the type of discretionary judgment, involving social, political and economic factors that immunity is intended to protect.

WMATA Mot. at 15.  Banneker does not contest that WMATA weighed social, economic, and/or political factors in making decisions regarding the Project.  Banneker argues only that WMATA's activities were not discretionary because they were governed by the Standards of Conduct.  An argument without response is treated as conceded.  *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004).

Because WMATA's discretionary actions here are entitled to sovereign immunity, Banneker's tort claims based on these actions are barred.  Thus, Count VII (alleging fraud, constructive fraud, and negligent misrepresentation) and Count VIII (alleging civil conspiracy based on fraud) will be dismissed due to lack of jurisdiction.

**B.  Sovereign Immunity for Unjust Enrichment Claim**

Sovereign immunity also applies to Count V of the Amended Complaint— Banneker's claim of unjust enrichment against WMATA.  Count V alleges that WMATA breached its promise to exclusively negotiate with Banneker and Banneker reasonably relied on this promise to its detriment.

A waiver of sovereign immunity must be clear and unequivocal, and it must be strictly construed in favor of the government.  *United States v. Nordic Village Inc*., 503 U.S. 30, 33-34 (1992); *Kingston Constructors, Inc. v. WMATA*, 860 F. Supp. 886, 888-89 (1994).  Section 80 of the Compact waives sovereign immunity for tort and contract claims where the claims arise out of WMATA's proprietary, non-governmental function, *see* D.C. Code § 9-1107.01, Compact, Title III, Art. XVI § 80, but it does not mention claims of promissory estoppel.  Thus,

WMATA has not clearly waived its sovereign immunity from liability for promissory estoppel claims. *Martin v. WMATA*, 273 F. Supp. 2d 114, 119 (D.D.C. 2003); *accord Fulcrum Int'l, Inc. v. Prince George Center I, Inc.*, 503 F. App'x 193, 195 (4th Cir. 2012) (the Compact does not waive immunity regarding claim of estoppel based on detrimental reliance). Banneker argues that it should be permitted to maintain an estoppel claim because WMATA is guilty of affirmative and egregious conduct. The Court rejects this argument, as Banneker cites no authority to support it and the sound reasoning of *Martin* and *Fulcrum* is to the contrary.

Since sovereign immunity has not been waived for promissory estoppel claims, the Court lacks jurisdiction to enter a judgment against WMATA on Count V. *See Watters*, 295 F.3d at 39-40. Count V, alleging unjust enrichment against WMATA, will be dismissed for lack of jurisdiction.

### C. Failure to State a Claim for Breach of Contract

WMATA also moves to dismiss Banneker's claims for breach of contract and breach of duty of good faith and fair dealing. The Term Sheet, executed on July 17, 2008, provided that Banneker had the exclusive right to negotiate a final Joint Development Agreement, referred to as a "Definitive Agreement," with WMATA "for a period of five (5) months from the date of this Term Sheet." Term Sheet at 11. Banneker and WMATA staff continued to negotiate and revise the Term Sheet through March 2010, but the WMATA Board did not approve a revised Term Sheet and the parties never agreed on a final Joint Development Agreement. Am. Compl. ¶¶ 3, 154-176. Despite three extensions of time, the Banneker's exclusive right to negotiate expired on March 31, 2010. *Id.* ¶¶ 12, 18, 176.

Banneker asserts two bases for its breach of contract and breach of duty of good faith and fair dealing claims: (1) WMATA breached Banneker's exclusivity period; and (2) the

July 2008 Term Sheet itself constituted a final contract for the lease and development of the Site, and that WMATA breached this final contract.  Am. Compl. ¶¶ 210-229.  In support of its claims of breach, Banneker sets forth a list of sixteen actions taken by Mr. Graham:

> 1) interfer[ing] with Banneker's period of exclusivity;
>
> 2) . . . prevent[ing] Banneker from being able to successfully negotiate a Definitive Agreement with WMATA;
>
> 3) execut[ing] a bid-suppression scheme to get Banneker out of the WMATA Project in exchange for a pay-off of an unrelated D.C. [l]ottery contract award to a then Banneker [p]rincipal;
>
> 4) requir[ing] Banneker to include Graham's favored development company (LaKritz Adler) as a member of Banneker's development team in order to provide a financial benefit to LaKritz Adler at Banneker's expense;
>
> 5) requir[ing] Banneker to purchase property from Graham's favored development company (LaKritz Adler) in order to provide a financial benefit to LaKritz Adler at Banneker's expense;
>
> 6) add[ing] components to the Project (such as an affordable housing requirement for which WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA;
>
> 7) interfer[ing] with Banneker Development Team composition . . . ;
>
> 8) provid[ing] the LaKritz Adler defendants with access to information not available to the public to enhance LaKritz Adler's competitive advantage and reduce or destroy Bannekers' competitive advantage;
>
> 9) continu[ing] to advocate (as a WMATA Board Member, Chair of the PDRE Committee[5] or Chair of the WMATA Board) and demonstrate his preference for LaKritz Adler to either become the Selected Developer or to otherwise gain a financial benefit from

