_____
                                                )
**BANNEKER VENTURES, LLC,**                     )
                                                )
      **Plaintiff,**                          )
                                                )
      **v.**                                 )      **Civil Action No. 13-391 (RMC)**
                                                )
**JIM GRAHAM, *et al*.,**                        )
                                                )
      **Defendants.**                         )
_____         )


## OPINION

      Banneker Ventures, LLC, is a developer that had an exclusive right to negotiate with Washington Metropolitan Area Transit Authority for the lease and development of certain real property, but failed to reach a final agreement. In this lawsuit, Banneker alleges tortious interference with contract and business expectancy, violation of local and federal antitrust law, and civil conspiracy. Defendants Jim Graham, Joshua Adler, Robb LaKritz, and LaKritz Adler Development, LLC move to dismiss. The motions will be granted.

## I. FACTS

      The Amended Complaint sets forth more than fifty pages of alleged facts, summarized here. Washington Metropolitan Area Transit Authority (WMATA) sought to improve certain real property located above the Shaw-Howard/Florida Avenue Metrorail Station (the Site), consisting of three lots located in the 700 and 800 blocks of Florida Avenue, N.W., in Washington, D.C. Am. Compl. [Dkt. 18] ¶¶ 1, 22. In the spring of 2007, WMATA issued a Request for Expressions of Interest for development of the Site. *Id*. ¶ 22.

      Banneker Ventures, LLC, (Banneker) is a firm that specializes in construction and property development. Banneker and eleven other developers separately submitted responses to

the Request for Expressions of Interest.  *Id.* ¶ 23.  In August 2007, WMATA issued a Joint

Development Solicitation to six developers, including Banneker and LaKritz Adler

Development, LLC (LAD),[1] requesting more detailed proposals.  The Joint Development

Solicitation provided that a developer would be selected, a term sheet would be negotiated, and a

Joint Development Agreement would be negotiated and completed within 150 days after the

WMATA Board's approval of the selected developer and the term sheet.  *Id.* ¶ 28; *see* Joint

Development Solicitation [Dkt. 22-4].

Banneker proposed a project that would be known as "The Jazz at Florida

Avenue" (Project), *id.* ¶ 50, and Banneker and WMATA staff negotiated a draft term sheet for

presentation to the WMATA Board.  *Id.* ¶ 59.  On June 26, 2008, the WMATA Board chose

Banneker as the "Selected Developer" for the Site.  *Id.* ¶¶ 2, 92, 115.  The Board simultaneously

directed its staff to negotiate an affordable housing set-aside as part of the Project.  *Id.* ¶ 89.

On July 17, 2008, WMATA and Banneker signed a Term Sheet, which provided

that Banneker had the exclusive right, for a limited period of time, to negotiate a Joint

Development Agreement with WMATA for development of the Site.  *Id.* ¶¶ 2, 18, 116; *see also*

WMATA Mot. [Dkt. 22], Ex. 3 [Dkt. 22-5] (Term Sheet).  The Term Sheet provided: "This

Term Sheet will have no binding effect on the parties except that [Banneker] shall have the

exclusive right to negotiate a Definitive Agreement with WMATA for a period of five (5)

months from the date of this Term Sheet."  Term Sheet at 11.  Through March 2010, Banneker

and WMATA staff continued to negotiate and revise the Term Sheet, but the WMATA Board

did not approve a revised Term Sheet and the parties never agreed on a final Joint Development

---

[1] LAD is a limited liability corporation whose members are Robb LaKritz and Joshua Adler.
LAD, Mr. LaKritz, and Mr. Adler are referred to collectively as the LaKritz Adler Defendants.

Agreement. Am. Compl. ¶¶ 3, 154–176. Despite three extensions of time, Banneker's exclusive right to negotiate expired on March 31, 2010. *Id.* ¶¶ 12, 18, 176.

Banneker alleges that Jim Graham, a District of Columbia Council Member and a WMATA Board of Directors Member at that time,[2] engaged in "bid suppression and bid rigging," *i.e.*, he objected to the choice of Banneker as the Selected Developer and interfered with Banneker's attempts to finalize the Term Sheet and a Joint Development Agreement. *Id.* ¶¶ 4–11, 127. Mr. Graham's alleged goal was to designate LAD, a major contributor to Mr. Graham's campaign and constituent services fund, as the Selected Developer for the Site. *Id.* ¶¶ 5, 7, 26.

Specifically, Banneker alleges that Mr. Graham interfered with Banneker's exclusive right to negotiate a Joint Development Agreement by offering his vote as a D.C. Council Member to approve a D.C. lottery contract that would benefit one of Banneker's then principals, Warren Williams, in exchange for Banneker's withdrawal as the Selected Developer for the Site. *Id.* ¶¶ 7, 98, 109. Mr. Williams refused. *Id.* ¶ 8. Mr. Graham also allegedly interfered by falsely reporting to the WMATA Board that Banneker did not have the capability to develop the Site, *id.* ¶ 65, and questioning whether the deal was financially viable, *id.* ¶¶ 93, 137. In addition, Mr. Graham allegedly convinced the WMATA Board to add affordable housing requirements to the Project, thereby decreasing the value of the Project to the detriment of Banneker. *Id.* ¶¶ 10, 89, 111. Further, Mr. Graham allegedly pressured Banneker to include LAD on the Project as a co-developer, *id.* ¶¶ 11, 70–71, 111, and to purchase a high-priced

---

[2] Mr. Graham served on the WMATA Board of Directors from 1999-2010. During Banneker's exclusivity period, Mr. Graham was a member of WMATA's Planning, Development and Real Estate Committee. Mr. Graham was (and is) the D.C. Council member representing Ward One, where the Site is located.

option on adjacent property from LAD, *id*. ¶¶ 119, 127.  Also, Mr. Graham allegedly pressured

Banneker to help fund a U Street Business Improvement District.[3]  *Id*. ¶¶ 111, 121.

