UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
**BANNEKER VENTURES, LLC,**                )
                                                            )
            **Plaintiff,**                                )
                                                            )
            **v.**                                         )            **Civil Action No. 13-391 (RMC)**
                                                            )
**JIM GRAHAM,** *et al.,*                      )
                                                            )
            **Defendants.**                          )
_____ )

## OPINION

Banneker Ventures, LLC (Banneker) is a developer that had an exclusive right to negotiate with Washington Metropolitan Area Transit Authority (WMATA) for the lease and development of certain real property, but failed to reach a final agreement. In this lawsuit, Banneker alleges tortious interference with contract and business expectancy and civil conspiracy. Defendant Jim Graham moves to dismiss. The motion will be denied.

## I.  FACTS

The facts are set forth in detail in this Court's prior opinion and the opinion of the D.C. Circuit and will not be repeated here. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1124-28 (D.C. Cir. 2015) (*Banneker II*); *Banneker Ventures, LLC v. Graham*, 19 F. Supp. 3d 231, 238-42 (D.D.C. 2014) (*Banneker I*).

On August 18, 2015, the D.C. Circuit reversed this Court's decision granting Mr. Graham's motion to dismiss based on absolute immunity and remanded for additional briefing. The Circuit specified that:

> [o]n remand, the district court should evaluate, for each action complained of:  (1) whether the alleged action, if established at trial, would be one that manifestly exceeded the scope of Graham's

1

official duties or was carried out through manifestly excessive means; or (2) whether the alleged action, if established at trial, would manifestly violate any statute, regulation, or policy governing WMATA Board Members' conduct. Any action that would be unauthorized under either standard is unprotected by immunity. The district court should therefore evaluate whether the actions that it concludes would not be immunized, taken together, state a claim against Graham for tortious interference or civil conspiracy.

*Banneker II*, 798 F.3d at 1145. Consistent with the Circuit opinion, the Court permitted limited discovery into Mr. Graham's official duties and, following completion of that discovery, Mr. Graham again moved to dismiss all claims against him. *See* Graham 2nd Mot. [Dkt. 88]. Banneker opposed, *see* Opp'n [Dkt. 90], and Mr. Graham replied, *see* Reply [Dkt. 92].[1] The motion is ripe for review.

### A. Mr. Graham's Official Duties

Mr. Graham's official duties as a member of the WMATA Board can be determined through review of a combination of documents: (1) the WMATA Compact, Graham 2nd Mot., Ex. 1 [Dkt. 88-2] (Compact); (2) Procedures for WMATA Board of Directors, Graham 2nd Mot., Ex. 4 [Dkt. 88-5] (WMATA Board Procedures & Standards of Conduct); (3) Standards of Conduct for Members of the WMATA Board of Directors, *id*.; and (4) the Joint Development Policies and Guidelines, Graham 2nd Mot., Ex. 6 [Dkt. 88-7] (Joint Development Guidelines). First, the WMATA Compact is the document that governs the practice and procedure of WMATA, including the role of its Board of Directors. The Compact proscribes that the Board shall "adopt rules and regulations governing its meeting, minutes and transactions," and provides specific rules to limit conflicts of interest. Compact at 3, 4. The

---

[1] WMATA submitted a response to Mr. Graham's motion and Banneker's opposition. *See* WMATA Response [Dkt. 89]; WMATA Reply [Dkt. 91]. Banneker's Notice of Supplemental Evidence was also received by the Court, but not considered. *See* Notice [Dkt. 94].

following official duties are also included in the sections of the Compact dealing with particular actions and roles of WMATA:

(1) "The Board shall develop and adopt, and may from time to time review and revise, a mass transit plan for the immediate and long-range needs of the Zone," *id.* at 6;

(2) "It shall be the duty and responsibility of each member of the Board to serve as liaison between the Board and the body which appointed him to the Board," *id.*;

(3) "[T]he Board shall create technical committees concerned with planning and collection and analyses of data relative to decision-making in the transportation planning process," *id.*;

(4) "Before a mass transit plan is adopted, altered, revised or amended, the Board shall transmit such proposed plan, alteration, revision or amendment for comment" to a number of agencies, *id.* at 7;

(5) The Board may temporarily borrow funds, *see id.* at 10;

(6) "The Board shall annually adopt a capital budget, including all capital projects it proposes to undertake or continue during the budget period," *id.* at 11;

(7) "The Board shall annually adopt a current expense budget for each fiscal year," *id.*;