---

[5] The PDRE Committee is the WMATA Board of Directors Planning, Development and Real Estate Committee.  *See* Am. Compl. ¶ 63.

the Project with the very same WMATA staff charged with negotiating exclusively with Banneker under the contract;

10) using his jurisdictional vote (either voting "no" or "abstaining") as both his capacity as a PDRE Committee Member and WMATA Board Member to exercise undue influence over the terms and conditions that WMATA staff was authorized to and responsible for negotiating with Banneker;

11) instructing WMATA's then General Counsel (during Banneker's period of exclusivity) to provide a legal roadmap [as to] how, when and under what circumstances Graham could request "Best and Final Offers" so that his favored developer (LaKritz Adler) would have another opportunity to financially benefit from the Project—which . . . was provided on November 30, 2009;

12) entering into an agreement, scheme or plan with LaKritz, Adler and LaKritz Adler defendants to engage in a continuous course of conduct both before and all-during [sic] Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense;

13) violating the WMATA [Standards] of Conduct by losing his impartiality with respect to Banneker as a vendor in favor of LaKritz Adler as found by the WMATA Board of Directors following the issuance of the [Cadwalader] Report;

14) violating the District's Code of Conduct by failing to act in the public interest as found by the District's Board of Ethics and Government Accountability in its Report issued on February 7, 2013;

15) violating the D.C. Council's Rules as found by the D.C. Council at the time it publicly reprimanded D.C. Council Member Graham on February 25, 2013; and

16) orchestrating and achieving the end goal (which culminated on March 25, 2010) of sowing enough delay, obstacles and interference such to allow Banneker's period of exclusivity [to] expire on March 31, 2010.

Am. Compl. ¶ 208 (part of Count I, breach of contract); *see id*. ¶ 239 (identical; part of Count II, breach of duty of good faith and fair dealing). Banneker summarizes these allegations by asserting that Graham "pressured and advocated" to Banneker, WMATA staff, and WMATA

Board Members to include LaKritz Adler in the Project "in some fashion," and that WMATA was aware that Mr. Graham was advocating for LaKritz. Opp'n at 12-13.

The Amended Complaint does not state a claim for breach of the exclusivity agreement because it does not allege that WMATA negotiated with another developer for development of the Project during Banneker's exclusivity period. Mr. Graham's suggestion to Banneker that it include LaKritz Adler in the Project and/or purchase property from LaKritz Adler was part of a negotiation *with Banneker* and was not a negotiation with a third party. Further, Mr. Graham's offer to Mr. Williams that Banneker withdraw as the Selected Developer on the Project in exchange for Mr. Graham's D.C. Council vote to approve a D.C. lottery contract benefitting Mr. Williams, was a negotiation *with Banneker* because Mr. Williams was a principal of Banneker. Banneker's assertion that LaKritz Adler sought to be included in the Project during Banneker's exclusivity period, *see* Opp'n at 13, points only to LaKritz Adler's desire to be part of the Project. The mere desire to be part of the Project does not constitute a negotiation between WMATA and LaKritz Adler for LaKritz Adler's work on the Project. Further, while Banneker contends that Mr. Graham improperly pressured WMATA staff and Board Members in favor of LaKritz Adler, there is no allegation that this resulted in actual negotiations between WMATA and LaKritz Adler.

The most pointed allegation of the sixteen listed above is that WMATA entered "into an agreement, scheme or plan with LaKritz, Adler and LaKritz Adler defendants to engage in a continuous course of conduct both before and all-during [sic] Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense." Am. Compl. ¶ 208(12). This allegation, however, like all the others, does not state that WMATA bargained with LaKritz Adler for its work as

developer of the Project during Banneker's exclusivity period. It asserts only that Mr. Graham and LaKritz Adler agreed to interfere with Banneker's negotiation. Though Mr. Graham's interference was found to be unethical, an agreement to interfere does not constitute a negotiation for work on the Project and thus was not a breach Banneker's exclusivity agreement.