The WMATA Board found that Mr. Graham violated the WMATA Standards of

Conduct[4] and the D.C. Board of Ethics and Government Accountability similarly determined

that Mr. Graham violated the D.C. Code of Conduct.  *Id*. ¶¶ 6, 18, 131.  In February 2012, the

WMATA Board launched an independent investigation into allegations that Mr. Graham had

offered to support Mr. Williams's bid for the D.C. lottery contract in exchange for Banneker's

withdrawal from the Project.  *Id*. ¶¶ 181-82.  A partner in the law firm of Cadwalader,

Wickersham & Taft LLP, Bradley Bondi, led the investigation and issued a Report of

Investigation to the WMATA Board on October 11, 2012.  *See id*. ¶¶ 182-191; Graham Mot., Ex.

3 [Dkt. 21-3] (Cadwalader Report).[5]

Central to the Amended Complaint is the allegation that Mr. Graham violated

Article III § A of the WMATA Standards of Conduct.  Am. Compl. ¶ 190.  Article III § A

provides:

> Public funds must be expended in a manner which assures the
> highest degree of confidence and public trust in WMATA.  It is
> imperative that Board Members in their private financial
> relationships and in their official conduct strictly avoid engaging in
> actions which create conflicts of interest or the appearance of a
> conflict of interest.  It is likewise imperative that Board Members

---

[3] The U Street Business Improvement District includes the Site.

[4] The Amended Complaint mistakenly refers to the WMATA "Code of Conduct," not the
WMATA Standards of Conduct.  Banneker corrected its error in its response to WMATA's
motion.  *See* Opp'n to WMATA Mot. [Dkt. 24] at 4.

[5] When a document is referred to in a complaint and is central to the plaintiff's claim, in
reviewing a motion to dismiss the court may consider the document without converting the
motion into one for summary judgment.  *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d
95, 99 (D.D.C. 2008).  The Amended Complaint refers to the Cadwalader Report as central to
Banneker's claim that Mr. Graham violated the WMATA Standards of Conduct.

> act impartially in their official conduct by avoiding any actions which might result in favored treatment or appearances thereof toward any individual, private organization, consultant, contractor or potential consultant or contractor. Each Board Member while acting in his/her capacity as a WMATA Board Member, has a duty to place the public interest foremost in any dealings involving WMATA.

*Id.* at 53. Mr. Bondi advised the WMATA Board that Mr. Graham violated Article III § A in two ways. First, by telling Mr. Williams that he would support his bid for the lottery contract if Banneker withdrew as Selected Developer for the Site, Mr. Graham "pitted the interests" of the D.C. Council against the interests of WMATA, thereby creating a conflict of interest, or at least the appearance of one. *Id.* Second, by supporting LAD's inclusion in the Project and opposing the choice of Banneker as the Selected Developer, Mr. Graham breached his duty to remain impartial. *Id.*; *see also* Am. Compl. ¶ 190.[6]

---

[6] According to Mr. Bondi, there were rational business reasons for the failure of Banneker and WMATA to negotiate a final contract:

> In the two years that Banneker Ventures spent negotiating with Metro, Banneker Ventures did not adequately resolve two significant issues: making a reasonable financial offer and finding a reliable development partner. Banneker Ventures initially lowered its offer price on the grounds that the Metro Board's requirement to include affordable housing caused a drop in the value of the project. While Banneker Ventures raised its financial offer somewhat in the ensuing negotiations, it was unable to raise its offer to a level that was acceptable to the Metro Board. Banneker Ventures was also unable to retain an experienced development partner, even though the Metro Board made it clear to Banneker Ventures that it must partner with one. At the time Banneker Ventures's negotiating period expired, Banneker's third development partner had dropped out of the project and Banneker Ventures has not identified a replacement. As Banneker Ventures struggled to resolve these issues, it lost support among Metro Board members.

Cadwalader Report at 5. While Banneker relies on the Report's finding that Mr. Graham violated the WMATA Standards of Conduct, Banneker disputes the findings regarding why the parties failed to enter into a contract. For the purpose of this Opinion, this dispute is immaterial.

WMATA did not sell or lease the Site to any of the LaKritz Adler Defendants. In July 2011, WMATA sold the Site to JBG Construction for $10.2 million. Cadwalader Report at 28.[7]

After the Cadwalader Report was issued, the D.C. Board of Ethics and Government Accountability initiated an investigation into Mr. Graham's conduct and issued an Ethics Report. The Ethics Report found that Mr. Graham violated the D.C. Code of Conduct by inappropriately favoring his campaign contributor, LAD, in the negotiation for development of the Site. Am. Compl. ¶ 195. On February 25, 2013, the D.C. Council adopted a resolution reprimanding Mr. Graham for improperly offering to support Mr. Williams's bid for the D.C. lottery contract in exchange for Banneker's withdrawal from the development of the Site. *Id.* ¶¶ 197–202 (citing Jim Baxter, *D.C. Council Reprimands Jim Graham*, The Wash. Examiner, Feb. 25, 2013).