(8) The Board may take a number of actions with respect to bonds, both selling and purchasing, *see id.* at 13-15;

(9) "The Board shall have power to execute agreements, leases and equipment trust certificates with respect to the purchase of facilities or equipment such as cars, trolley buses and motor buses, or other craft," *id.* at 15;

(10) "The Board shall enter into an operating contract only after formal advertisement and negotiations with all interested and qualified parties, including private transit companies rendering transit service within the Zone, *id.* at 19; and

(11) "The Board is authorized to locate, construct and maintain any of its transit and related facilities in, upon, over, under or across any

streets, highways, freeways, bridges and any other vehicular facilities," *id*. at 29.

As required by the Compact, the WMATA Board developed and adopted its own set of procedures, which include the following official duties of the Board:

> The WMATA Board of Directors determines agency policy and provides oversight for the funding, operation and expansion of transit facilities within the Transit Zone.

> The authority of the Board of Directors is vested in the collective body and not in its individual members. Accordingly, the Board, in establishing or providing any policies, orders, guidance, or instructions to the General Manager or WMATA staff, shall act as a body. No member individually shall direct or supervise the General Manager or any WMATA employee or contractor.

WMATA Board Procedures & Standards of Conduct at 1. Attached as Appendix 1 to the Procedures of the WMATA Board were the Standards of Conduct for Members of the WMATA Board of Directors. *See id*. at 10. The Standards specify how Board members should conduct themselves to avoid appearances of impropriety or conflicts of interest. While the Standards do not specifically denote official duties of the Board, they do impose restrictions on the power and authority of the Board members. The following Standards of Conduct are relevant to the Court's analysis:

> (1) "It is imperative that Board Members in their private financial relationships and in their official conduct strictly avoid engaging in actions which create conflicts of interest or the appearance of a conflict of interest. It is likewise imperative that Board Members act impartially in their official conduct by avoiding any actions which might result in favored treatment or appearances thereof. . . . Each Board Member while acting in his/her capacity as a WMATA Board Member, has a duty to place the public interest foremost in any dealings involving WMATA," *id*. at 12;

> (2) "Under the Compact, Board Members shall not (1) be financially interested, either directly or indirectly, in any contract, sale, purchase, lease or transfer of real or personal property to which the Board or the Authority is a party; (2) in connection with services performed within the scope of their official duties, solicit or accept

4

money or any other thing of value in addition to the compensation or expenses paid to him by the Authority; (3) offer money or any thing of value for or in consideration of obtaining an appointment, promotion or privilege with the Authority," *id*.;

(3) "No Board Member nor household member may singly or in combination, be a party nor any or all of them have a direct financial interest in a party with an actual or prospective business relationship with the Authority," *id*.;

(4) "Except [if the gratuity is unsolicited and valued less than $75 or in connection with a widely attended gathering], a Board Member or household member shall not solicit or accept anything of value from a party with an actual or prospective business relationship with the Authority," *id*. at 13;

(5) "Board Members shall not use, nor give the appearance that they are using, their official position with the Authority in a manner inconsistent with their responsibilities to the Authority," *id*. at 14; and

(6) "Board members shall not: (1) use or permit others to use information not generally available to the public obtained from the Authority through the Board Member's official position with the Authority to further the direct or indirect financial interests of a Board Member, any household member, a Member's business associates, or any party to any actual or prospective financial transaction with the Authority; [or] (2) disclosure or permit others to disclose to anyone outside the Authority information obtained through their official position with the Authority and not generally available to the public except where and to the extent necessary to fulfill the Board Member's public responsibility," *id*.

The final relevant document containing official duties of the WMATA Board is the WMATA

Joint Development Policies and Guidelines, which specifically addresses duties with respect to

joint development projects. *See* Joint Development Guidelines. The WMATA Board's roles and

responsibilities are specifically set out in the guidelines as follows:

The WMATA Board of Directors establishes joint development policies, exercises specific approvals within the joint development process, and maintains oversight of the joint development program. The Board has specific responsibilities to authorize joint development solicitations, approve developer selection and a non-binding term sheet based on a staff recommendation, and approve

5

terms of a lease or sales agreement (the final contract) with the designated developer. Additionally, the WMATA Board authorizes a public hearing, prior to final site plan approval by the local jurisdiction, when such hearing is required because of a substantial change to WMATA facilities on site or a change to the site access.