With regard to the breach of contract claim alleging that the Term Sheet constituted a final agreement, the claim will be dismissed for failure to allege a valid and binding contract reflecting agreement as to all material terms. To assert a breach of contract claim under D.C. law, a plaintiff must allege four elements: (1) a valid contract between the parties; (2) a duty arising out of the contract; (3) breach of that duty; and (4) damages caused by the breach. *Paulin v. George Wash. Univ. Sch. of Med.*, 878 F. Supp. 2d 241, 246 (D.D.C. 2012); *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). A valid and enforceable contract requires the express intention of the parties to be bound and agreement to all material terms. *Simon v. Circle Assocs.*, 753 A.2d 1006, 1012 (D.C. 2000). "There must thus be an honest and fair 'meeting of the minds' as to all issues in a contract." *Id.* "[P]arties will not be bound to a preliminary agreement unless the evidence presented clearly indicates that they intended to be bound at that point." *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1239 (D.C. 1995).

Banneker alleges that the Term Sheet included all material terms, Am. Compl. ¶ 216, that WMATA "agreed that the Board would only decline to approve development of the Site under certain conditions" that were not present, *id.* ¶¶ 217-18, and that WMATA breached the Term Sheet by failing to formally memorialize a final Joint Development Agreement without reason, *id.* ¶ 222. Banneker's claim for breach of contract is facially implausible, as the Term Sheet itself reveals there was no valid contract between the parties containing all material terms.

*See Twombly*, 550 U.S. at 570 (a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is "plausible on its face.").  Banneker conveniently overlooks the explicit language of the Term Sheet setting forth the understanding that the parties "wished to negotiate" a Definitive Agreement in the near future and that WMATA would not be bound by such Definitive Agreement "unless and until" it was approved by the Board.  The Term Sheet's preamble stated:

> This Term Sheet . . . is intended to summarize the principal terms of a proposal being considered by the undersigned parties regarding a lease of certain real property on the south side of Florida Avenue, NW between 7th and 9th streets, NW.  The undersigned parties *wish to negotiate* a Definitive Agreement, as defined in Section 2.1 herein.

Term Sheet at 1 (emphasis added).  Section 2.1 provided:

> 2.1 Definitive Agreement
>
> The Definitive Agreement, *to be prepared initially by WMATA and presented by WMATA to the WMATA Board for approval* and signature within five months of Board Term Sheet approval, will be a Joint Development Agreement (JDA) that will include, as an exhibit, a 60-year ground lease agreement (Lease), together with all related documentation upon which WMATA and Developer mutually agree.  The Lease term will begin with the earlier of twenty (20) months after the WMATA Board approves the Definitive Agreement or the start of construction of the Project.

*Id*. (emphasis added).  Critically, the Term Sheet mandated certain conditions precedent to the consummation of a Definitive Agreement, conditions that included mandatory Board approval:

> 8.  Conditions to Definitive Agreement Consummation
>
> 8.4 Subsequent Approval: Developer acknowledges that WMATA will not be bound by the Definitive Agreement *unless and until such Definitive Agreement is approved by WMATA's Board of Directors and executed by WMATA*.

*Id*. at 7 (emphasis added).  Moreover, the Term Sheet expressly stated that it was non-binding in all respects, except with regard to the exclusivity period: "*This Term Sheet will have no binding*

*effect on the parties* except that [Banneker] shall have the exclusive right to negotiate a Definitive Agreement with WMATA for a period of five (5) months from the date of this Term Sheet." Term Sheet at 11 (emphasis added).

The Term Sheet was not itself a Definitive Agreement between the parties, as it clearly indicated that the parties wished to negotiate a Definitive Agreement in the near future. Moreover, the Term Sheet expressly stated that WMATA would not be bound by any Definitive Agreement unless and until it Board approved. It refers to a yet-to-be-negotiated Definitive Agreement that "*will include* . . . related documentation upon which WMATA and Developer mutually agree." Term Sheet at 1. Banneker acknowledges in the Amended Complaint that it was still negotiating with WMATA at the time the exclusivity expired and that the parties were working on an "amended Term Sheet." Banneker asserts that "[f]rom January 14, 2010, through March 25, 2010, WMATA staff and Banneker engaged in negotiations to reach a final agreement with regard to the amended Term Sheet for the Project . . . ." Am. Compl. ¶ 165. Banneker has not alleged a valid and enforceable contract for conveyance and development of the Site which bound the parties and contained all material terms.