Thereafter, Banneker filed this suit against WMATA, Mr. Graham, Mr. LaKritz, Mr. Adler, and LAD. Mr. Graham is sued in his official and personal capacities. The Amended Complaint alleges eight counts:

> Count I–Breach of Contract (against WMATA);
>
> Count II–Breach of Covenant of Fair Dealing (against WMATA);
>
> Count III–Tortious Interference with a Prospective Economic Advantage (against Messrs. Graham, LaKritz, Adler, and LAD);
>
> Count IV–Tortious Interference with Contract (against Messrs. Graham, LaKritz, Adler, and LAD);
>
> Count V–Unjust Enrichment (against WMATA);

---

[7] As of October 2012, the Site remained undeveloped and JBG Construction was awaiting the requisite approval from the D.C. Historic Preservation Review Board. Cadwalader Report at 28 n.103. As of the date of this Opinion, construction is ongoing.

Count VI–Unlawful Restraint of Trade (against Messrs. Graham, LaKritz, and Adler);

Count VII–Fraud, Constructive Fraud, and Negligent Misrepresentation (against WMATA); and

Count VIII–Civil Conspiracy (against all Defendants).

*Id.* ¶¶ 203-330.  In support of its claims, Banneker sets forth a list of sixteen improper actions allegedly taken by Mr. Graham:

(1) interfer[ing] with Banneker's period of exclusivity;

(2) . . . prevent[ing] Banneker from being able to successfully negotiate a Definitive Agreement with WMATA;

(3) execut[ing] a bid-suppression scheme to get Banneker out of the WMATA Project in exchange for a pay-off of an unrelated D.C. [l]ottery contract award to a then Banneker [p]rincipal;

(4) requir[ing] Banneker to include Graham's favored development company (LaKritz Adler) as a member of Banneker's development team in order to provide a financial benefit to LaKritz Adler at Banneker's expense;

(5) requir[ing] Banneker to purchase property from Graham's favored development company (LaKritz Adler) in order to provide a financial benefit to LaKritz Adler at Banneker's expense;

(6) add[ing] components to the Project (such as an affordable housing requirement for which WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA;

(7) interfer[ing] with Banneker Development Team composition . . . ;

(8) provid[ing] the LaKritz Adler defendants with access to information not available to the public to enhance LaKritz Adler's competitive advantage and reduce or destroy Banneker's competitive advantage;

(9) continu[ing] to advocate (as a WMATA Board Member, Chair of the PDRE Committee[8] or Chair of the WMATA Board) and demonstrate his preference for LaKritz Adler to either become the Selected Developer or to otherwise gain a financial benefit from the Project with the very same WMATA staff charged with negotiating exclusively with Banneker under the contract;

(10) using his jurisdictional vote (either voting "no" or "abstaining") [in] both his capacity as a PDRE Committee Member and WMATA Board Member to exercise undue influence over the terms and conditions that WMATA staff [were] authorized to and responsible for negotiating with Banneker;

(11) instructing WMATA's then General Counsel (during Banneker's period of exclusivity) to provide a legal roadmap [as to] how, when and under what circumstances Graham could request "Best and Final Offers" so that his favored developer (LaKritz Adler) would have another opportunity to financially benefit from the Project—which . . . was provided on November 30, 2009;

(12) entering into an agreement, scheme or plan with LaKritz, Adler and LaKritz Adler defendants to engage in a continuous course of conduct both before and all-during [sic] Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense;

(13) violating the WMATA [Standards] of Conduct by losing his impartiality with respect to Banneker as a vendor in favor of LaKritz Adler as found by the WMATA Board of Directors following the issuance of the [Cadwalader] Report;

(14) violating the District's Code of Conduct by failing to act in the public interest as found by the District's Board of Ethics and Government Accountability in its Report issued on February 7, 2013;

(15) violating the D.C. Council's Rules as found by the D.C. Council at the time it publicly reprimanded D.C. Council Member Graham on February 25, 2013; and

---

[8] The PDRE Committee is the Planning, Development and Real Estate Committee of the WMATA Board of Directors. *See* Am. Compl. ¶ 63.

> (16) orchestrating and achieving the end goal (which culminated on March 25, 2010) of sowing enough delay, obstacles and interference such [as] to allow Banneker's period of exclusivity [to] expire on March 31, 2010.

*Id.* ¶ 247 (allegations in support of Count III, tortious interference with prospective business advantage). These allegations are repeated verbatim throughout the Amended Complaint. *See, e.g., id.* ¶¶ 208, 227 (allegations in support of Count I, breach of contract); *id.* ¶ 239 (allegations in support of Count II, breach of implied covenant of good faith); *id.* ¶ 275 (allegations in support of Count IV, tortious interference with contract); *id.* ¶ 286 (allegations in support of Count V, unjust enrichment); *id.* ¶ 294 (allegations in support of Count VI, unlawful restraint of trade).[9]

The Court granted WMATA's motion to dismiss, dismissing entirely Counts I (breach of contract), II (breach of duty of good faith and fair dealing), V (unjust enrichment), and VII (fraud) and dismissing, as against WMATA only, Count VIII (civil conspiracy). *See* Op. [Dkt. 34]; Order [Dkt. 35]. Because all claims against WMATA were dismissed, WMATA was dismissed as a defendant. Order [Dkt. 35].

Mr. Graham now moves to dismiss all claims against him. *See* Graham Mot. [Dkt. 21]; Graham Reply [Dkt. 30]. The LaKritz Adler Defendants similarly move to dismiss all claims against them. *See* LaKritz Mot. [Dkt. 20]; LaKritz Reply [Dkt. 31]. Banneker opposes. *See* Opp'n to Graham Mot. [Dkt. 25]; Opp'n to LaKritz Mot. [Dkt. 26].