*Id.* at 5.

## B. Mr. Graham's Alleged Improper Actions

While Banneker repeatedly lists 16 allegedly improper actions undertaken by Mr. Graham in its Amended Complaint,[2] the Court has identified 5 categories of actions, which include specific allegations of actual improper acts, in lieu of unspecific or conclusory allegations of unfavorable behavior.

*1. Extortion and Vote Bartering*

Mr. Graham expected that "before approval of the joint development agreement by WMATA, Banneker and [Mr.] Karim would host a fundraiser for Graham's D.C. Council race and contribute to his Council campaign," Am. Compl. ¶ 27;

Mr. Graham "sought to barter a vote in his capacity as member of the D.C. Council for his vote as a WMATA Board member on the Florida Avenue project," *Banneker II*, 798 F.3d at 1141; *see also* Am. Compl. ¶¶ 61, 77, 96-98, 106-109, 190, 195; and

Mr. Graham told Mr. Karim that "he wanted him to participate in a U Street Business Improvement District ('BID') program that he was spearheading" in exchange for support on the Project, Am. Compl. ¶¶ 111, 121.

---

[2] *See* Am. Compl. [Dkt. 18] ¶ 247 (allegations in support of Count III, tortious interference with prospective business advantage); *id.* ¶¶ 208, 227 (allegations in support of Count I, breach of contract); *id.* ¶ 239 (allegations in support of Count II, breach of implied covenant of good faith); *id.* ¶ 275 (allegations in support of Count IV, tortious interference with contract); *id.* ¶ 286 (allegations in support of Count V, unjust enrichment); *id.* ¶ 294 (allegations in support of Count VI, unlawful restraint of trade).

*2. Interference with Development Team Members and Actions*

Mr. Graham convinced Donatelli Development, Inc. to withdraw from the project and "to wait until the last minute to drop out of the Project so that LaKritz Adler's bid would be accepted," *id.* ¶ 43;

Mr. Graham directed Banneker, through Buwa Binitie in the District of Columbia Office of the Deputy Mayor for Planning and Economic Development, not to attend a scheduled Oral Interview for the Project, *see id.* ¶ 48;

Mr. Graham "told [Metropolis Development Company] not to partner with Banneker," *id.* ¶¶ 60, 112, 191;

Mr. Graham attempted to require Banneker to include Mr. Graham's favored development company (LaKritz Adler) as a member of Banneker's development team, *id.* ¶¶ 70, 119, 190; and

Mr. Graham attempted to require Banneker to purchase property from Mr. Graham's favored development company (LaKritz Adler), *id.* ¶ 127.

*3. Directing WMATA Staff*

Mr. Graham ordered WMATA staff to investigate "alleged financial obligations to the District by Banneker's then principal, Williams," *id.* ¶ 72;

Mr. Graham directed WMATA staff to take specific actions with regard to the Banneker proposal, *id.* ¶¶ 147-48, 150, 168; and

Mr. Graham instructed WMATA's then-General Counsel (during Banneker's period of exclusivity) to provide a legal roadmap as to how, when, and under what circumstances Mr. Graham could request "Best and Final Offers" from additional developers, *see id.* ¶¶ 155, 160.

*4. Aggressively Advocating for His Preferences*

"[Mr.] Graham knowingly made false representations about Banneker, its financial wherewithal and its capabilities during . . . closed door [Board meetings]," *id.* ¶ 88;

Mr. Graham orchestrated the addition of "components to the Project (such as an affordable housing requirement for which WMATA had no guidelines and WMATA staff did not know how to implement) to make it both less profitable to Banneker and less financially attractive or feasible to WMATA," *id.* ¶ 247;

7

> Mr. Graham "advocate[d] (as a WMATA Board Member, Chair of the PDRE Committee[3] or Chair of the WMATA Board) and demonstrate his preference for LaKritz Adler to either become the Selected Developer or to otherwise gain a financial benefit from the Project with the very same WMATA staff charged with negotiating exclusively with Banneker under the contract," *id.*; and

> Mr. Graham "use[d] his jurisdictional vote (either voting 'no' or 'abstaining') [in] both his capacity as a PDRE Committee Member and WMATA Board Member to exercise undue influence over the terms and conditions that WMATA staff was authorized to and responsible for negotiating with Banneker," *id.*

*5. Sharing Confidential Information*

> Mr. Graham "provided confidential Board information to LaKritz Adler about Banneker's proposal," *id.* ¶¶ 134-35.