In sum, Banneker has failed to state a claim for breach of contract or for breach of the duty of good faith and fair dealing. It has not alleged that WMATA breached the Term Sheet by entering into a negotiation with another developer during Banneker's exclusivity period. It has not alleged that WMATA was bound to a valid contract containing all material terms regarding the conveyance and development of the Site. Counts I and II, therefore, will be dismissed for failure to state a claim.

### D. Jurisdiction Over the Remainder of the Case

Since the claims against WMATA will be dismissed and jurisdiction here is based on WMATA's presence as a party, the question arises whether the Court has jurisdiction over the claims against the remaining defendants: Mr. Graham, Mr. LaKritz, Mr. Adler, and LaKritz Adler. The Amended Complaint alleges only violations of D.C. law and does not allege any federal law claims. Thus, federal question jurisdiction does not apply. *See* 28 U.S.C. § 1331. However, it may be that the Court has diversity jurisdiction. Diversity jurisdiction applies to suits between citizens of different states where the amount in controversy exceeds the sum of $75,000. *See* 28 U.S.C. § 1332(a).

Diversity jurisdiction exists when the citizenship of each plaintiff is "diverse" form the citizenship of each defendant. *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996). "[D]iversity jurisdiction is lacking if there are any litigants from the same state on opposing sides." *Prakash v. American Univ.*, 727 F.2d 1174, 1178 n.25 (D.C. Cir. 1984). For diversity purposes, an individual is a citizen of the State where he is domiciled. *See Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 828 (1989). The citizenship of a non-corporate entity, such as a limited liability company like Banneker, is determined by looking to the residency of all of its members. *Shulman v. Voyou, LLC*, 305 F. Supp. 2d 36, 40 (D.D.C. 2004) (citing *C.T. Carden v. Arkoma Assoc.*, 494 U.S. 185, 195-96 (1990)); *see, e.g., NIPMUC Props., LLC v. PDC–El Paso Meriden, LLC*, Civ. No. 301-2081(CFD), 2002 WL 1608324, at *6 (D. Conn. June 25, 2002) (holding that a limited liability company organized in Connecticut is a citizen of Delaware, where its sole member resided).

The amount in controversy requirement is met here, as Banneker seeks to recover $100 million. *See* Am. Compl. at 99 (Relief Requested). The Amended Complaint, however,

fails to allege the citizenship of the parties. *See id.* ¶ 13 (alleging original jurisdiction because WMATA is a party, pursuant to D.C. Code § 9-1107.01). Diversity jurisdiction is determined based on the citizenship of the parties at the time the suit was filed. *Grupo Dataflux v. Atlas Global Grp., LP*, 541 U.S. 567, 570-71 (2004). Thus, at this juncture it cannot be determined whether diversity jurisdiction applies.

Even if it lacks diversity jurisdiction, the Court may exercise supplemental jurisdiction over the local law claims. *See* 28 U.S.C. § 1367(c); *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005). The decision whether to exercise supplemental jurisdiction after dismissing every claim over which the court had original jurisdiction is "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1866 (2009). In exercising such discretion, district courts consider judicial economy, convenience, comity, and fairness. *Shekoyan*, 409 F.3d at 424. In the usual case, these factors point toward declining jurisdiction. *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

It is unclear at this juncture whether the Court has diversity jurisdiction. This determination should be made before the Court decides whether to exercise supplemental jurisdiction over the D.C. law claims against the remaining defendants. Accordingly, all remaining parties will be required to file a notice setting forth their citizenship for diversity purposes as of the date this case was filed.[6]

---

[6] The Court will determine jurisdiction before deciding the motions to dismiss filed by the remaining defendants. *See* LaKritz Adler Mot. [Dkt. 20]; Graham Mot. [Dkt. 21].

## IV.  CONCLUSION

For the reasons set forth above, WMATA's motion to dismiss, Dkt. 22, will be granted.  Count I (breach of contract), Count II (breach of duty of good faith and fair dealing), Count V (unjust enrichment), and Count VII (fraud) will be dismissed in their entirety.  Count VIII (civil conspiracy) will be dismissed as against WMATA only.  As a result, WMATA will be dismissed as a defendant here.  Since original jurisdiction was based on the presence of WMATA in this case and WMATA will be dismissed as a party, the remaining parties will be required to file a notice setting forth their citizenship for diversity purposes as of the date this case was filed.  A memorializing Order accompanies this Opinion.


Date:  December 11, 2013                              _____/s/_____
                                                     ROSEMARY M. COLLYER
                                                     United States District Judge