---

[9] The Amended Complaint does not allege that Mr. Graham took any particular action in his capacity as a D.C. Council Member.

## II.  JURISDICTION AND LEGAL STANDARDS

### A.  Jurisdiction

Diversity jurisdiction applies to suits between citizens of different states where the amount in controversy exceeds the sum of $75,000.  *See* 28 U.S.C. § 1332(a); *Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996) (diversity jurisdiction exists when the citizenship of each plaintiff is "diverse" from the citizenship of each defendant).  Diversity jurisdiction is determined based on the citizenship of the parties at the time the suit was filed.  *Grupo Dataflux v. Atlas Global Grp., LP*, 541 U.S. 567, 570-71 (2004).  "[D]iversity jurisdiction is lacking if there are any litigants from the same state on opposing sides."  *Prakash v. American Univ.*, 727 F.2d 1174, 1178 n.25 (D.C. Cir. 1984).  For diversity purposes, an individual is a citizen of the State where he is domiciled.  *See Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 828 (1989).  The citizenship of a non-corporate entity, such as Banneker, which is a limited liability company, is determined by looking to the residency of all of its members.  *Shulman v. Voyou, LLC*, 305 F. Supp. 2d 36, 40 (D.D.C. 2004) (citing *C.T. Carden v. Arkoma Assoc.*, 494 U.S. 185, 195-96 (1990)).

The Court has diversity jurisdiction in this case.  The amount in controversy requirement is met, as Banneker seeks to recover $100 million.  *See* Am. Compl. at 99 (Relief Requested).  Further, the parties are citizens of different states.  Banneker has only a single member, Omar Karim, who is domiciled in Maryland.  *See* Banneker Notice of Citizenship [Dkt. 37].  Mr. Graham is a resident of the District of Columbia.  *See* Graham Notice of Citizenship [Dkt. 36].  Mr. LaKritz is a resident of Virginia, Mr. Adler is a resident of New Hampshire, and LAD is a citizen of Virginia and New Hampshire.  *See* LaKritz Notice of Citizenship [Dkt. 38].

## B. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Mr. Graham contends that because the claims against him in his official capacity are barred by sovereign immunity, they must be dismissed for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1); *Watters v. WMATA*, 295 F.3d 36, 39-40 (D.C. Cir. 2002) (where sovereign immunity applies, a district court lacks jurisdiction).

When reviewing a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged. *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004). Nevertheless, "the court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006).

A court is not limited to the pleadings when deciding whether it has jurisdiction over a claim. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005). No action of the parties can confer subject matter jurisdiction on a federal court because subject matter jurisdiction is an Article III and a statutory requirement. *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003). The party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists. *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008); *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting that federal courts are courts of limited jurisdiction and "[i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (internal citations omitted).

## C. Motion to Dismiss for Failure to State a Claim

Mr. Graham, in his personal capacity, and the LaKritz Adler Defendants also move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief  "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*  The facts alleged "must be enough to raise a right to relief above the speculative level." *Id.*  "[A] complaint needs *some* information about the circumstances giving rise to the claims." *Aktieselskabet Af 21. Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 16 n.4 (D.C. Cir. 2008).  A complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570.  When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555.  But a court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 556 U.S. at 678.

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (internal quotation marks and citation omitted).  Generally, when a court relies upon matters outside the pleadings, a motion to dismiss must be treated as one for summary judgment and disposed of pursuant to Rule 56.  *See* Fed. R. Civ. P. 12(d).  "However, where a document is referred to in the complaint and is central to the plaintiff's

claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99 (D.D.C. 2008) (citation omitted). The Amended Complaint refers to the Joint Development Solicitation, the Term Sheet, and the Cadwalader Report as central to Banneker's claim, and the Court considers these documents in reviewing the motions to dismiss. *See* Joint Development Solicitation [Dkt. 22-4], Cadwalader Report [Dkt. 21-3], Term Sheet [Dkt. 22-5].

## III. ANALYSIS

### A. Immunity

#### 1. Sovereign Immunity

To the extent that Mr. Graham is sued in his official capacity, as a WMATA Board Member or as a D.C. Council Member, this suit is barred by sovereign immunity. Claims against Mr. Graham in his official capacity are treated as claims against WMATA and the District. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Delaney v. District of Columbia*, 659 F. Supp. 2d 185, 192 n.4 (D.D.C. 2009). WMATA and the District both enjoy sovereign immunity. The District of Columbia is "immune from suit in tort if the act complained of was committed in the exercise of a discretionary function." *D.C. Hous. Auth. v. Pinkney*, 970 A.2d 854, 859-60 (D.C. 2009). WMATA is a quasi-governmental agency created by an Interstate Compact, enacted by Congress and adopted by the District of Columbia, the State of Maryland, and the Commonwealth of Virginia. *See Martin v. WMATA*, 667 F.2d 435 (4th Cir. 1981). By signing the Compact, the District of Columbia, Maryland, and Virginia extended their sovereign immunity to WMATA. *Beatty v. WMATA*, 860 F.2d 1117, 1126 (D.C. Cir. 1988).

Because WMATA and the District are immune from liability for certain claims where the act complained of was done in an official capacity and was discretionary, Mr. Graham, in his official capacity, also is immune from liability. The Court previously held that Banneker's

tort and quasi-contract claims against WMATA were barred by sovereign immunity because the critical decisions challenged here, such as for how long to negotiate a final contract and what terms to include, were discretionary. *See* Op. at 9-18 (citing *Greenbelt Ventures, LLC v. WMATA*, 481 F. App'x 833 (4th Cir. 2012); *KiSKA Constr. Corp. v. WMATA*, 321 F.3d 1151 (D.C. Cir. 2003); *Monument Realty LLC v. WMATA*, 535 F. Supp. 2d 60 (D.D.C. 2008)).