## II.  JURISDICTION AND LEGAL STANDARDS

### A.  Jurisdiction

The Court has jurisdiction because the parties are diverse and there is a sufficient amount in controversy.  *See Banneker I*, 19 F. Supp. 3d at 243 (citing 28 U.S.C. § 1332(a)); *see also* Am. Compl. at 99 (Relief Requested); Banneker Notice of Citizenship [Dkt. 37]; Graham Notice of Citizenship [Dkt. 36]; LaKritz Notice of Citizenship [Dkt. 38].

### B.  Motion to Dismiss for Failure to State a Claim

Mr. Graham moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  A complaint must be sufficient "to give a defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  Although a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to

---

[3] The PDRE Committee is the Planning, Development and Real Estate Committee of the WMATA Board of Directors.  *See* Am. Compl. ¶ 63.

relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* The facts alleged "must be enough to raise a right to relief above the speculative level." *Id.* "[A] complaint needs *some* information about the circumstances giving rise to the claims." *Aktieselskabet Af 21. Nov. 2001 v. Fame Jeans, Inc.*, 525 F.3d 8, 16 n.4 (D.C. Cir. 2008). A complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Twombly*, 550 U.S. at 570. When a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged, then the claim has facial plausibility. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must treat the complaint's factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. But a court need not accept as true legal conclusions set forth in a complaint. *Iqbal*, 556 U.S. at 678.

In deciding a motion under Rule 12(b)(6), a court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits or incorporated by reference, and matters about which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007). Generally, when a court relies upon matters outside the pleadings, a motion to dismiss must be treated as one for summary judgment and disposed of pursuant to Rule 56. *See* Fed. R. Civ. P. 12(d). "However, where a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment." *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99 (D.D.C. 2008) (citation omitted).

### C. Absolute Immunity

"A motion to dismiss is an appropriate vehicle to assert a claim of absolute immunity." *Stoddard v. Wynn*, 168 F. Supp. 3d 124, 129 (D.D.C. 2016). "The burden of establishing immunity must be borne by the official claiming it." *Banneker II*, 798 F.3d at 1140 (citing *Westfall v. Erwin*, 484 U.S. 292, 299 (1988)). Absolute immunity is determined by applying the two-part test established in *Westfall v. Erwin*. 484 U.S. 292. Absolute immunity only shields an official if the "challenged conduct is within the outer perimeter of an official's duties and is discretionary in nature." *Id*. at 300.

The purpose of granting immunity to officials when acting within their official duties is to "insulate the decisionmaking process from the harassment of prospective litigation." *Id*. at 295. If officials are tailoring their actions or making decisions due to potential suit, they will act less effectively than otherwise, if not so fearful. *See Forrester v. White*, 484 U.S. 219, 223 (1988). Absolute immunity is justified only when the benefits outweigh the potential harms; its use is intended to be sparing. "[C]ourts may, where appropriate, answer the question of whether an official has acted within the outer perimeter of official duties through limited evidentiary analysis focusing on the nature and scope of the job duties in question." *Banneker II*, 798 F.3d at 1142.

### III.  ANALYSIS

The D.C. Circuit directed this Court to conduct a two-part analysis to determine whether Banneker's claims against Mr. Graham should be dismissed. First the Court must determine whether Mr. Graham's alleged actions were "within the outer perimeter" of his official duties or discretionary in nature. *Westfall*, 484 U.S. at 300. An official is not entitled to absolute immunity from suit for actions that were clearly outside the realm of his official duties or that

were not discretionary.  Second the Court assesses whether the remaining allegations sufficiently

state claims of tortious interference or civil conspiracy.

### A.  Absolute Immunity

Official duties extend beyond the "'title of [the] office'" to cover "'the duties with

which [the official] is entrusted.'"  *Banneker II*, 798 F.3d at 1140 (quoting *Barr v. Matteo*, 360

U.S. 564, 573 (1959).  To determine official duties, a court looks beyond the specific language of

the roles and responsibilities in order to determine the "outer perimeter" of such duties.  *Westfall*,

484 U.S. at 300.  An official is not protected by absolute immunity if he "act[ed] in a manner that

is manifestly or palpably beyond his authority," including the use of "manifestly excessive

means" when acting within his scope of authority.  *Banneker II*, 798 F.3d at 1140 (citing *Simons*

*v. Bellinger*, 643 F.2d 774, 786 (D.C. Cir. 1980) and *McKinney v. Whitfield*, 736 F.2d 766, 769-

70 (D.C. Cir. 1984)).