   In opposing WMATA's motion to dismiss, Banneker contended that WMATA's actions were non-discretionary because it was bound by the Standards of Conduct, alleged to be "flat-out prescriptions," prohibiting impartiality and the release of private information. *See* Opp'n to WMATA Mot. [Dkt. 24] at 45. When granting WMATA's motion to dismiss, the Court rejected this argument because Banneker had framed the issue incorrectly:

> The issue is not whether WMATA had discretion to act impartially or to disclose non-public information, the issue is whether WMATA had discretion to decide whether or not to extend Banneker's exclusive right to negotiate and whether or not WMATA had discretion to decide if the proposed terms were acceptable. . . . . [T]he Standards of Conduct do not dictate a course of action with regard to a real property transaction. In fact, the Standards of Conduct prescribe ethical conduct and do not prescribe any particular course of action. Decisions such as how long to negotiate a final contract and the terms to include are discretionary.

Op. at 15-16.

   Banneker makes the identical argument in opposition to Mr. Graham's motion to dismiss—that Mr. Graham's actions were ministerial because he was bound by the WMATA Standards of Conduct. *See* Opp'n to Graham Mot. [Dkt. 25] at 6. Again, Banneker mischaracterizes the issue at hand. The Standards of Conduct do not compel a WMATA Board Member to take any particular action with regard to a real estate deal. In fact, the WMATA Standards of Conduct describe how *not* to act, not how *to* act. Mr. Graham's actions were

discretionary.  He exercised discretion in deciding whether to vote for an extension of Banneker's exclusivity period; he exercised discretion in deciding whether, and on what terms, to vote for a final contract with Banneker.  Accordingly, Mr. Graham, in his official capacity, is immune from the claims set forth against him in the Amended Complaint.[10]  Because the claims against Mr. Graham in his official capacity are barred by sovereign immunity, the claims must be dismissed for lack of subject matter jurisdiction.  *See Watters*, 295 F.3d at 39-40.

### 2.  Absolute Immunity

Banneker also seeks to hold Mr. Graham personally liable, but Mr. Graham is protected from suit in his personal capacity by absolute immunity.  Banneker understands that its exclusive right to negotiate was a contract with WMATA, not Mr. Graham, and Banneker hoped to enter into a final development contract with WMATA, not Mr. Graham.  *See, e.g.*, Am. Compl. ¶ 92 (WMATA Board voted to approve contract giving Banneker exclusive right to negotiate a final contract with WMATA).  Further, Banneker acknowledges that any extension of the exclusivity period and any final contract had to be approved by a vote of the WMATA Board of Directors.  *See id*. ¶ 174 (WMATA Board indefinitely tabled approval of a final contract and allowed exclusivity period to expire).  Even so, Banneker asserts that Mr. Graham "unlawfully stall[ed] Banneker's project."  *See id*. ¶ 159 ("Graham, with the acquiescence of the members of the PDRE Committee and full WMATA Board, continued to unlawfully stall Banneker's project with the intent of running out the clock on its contract period of exclusive negotiations with WMATA . . . .").

---

[10] While the Amended Complaint notes that Mr. Graham was a D.C. Council Member, *see* Am. Compl. ¶ 20, the allegations focus on actions he took as a WMATA Board Member, alleging that he "used his WMATA Board position to derail the WMATA project with Banneker," *see id*. ¶ 10.  Further, in opposing summary judgment, Banneker focuses only on the actions of Mr. Graham alleged to be in violation of WMATA Standards of Conduct.

Under D.C. law, an officer of the government such as Mr. Graham is entitled to absolute immunity from suit when his conduct is within the "outer perimeter" of official duties and the governmental function at issue was discretionary. *District of Columbia v. Jones*, 919 A.2d 604, 608 (D.C. 2007). The Supreme Court has explained that absolute immunity enables public officials to zealously serve the public interest without fear of suit.

> [O]fficials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

*Barr v. Mateo*, 360 U.S. 564, 571 (1959).

Banneker contends that Mr. Graham was motivated by "political calculus and personal animus." Am. Comp. ¶ 67; *see also* Cadwalader Report at 6 (Mr. Graham was motivated by "some combination of his own animosity toward Warren Williams and his interest in shaping the Florida Avenue Project as he thought appropriate"). However, it is clear that courts do *not* examine the motives of an accused official when making an immunity determination. Absolute immunity bars all suits "attacking conduct within the scope of the immunity, even if the official is alleged to have acted in bad faith." *Gray v. Poole*, 243 F.3d 572, 575 (D.C. Cir. 2001).

In *District of Columbia v. Jones*, for example, Mark Jones sued D.C. Mayor Anthony Williams for defamation. 919 A.2d at 605. Mr. Jones was serving as Mayor Williams's deputy chief of staff when the media questioned Mayor Williams's fundraising activities. As a result, Mayor Williams placed Mr. Jones on leave and allegedly defamed Mr. Jones to the press, telling them that Mr. Jones was involved in improper fundraising. Mayor Williams allegedly made this statement "exclusively for the purpose of advancing [his] political

career." *Id*. at 607. The D.C. Court of Appeals explained that Mayor Williams's motive had no bearing on the question of immunity:

> When determining whether an act qualifies for absolute immunity, the court does not inquire into an official's motives . . . . Permitting inquiry into the official's motive would defeat the very purpose of absolute immunity. A determined litigant could always assert an improper motive, and the official would be required to shoulder the burden of responding to discovery, and perhaps enduring a trial, to explore those motives.