If an action is part of official duties, a court must then determine if it is

discretionary in nature.  As to the latter, the inquiry begins with determining whether "any

statute, regulation, or policy specifically prescribes a course of action for an employee to

follow."  *KiSKA Constr. Corp. v. WMATA*, 321 F.3d 1151, 1159 (D.C. Cir. 2003).  An action is

discretionary unless the statute, regulation, or policy leaves "'no room for choice.'"  *Banneker II*,

798 F.3d at 1143 (quoting *U.S. v. Gaubert*, 499 U.S. 315, 324 (1991)).  "Only alleged conduct

that manifestly violates an ethical proscription or other statute, regulation, or policy that

constrains the exercise of discretion may be subject to liability."  *Id*. at 1144.  If these kinds of

prescribed limitations do not apply, the inquiry must determine whether "the exercise of

discretion is grounded in social, economic, or political goals."  *Id*. at 1143.  Discretionary actions

grounded in such goals "retain governmental function immunity."  *Id*.

The Court will consider each category of actions identified above to evaluate the applicability of absolute immunity.  For these purposes, the Court assumes the truthfulness of all well-plead factual allegations.  *See Iqbal*, 556 U.S. at 696 (citing *Twombly*, 550 U.S. at 555).

    *1. Extortion and Vote Bartering.*

The first category of actions includes Mr. Graham's alleged attempts to extort Banneker by seeking a contribution to his local political campaign and suggesting that Banneker support a Business Development Project that Mr. Graham favored.  Mr. Graham is also alleged to have offered to exchange his vote for the D.C. Lottery project in return for Banneker's withdrawal from the Florida Avenue Project.  Mr. Graham argues that these actions were communications with developers and part of his official duties to investigate potential agreements.  The Court agrees that Mr. Graham could communicate with prospective WMATA contractors as part of his official duties as a WMATA Board member and chair, but tying a developer's business prospects to Mr. Graham's fundraising for his personal campaign to retain his seat on the D.C. Council, as alleged, would exceed the "outer perimeter" of these official duties.

The D.C. Circuit has found that Mr. Graham's attempt to convince Warren Williams, Banneker's then-principle, to withdraw Banneker's bid on the Florida Avenue Project in exchange for Mr. Graham's vote in favor of Mr. Williams for the D.C. Lottery contract and alleged attempts to extort Banneker were outside his official duties.  *See Banneker II*, 798 F.3d at 1141 (finding "to barter a vote in his capacity as member of the D.C. Council for his vote as a WMATA Board member on the Florida Avenue Project, and attempt[] to extort Banneker . . . are manifestly beyond the authority of a WMATA Board member").  Without such authority, Mr. Graham is not protected by absolute immunity and must defend against these allegations.

*2. Interference with Development Team Members and Actions*

Mr. Graham argues that his actions in connection with the Florida Avenue Project are protected under absolute immunity because Board members are tasked with overseeing joint development projects, authorizing solicitations, approving developer selection, and approving terms of the contracts. He considers his actions with respect to Donatelli and Metropolis, and encouraging Banneker to partner with or purchase land from LaKritz Adler to be within the outer perimeter of his responsibly to research and approve developers. Mr. Graham stresses that his actions "bear some reasonable relationship to" his duty to investigate and vote on joint development projects. *Kumar v. George Washington University*, No. 15-120, 2016 WL 1273186, at *6 (D.D.C. March 31, 2016).

While a director may take actions not specifically defined or described by the Joint Development Guidelines to investigate and decide whether to approve a developer, such actions must be reasonably related to those tasks. Just as "absolute immunity is lost when a supervisor adopts *means* beyond the outer perimeter of his authority," Mr. Graham's immunity may have been lost if he adopted unreasonable means in his dealings with prospective WMATA contractors. *McKinney*, 736 F.2d at 771. Mr. Graham is alleged to have caused two partners to withdraw from Banneker's development team, attempted to cause Banneker to miss a meeting with WMATA, and acted in his individual capacity to encourage Banneker to add LaKritz Adler to the project and purchase land from LaKritz Adler. WMATA Board Procedures stress that the Board acts as a unit and no individual Board member may direct "any WMATA employee or contractor." WMATA Board Procedures & Standards of Conduct at 1. Banneker alleges that Mr. Graham was acting on his own and not as a representative of the Board as a whole. If proved, such interference with a development team's composition and proposal would be

"manifestly or palpably beyond [Mr. Graham's] authority" as a Board member and would not entitled to absolute immunity from suit.  *Bellinger*, 643 F.2d at 786.