*Jones*, 919 A.2d at 610-11. Absolute immunity can apply even when a plaintiff alleges that the official's actions were "completely self-serving and personal and were made exclusively for the purpose of advancing [the official's] political career." *Id*. at 607. Under these legal principles, Banneker's allegations regarding Mr. Graham's animosity and personal political interests do not influence an immunity analysis.

Instead, courts decide whether immunity applies by determining whether the official's actions were discretionary and within the scope of his official duties. *Jones*, 919 A.2d at 608. Banneker argues that Mr. Graham's actions were non-discretionary because he failed to comply with specific duties imposed by the WMATA Standards of Conduct. To the contrary, the WMATA Standards of Conduct do not mandate specific action and Mr. Graham's actions were discretionary in nature, as they involved choices among alternatives.

When deciding whether an act was discretionary in the context of absolute immunity, courts consider whether society's interest in shielding "the government function at issue from the disruptive effects of civil litigation requires subordinating the vindication of private injuries otherwise compensable at law." *Moss v. Stockard*, 580 A.2d 1011, 1020-21 (D.C. 1990). *Moss* dictates four factors to be considered:

(1) the nature of the injury;

(2) the availability of alternative remedies;

(3) the ability of the courts to judge fault without unduly invading the executive's function; and

(4) the importance of protecting particular kinds of acts.

*Id*. at 1021 n.21.

When an injury is economic and not physical, the first factor weighs in favor of immunity. *District of Columbia v. Simpkins*, 720 A.2d 894, 898 (D.C. 1998). Banneker alleges only monetary damages. As for the second factor, an alternative remedy for Mr. Graham's poor behavior is available and already has been implemented—on February 25, 2013, D.C. Council passed a resolution officially reprimanding Mr. Graham.[11] *See* Am. Compl. ¶¶ 197–202. The third factor, whether a court could adjudicate the matter "without unduly invading the executive's function," weighs on the side of immunity. This suit would require discovery covering at least the period from August 2007 to March 2010 and would involve numerous WMATA Board of Directors Members and their staff, necessitating intrusion into WMATA's executive function. Finally, it is important that WMATA officials be free to make complex decisions regarding large real estate projects, which are often controversial, without fear of suit. Under the *Moss* factors, Mr. Graham's challenged actions were discretionary.

The Court also must decide whether Mr. Graham's actions fell within his "official duties." For an act to come within official duties, it only needs to fall within the "outer perimeter" of official duties; to come within such "outer perimeter," it need only be "related more or less" to the general matters committed by law to the officer's control and supervision. *Minch v. District of Columbia*, 952 A.2d 929, 939 (D.C. 2008) (citing *Barr*, 360 U.S. at 578). The actions allegedly taken by Mr. Graham, such as seeking to include LAD as a member of the

---

[11] Also, Mr. Graham is subject to reelection.

development team for the Project and adding an affordable housing requirement to the Project, were done as part of Mr. Graham's involvement, as a WMATA Board Member and as a PDRE Committee Member, in setting contract terms for the development of the Site.

Banneker raises the same objection with regard to this issue that it raises to all the others:  Banneker reasons that Mr. Graham's conduct was outside his official duties because the conduct violated the directives of the WMATA Standards of Conduct.  *See* Opp'n to Graham Mot. [Dkt. 25] at 11.  The argument again misses the mark.  The Standards of Conduct describe ethical considerations, but do not define the duties of WMATA Board Members.  Mr. Graham's conduct was within the perimeter of his official duties—that is, Mr. Graham's alleged conduct regarding Banneker and the negotiation of the proposed development contract was related to the general matters committed to his control and supervision.[12]

Because Mr. Graham's actions relating to the negotiation for development of the Project were discretionary and related to his duties as a member of the WMATA Board of Directors, Mr. Graham is entitled to absolute immunity.[13]  Banneker's claims against him will be dismissed.

## B.  Tortious Interference with a Prospective Economic Advantage

The LaKritz Adler Defendants move to dismiss Banneker's claim for tortious interference with a prospective business advantage, also called tortious interference with

---

[12] While WMATA lacked a clear policy on the appropriate level of involvement for individual Board Members in real estate development projects, members of WMATA's Board of Directors were not prohibited from "meeting or consulting with [WMATA] staff or developers." Cadwalader Report at 4.

[13] The analysis does not change because Mr. Graham is no longer a voting member of the WMATA Board of Directors.  The threat of lawsuits after an official leaves office might well inhibit his "fearless, vigorous, and effective administration" of government policies while in office.  *Jones*, 919 A.2d at 607 n.4 (citing *Barr*, 360 U.S. at 571).

business expectancy, for failure to state a claim.[14]  Banneker alleges in Count III of the Amended

Complaint that Messrs. Graham, LaKritz, Adler and LAD tortiously interfered with Banneker's

prospective business advantage.  Under D.C. law, the elements of a successful claim for tortious

interference with a prospective business advantage are (1) the existence of a valid business

relationship or other expectancy; (2) knowledge of the relationship or expectancy on the part of

the interferor; (3) intentional interference causing termination of the relationship or expectancy

or causing a failure of performance by one of the parties; and (4) resultant damage.  *McNamara*

*v. Picken*, 866 F. Supp. 2d 10, 15 (D.D.C. 2012) (describing D.C. law).