The facts alleged in the Amended Complaint are sufficient to overcome Mr. Graham's asserted absolute immunity from suit on these allegations.

*3. Directing WMATA Staff*

Mr. Graham argues that, despite the language in the Procedures for WMATA Board of Directors—specifically noting that "[n]o member individually shall direct or supervise the General Manager or any WMATA employee or contractor"—he was permitted, as chair, to direct WMATA employees if it were related to the investigation or approval of a joint development project.  *See* Graham 2nd Mot. at 29-32.  While it is possible that the custom and practices of the WMATA Board modified the explicit statement limiting Members' authority in its Procedures, such a finding cannot be made on this record.  Similarly, in light of the specificity of the WMATA Board Procedures, the Court cannot find that Mr. Graham's alleged instructions to WMATA staff are protected by absolute immunity and that he does not have to defend against these allegations.

*4. Aggressively Advocating for His Preferences.*

Mr. Graham argues that his actions to promote his preferred developer and shape the components of the Florida Avenue Project were part of his official duties and protected by absolute immunity.  Banneker complains loudly of nefarious motivations behind Mr. Graham's promotion of LaKritz Adler and his efforts to add affordable housing requirements to the Florida Avenue Project.  Contrary to its argument, subjective motives are irrelevant to immunity from suit for official acts.  *See Gray v. Poole*, 243 F.3d 572, 575 (D.C. Cir. 2001) (recognizing that suits are prohibited act within the scope of official duties, "even if the official is alleged to have

acted in bad faith"); *Barr*, 360 U.S. at 570.  The question is resolved not by considering Mr.

Graham's alleged personal motives, but by whether he, as Board chair or member, had

corresponding official duties in connection with joint development projects.

      The WMATA Board as a whole establishes policies, exercises approval,

maintains oversight, authorizes solicitations, approves selections, and approves agreements.  In

furtherance of those duties, a Board member may and should express his opinion of development

candidates, suggest additions or changes to projects, show preferences between and among

candidates, and vote accordingly.  Thus, advocating for his preferences, even aggressively, was

within the scope of Mr. Graham's official duties.  *See Banneker II*, 798 F.3d at 1141 (finding that

"persuad[ing] his fellow Board members to add an affordable housing requirement to the project

with approving the original Term Sheet" was "an exercise of Graham's authority as a Board

member").  The Court also finds that WMATA Board members have considerable discretion in

how they might review projects, assess options, and approve selections.  As a result, Mr. Graham

is entitled to absolute immunity from suit for his alleged actions as they related to advocating for

a particular developer or adding components to the Florida Avenue Project.

      *5. Sharing Confidential Information.*

      Mr. Graham argues that "speaking with developers did not manifestly exceed, but

instead was closely related to, a director's duties."  Graham 2nd Mot. at 38.  Further, he contends

that Banneker's allegations that information was leaked are neither accurate nor advanced in the

Amended Complaint with supporting facts.  *See id*.  The applicable Standards of Conduct

prohibit sharing confidential information.  *See* WMATA Board Procedures & Standards of

Conduct at 14 ("Board members shall not . . . disclose or permit others to disclose to anyone

outside the Authority information obtained through their official position with the Authority and

not generally available to the public except where and to the extent necessary to fulfill the Board

Member's public responsibility."). The Standards leave no room for discretion; and Banneker is

afforded a presumption of truth to its allegations of fact at this stage in the proceedings. *See*

*Iqbal*, 556 U.S. at 696. Mr. Graham is not protected by absolute immunity from defending

against these allegations.[4]

### B. Tortious Interference with Prospective Economic Advantage

Mr. Graham moves to dismiss Banneker's claim for tortious interference with

prospective business advantage, also called tortious interference with business expectancy,

because the remaining allegations are not sufficient to state a claim. Under D.C. law, the

elements of a successful claim for tortious interference with a prospective business advantage

are:

> (1) the existence of a valid business relationship or expectancy;
>
> (2) knowledge of the relationship or expectancy on the part of the interferer;
>
> (3) intentional interference inducing or causing termination of the relationship or expectancy; and
>
> (4) resultant damage.