A plaintiff must allege a business expectancy, not grounded in a present

contractual relationship, which is commercially reasonable to expect.  *McNamara*, 866 F. Supp.

2d at 15.  "A valid business expectancy requires a probability of future contractual or economic

relationship and not a mere possibility."  *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 55

(D.D.C. 2012) (describing D.C. law).  An expectancy that is dependent upon approval by

government bodies ordinarily is considered "too remote" to establish a valid business

expectancy.  *Democratic State Comm. of D.C. v. Bebchick*, 706 A.2d 569, 573 (D.C. 1989); *Carr*

*v. Brown*, 395 A.2d 79, 84 (D.C. 1978).  In *Carr*, a developer claimed that a neighboring

property owner tortiously interfered with the developer's attempt to obtain an alley closing and

zoning exceptions.  *Carr*, 395 A.2d at 82-83.  The court dismissed the claim, finding that the

developer had not alleged a cognizable business expectancy, since the expectancy was

---

[14] Like the LaKritz Adler Defendants, Mr. Graham also moves to dismiss for failure to state a claim the Counts asserting tortious interference with business expectancy and contract, unlawful restraint of trade, and civil conspiracy.  Sovereign immunity requires dismissal of all claims against Mr. Graham in his official capacity; absolute immunity requires dismissal of all claims against him in his personal capacity.

contingent upon the approval of two government bodies, the D.C. Transportation Committee and the D.C. Board of Zoning Adjustment. *Id.* at 84.

Banneker has failed to state a claim for tortious interference with a prospective economic advantage because it has not alleged a valid business expectancy. Banneker alleges that the "failed business expectancy" at issue was the failure to reach a final contract for the Project. But Banneker only hoped to enter into a final contract with WMATA. Any final contract was contingent upon approval and execution by the WMATA Board of Directors, a possibility that was too remote to establish a valid business expectancy. *See Bebchick*, 706 A.2d at 573; *Carr*, 395 A.2d at 84. Banneker has not alleged that a final contract was "probable." *See Robertson*, 867 F. Supp. 2d at 55.

Moreover, Banneker has not alleged that the interference by the LaKritz Adler Defendants actually caused termination of the business relationship/expectancy or actually caused a failure of performance by WMATA. Banneker had an exclusive right to negotiate with WMATA and hoped to enter into a final development contract with WMATA. *See* Am. Compl. ¶ 92. Any extension of the exclusivity period and any final contract had to be approved by a vote of the WMATA Board of Directors. *Id.* ¶ 174. The LaKritz Adler Defendants did not have the power or authority to cause the WMATA Board to vote.

Accordingly, Banneker has not alleged that the LaKritz Adler Defendants interfered with a valid business expectancy or that such alleged interference caused termination of the expectancy or caused WMATA to fail to perform. Because the Amended Complaint fails to allege the critical elements of tortious interference with a prospective economic advantage, Count III will be dismissed.

## C. Tortious Interference with Contract

Mr. Graham and the LaKritz Adler Defendants move to dismiss Banneker's claim for tortious interference with contract for failure to state a claim. The elements of a claim for tortious interference with contract are: (1) the existence of a valid contract; (2) knowledge of the contract on the part of the interferor; (3) intentional interference causing termination of the contract or causing a failure of performance by one of the parties; and (4) resultant damage. *Onyeoziri v. Spivok*, 44 A.3d 279, 286 (D.C. 2012). A plaintiff cannot establish liability without a strong showing of intent to disrupt ongoing business relationships. *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1988).

Banneker's claim for tortious interference with contract fails. Banneker asserts that it had rights under two contracts: (1) the July 2008 Term Sheet; and (2) the exclusive right to negotiate with WMATA for a limited period. The claim for tortious interference with the July 2008 Term Sheet fails because, as the Court previously held, the July 2008 Term Sheet was not a valid and enforceable contract. *See* Op. at 23-24. A valid and enforceable contract requires the express intention of the parties to be bound and agreement to all material terms. *Simon v. Circle Assocs.*, 753 A.2d 1006, 1012 (D.C. 2000). The Term Sheet did not contain all material terms. Instead, it stated that the parties "wished to negotiate" a Definitive Agreement in the near future and that WMATA would not be bound by such Definitive Agreement "unless and until" it was approved by the Board. Term Sheet at 1. Moreover, the Term Sheet expressly stated that it was non-binding in all respects, except with regard to the exclusivity period: "This Term Sheet will have no binding effect on the parties except that [Banneker] shall have the exclusive right to negotiate a Definitive Agreement with WMATA for a period of five (5) months from the date of this Term Sheet." Term Sheet at 11. Because Banneker has not alleged that the Term Sheet was

a valid contract, Banneker cannot base a claim for tortious interference with contract on an allegation that Messrs. Graham, LaKritz, and Adler interfered with the Term Sheet.

The claim for tortious interference with Banneker's exclusivity period fails because the Amended Complaint does not allege facts in support of the third element, *i.e.*, intentional interference causing termination of the contract or causing a failure of performance by one of the parties. As the Court previously held, the Amended Complaint does not allege that the exclusivity period was terminated prematurely. In fact, the exclusivity period was extended three times before it expired. *See* Am. Compl. ¶¶ 12, 18, 176. Nor is it alleged that WMATA failed to perform the contract by actually negotiating with Messrs. LaKritz or Adler, with LAD, or with any other developer during Banneker's exclusivity period. The Court explained in its prior Opinion:

> The [Amended Complaint alleges] that WMATA entered "into an agreement, scheme or plan with LaKritz, Adler and LaKritz Adler defendants to engage in a continuous course of conduct both before and all-during [sic] Banneker's period of exclusivity designed to interfere with the rights of Banneker and provide a financial benefit to LaKritz Adler at Banneker's expense." Am. Compl. ¶ 208(12). This allegation, however, like all the others, does not state that WMATA bargained with LaKritz Adler for its work as developer of the Project during Banneker's exclusivity period. It asserts only that Mr. Graham and LaKritz Adler agreed to interfere with Banneker's negotiation. Though Mr. Graham's interference was found to be unethical, an agreement to interfere does not constitute a negotiation for work on the Project and thus was not a breach of Banneker's exclusivity agreement.

*See* Op. at 21-22. Thus, the Amended Complaint does not allege actual breach of, or failure to perform, the exclusivity contract.

In sum, the Amended Complaint fails to state a claim for tortious interference with regard to the July 2008 Term Sheet or with regard to the exclusivity agreement. Count IV

(tortious interference with contract) against Messrs. Graham, LaKritz, Adler, and LAD, must be dismissed for failure to state a claim.

### D. Unlawful Restraint of Trade

Count VI of the Amended Complaint alleges that Messrs. Graham, LaKritz, and Adler unlawfully restrained trade in violation of federal and local antitrust law—the Sherman Act, 15 U.S.C. § 1, and D.C. Code §§ 28-4501, *et seq.* The Sherman Act declares "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . . to be illegal." 15 U.S.C. § 1. The Sherman Act prohibits only unreasonable restraints on trade. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988). D.C. Code § 28-4502 is substantially the same; if a plaintiff fails to state a claim under the Sherman Act, he also fails to state a claim under D.C. Code § 28-4502. *See GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 45 (D.D.C. 1998).

A Section 1 claim under the Sherman Act requires that (1) defendants entered into some agreement for concerted activity, (2) the agreement either did or was intended to restrict trade unreasonably in the relevant market, and (3) it affected interstate commerce. *ASA Accugrade, Inc. v. Am. Numismatic Ass'n*, 370 F. Supp. 2d 213, 215 (D.D.C. 2005). Antitrust laws were designed to protect competition, not competitors. A plaintiff must allege "anti-competitive effects resulting from [the defendant's] actions; absent injury to *competition*, injury to a plaintiff as a *competitor* will not satisfy this pleading requirement." *Mizlou Television Network, Inc. v. Nat'l Broad. Co.*, 603 F. Supp. 677, 683 (D.D.C. 1984) (emphasis in original); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488-89 (1977) (an antitrust claim must allege an anticompetitive effect on a particular market, not injury to a sole market participant). There is no antitrust injury when a defendant's entry into the marketplace actually increased competition, even if such competition caused plaintiff harm. *Dial A Car, Inc. v.*

*Transp., Inc.*, 884 F. Supp. 584, 589 (D.D.C. 1995), *aff'd*, 82 F.3d 484 (D.C. Cir. 1996). Further,

an antitrust claim of bid-rigging, such as that alleged in the Amended Complaint, must allege

collusion among competitors, not between a competitor and a third party. *Tal v. Hogan*, 453

F.3d 1244, 1261 n.15 (10th Cir. 2006); *see also United States v. Sargent Elec. Co*., 785 F.2d

1123, 1126-27 (3d Cir. 1986) (an alleged agreement to rig bids, made among persons who are

not competitors, does not state a claim under the Sherman Act).

The Amended Complaint fails to state an antitrust claim because it does not allege

injury to competition or an agreement among individuals who were competitors in the real estate

development market. Banneker alleges that the LaKritz Adler Defendants petitioned Graham to

involve them in the Project, even though Banneker had the exclusive right to negotiate a deal to

develop the Site. This conduct may have harmed one competitor (Banneker), but it cannot be

said to have harmed the marketplace competition. Without an allegation that competition itself

was harmed, no actionable antitrust injury is alleged. Further, Mr. Graham is a public official

and not a developer. The assertion that Mr. Graham colluded with the LaKritz Adler Defendants

alleges an agreement between a competitor and a third party; it does not allege collusion *among*

*competitors*, and thus it does not state an antitrust claim under the Sherman Act. Count VI,

alleging unlawful restraint of trade, will be dismissed for failure to state a claim.

### E. Civil Conspiracy

Finally, Count VIII of the Amended Complaint alleges civil conspiracy. The

elements of civil conspiracy are:

(1) an agreement between two or more persons;

(2) to participate in an unlawful act, or in a lawful act in an
unlawful manner; and

(3) an injury caused by an unlawful overt act performed by one of
the parties to the agreement

(4) pursuant to, and in furtherance of, the common scheme.

*Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) (citing *Griva v. Davison,* 637 A.2d 830, 848 (D.C. 1994)).  There is no independent action in the District of Columbia for civil conspiracy; it is a means to establish vicarious liability for an underlying tort. *Exec. Sandwich Shoppe*, 749 A.2d at 738.

The underlying torts alleged here are tortious interference with contract and a prospective business advantage.  Because the underlying torts must be dismissed, a civil conspiracy claim based on those torts cannot stand.

## IV.  CONCLUSION

For the reasons set forth above, the motion to dismiss filed by Mr. Graham, Dkt. 21, and the motion to dismiss filed by Joshua Adler, Robb LaKritz, and LaKritz Adler Development LLC, Dkt. 20, will be granted.  The Amended Complaint will be dismissed.  A memorializing Order accompanies this Opinion.


Date:  February 6, 2014                                  _____/s/_____
                                                                          ROSEMARY M. COLLYER
                                                                          United States District Judge