*McNamara v. Picken*, 866 F. Supp. 2d 10, 15 (D.D.C. 2012).

A plaintiff must allege a business expectancy, not grounded in a present

contractual relationship, which is commercially reasonable to expect. *See id.* at 15. "A valid

business expectancy requires a probability of future contractual or economic relationship and not

a mere possibility." *Robertson v. Cartinhour*, 867 F. Supp. 2d 37, 55 (D.D.C. 2012). Because

---

[4] Notably, the Circuit concluded that Mr. "Graham's alleged leaking of confidential information manifestly violated the Standards." *Banneker II*, 798 F.3d at 1144.

Banneker had a valid Term Sheet, which was an "agreement that bound WMATA to negotiate

exclusively and in good faith with Banneker," "Banneker had a justified expectation that a

development agreement would be finalized." *Banneker II*, 798 F.3d at 1134-35.  The Amended

Complaint sufficiently alleges Mr. Graham's knowledge of the Term Sheet and Banneker's

resulting damage from the failure to consummate a final contract for the Florida Avenue Project.

Recognizing these factors, Mr. Graham's argument focuses on the sufficiency of the Complaint's

allegations of intentional interference.

   As discussed above, the D.C. Circuit and/or this Court have already determined

that absolute immunity does not protect Mr. Graham from defending this suit with respect to the

allegations that he attempted to extort Banneker and trade votes, interfered with the composition

of Banneker's development team and proposal, directed WMATA staff, and leaked confidential

information.  These allegations are sufficient to allege intentional interference with prospective

business advantage.  The motion to dismiss Count III will be denied.

  **C.  Tortious Interference with Contract**

   Mr. Graham also moves to dismiss Banneker's claim for tortious interference with

contract for failure to state a claim.  The elements of a claim for tortious interference with

contract are:  (1) the existence of a valid contract; (2) knowledge of the contract on the part of

the interferer; (3) intentional interference causing termination of the contract or causing a failure

of performance by one of the parties; and (4) resulting damages. *See Nanko Shipping, USA v.*

*Alcoa, Inc.*, 107 F. Supp. 3d 174, 182-83 (D.D.C. 2015); *Onyeoziri v. Spivok*, 44 A.3d 279, 286

(D.C. 2012).  A plaintiff cannot establish liability without a strong showing of intent to disrupt

ongoing business relationships. *See Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 423 (D.D.C. 1988).

As described above, the Amended Complaint adequately alleges knowledge, interference, and damages with respect to the allegation of tortious interference with prospective business advantage; those allegations suffice for the alternative theory of tortious interference with contract, although double recovery may be scant. The Term Sheet was a contract in itself with which Mr. Graham allegedly interfered by actions and means beyond his official position. *See Banneker II*, 798 F.3d at 1134-35. The motion to dismiss Count IV will be denied.

### D. Civil Conspiracy

Finally, Count VIII of the Amended Complaint alleges civil conspiracy. The elements of civil conspiracy are:

> (1) an agreement between two or more persons;
>
> (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and
>
> (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement
>
> (4) pursuant to, and in furtherance of, the common scheme.

*Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) (citing *Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994)). A claim of civil conspiracy "depends on the performance of some underlying tortious act." *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983). Because the Court finds Banneker has adequately alleged tortious interference and resulting damage, the Complaint sufficiently alleges an underlying tort, or unlawful act, and injury caused by that act. All well-plead allegations in the Complaint must be taken as true and Banneker is entitled to the benefit of all reasonable inferences that may be drawn from the allegations. *See Iqbal*, 556 U.S. at 676-77. The Complaint includes numerous allegations of

concerted action in furtherance of the tortious interference by Mr. Graham and LaKritz Adler, specifically through the sharing of confidential information about Banneker's proposal and attempts to involve LaKritz Adler in Banneker's development team, which are sufficient to allege an agreement. *See* Am. Compl. ¶¶ 70-71, 73-75, 134-35, 317. The motion to dismiss Count VIII will be denied.

## IV. CONCLUSION

For the reasons set forth above, Defendant Jim Graham's Renewed Motion to Dismiss, Dkt. 88, will be granted in part and denied in part. Allegations that Mr. Graham exceeded the scope of his official duties by aggressively advocating for his positions, *see* Am. Compl. ¶¶ 88, 247, 275, will be dismissed. The motion will otherwise be denied. A memorializing Order accompanies this Opinion.


Date:  December 22, 2016                                    /s/
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge