# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BANNEKER VENTURES, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 13-391 (RMC) |
| JIM GRAHAM, *et al.*, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiff Banneker Ventures, LLC brings this action against Jim Graham, Joshua A. Adler, Robb M. LaKritz, LaKritz Adler Development, LLC, and Washington Metropolitan Area Transit Authority (WMATA) for breach of contract, breach of implied covenant of good faith and fair dealing, tortious interference, unjust enrichment, unlawful restraint of commerce, fraud, and civil conspiracy. During fact discovery, Banneker issued a request for documents to WMATA which included the production of 51 witness interview memoranda prepared by the law firm Cadwalader Wickersham & Taft, LLP. Banneker also subpoenaed Cadwalader directly. WMATA now moves for a protective order precluding the production of the 51 witness interview memoranda because they are protected by the work-product and attorney-client privileges. The Court will grant in part and deny in part WMATA's motion for a protective order.

## I. BACKGROUND

The facts of this case are set forth in detail in the Court's order on Mr. Graham's second motion to dismiss and will be repeated here only as necessary. *See Banneker Ventures, LLC v. Graham*, No. 13-391, 2016 WL 7408825 (D.D.C. December 22, 2016). This case springs

1

from the breakdown of negotiations between Banneker and WMATA regarding the development of the Shaw-Howard/Florida Avenue Joint Development Site (Florida Avenue Project). *See* Mem. in Supp. of Mot. for PO [Dkt. 104-1] at 1 (WMATA Mem.). After Banneker's successful bid and over a year of negotiations, WMATA terminated its partnership with Banneker for the development of the Florida Avenue Project on March 25, 2010. WMATA Mem. at 2. One month later, on April 27, 2010, Banneker's attorney A. Scott Bolden sent a letter to WMATA detailing what Banneker believed to be the improper actions of WMATA and its Board of Directors. *See* WMATA Mem., Ex. A, April 27, 2010 Letter from A. Scott Bolden to WMATA [Dkt. 104-3] (Bolden Letter). The letter requested an opportunity to restart negotiations and move forward with the Florida Avenue Project. *See id.* at 10 ("Banneker requests a meeting as soon as possible with the appropriate WMATA officials, including members from the WMATA Joint Development & Retail Estate Committee, in order to expedite WMATA's action on the Project and formal consideration of Banneker's amended Term Sheet."). The Bolden Letter also indicated that Banneker may seek further remedies if negotiations were not restarted. *See id.* ("If the parties are unable to successfully move forward with action on Banneker's amended Term Sheet, given the foregoing, Banneker is prepared to seek any and all available remedies at law or in equity to address Banneker's damages and concerns regarding the selection process in this instance."). WMATA briefly responded to Banneker's letter, but did not reopen negotiations on the Florida Avenue Project. *See* Opp'n, Ex. B, Cadwalader Report of Investigation for the Board of Directors for the Washington Metropolitan Area Transit Authority [Dkt. 105-3] at 7 n.1 (Bondi Report) (indicating that WMATA's General Counsel responded to some allegations in the 2010 letter from Mr. Bolden, but took no further action).

Over two years later, WMATA retained Cadwalader, Wickersham & Taft LLP to "provide investigative and legal services regarding the actions of WMATA's Board in connection with the Florida Avenue Project." WMATA Mem. at 3. During the investigation, which lasted five months, Cadwalader attorneys interviewed approximately 34 individuals, 19 of whom were current or former WMATA employees or Board members. *See id*. The interviews resulted in the creation of 51 interview memoranda—the documents which are at issue in this motion for protective order. S*ee id*. The Cadwalader attorney who created each memorandum marked the documents "attorney work product." *Id*.

At the end of Cadwalader's investigation, Bradley Bondi of Cadwalader released an investigative report to WMATA. *See* Bondi Report. On October 11, 2012, WMATA adopted a Board Resolution which recommended the public release of the Bondi Report. *See* Opp'n, Ex. M, WMATA Board Resolution 2012-25 [Dkt. 105-14]. The Bondi Report includes references to and citations from interview memoranda prepared by Cadwalader attorneys.

## II. LEGAL STANDARD

### A. Motion for Protective Order

The general rule in discovery is that a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The party claiming a privilege bears the burden to prove the communication or document is protected. *See* Fed. R. Civ. P. 26(b)(5). The proponent of a privilege in federal court bears the burden of demonstrating facts sufficient to establish the privilege's applicability. *In re Subpoena Duces Tecum*, 439 F.3d 740, 750 (D.C. Cir. 2006). The "basis of privilege" must be "adequately established in the record," *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1303 (D.C. Cir. 1988), through evidence "sufficient . . . to establish the privilege . . . with reasonable certainty." *FTC v. TRW, Inc.*, 628 F.2d 207, 213 (D.C. Cir. 1980).

Although not necessary to prevent disclosure, a party may seek a protective order to prevent the disclosure of specific privileged materials upon a showing of good cause. Fed. R. Civ. P. 26(c). A valid claim of privilege is considered "good cause" to justify a protective order. *See Navajo Nation v. Peabody Holding Co.*, 209 F. Supp. 2d 269, 283 (D.D.C. 2002), *aff'd*, 64 Fed. App'x 783 (D.C. Cir. 2003).

## B. Work-Product Privilege

The Federal Rules of Civil Procedure protect from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3). The purpose of the doctrine is to protect the adversary process by ensuring that lawyers work with a "degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). The work-product doctrine "protects factual materials prepared in anticipation of litigation." *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997). Thus, "[a]ny part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work[-]product doctrine." *Id.* Courts employ a "because of" test to determine whether a document was created in anticipation of litigation, determining "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010). "For a document to meet this standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (noting litigation must be the "primary object of attention"). "The inquiry contains two related, but nevertheless distinct concepts—one a

4

question of timing and the other a question of intent." *In re Veiga*, 746 F. Supp. 2d 27, 35 (D.D.C. 2010).

Work-product immunity is held by the lawyer, not the client, although either may assert the doctrine during discovery. "The party invoking the privilege, however, has the burden of proving that the memoranda qualify as work product." *Hager v. Bluefield Regional Medical Center, Inc.*, 170 F.R.D. 70, 76 (D.D.C. 1997). "In reviewing the documents claimed to be protected by the work-product privilege, the court must determine whether, in light of the nature of the document or the factual situation in a particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Jinks-Umstead v. England*, 231 F.R.D. 13, 19 (D.D.C. 2005). Protection for attorney work product is not absolute and can be overcome if a party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). The work-product doctrine relies, in the first instance, on the existence of an attorney-client relationship.

### C. Attorney-Client Privilege

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Its purpose is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id*. A party asserting the attorney-client privilege must demonstrate that:

> (1) the asserted holder of the privilege is or sought to become a client;
>
> (2) the person to whom the communication was made (a) is a member of the bar of a court or her subordinate and (b) in connection with this communication is acting as a lawyer;

> (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on the law, (ii) legal services, or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and
>
> (4) the privilege has been (a) claimed and (b) not waived by the client.

*See In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984). The privilege attaches to an attorney's communication with his client "only insofar as the attorney's communications disclose the confidential communications from the client." *Evans v. Atwood*, 177 F.R.D. 1, 4 (D.D.C. 1997) (quoting *Brinton v. Dep't of State*, 636 F.2d 600, 603-04 (D.C. Cir. 1980)). "A blanket assertion of the privilege will not suffice. Rather, the proponent must conclusively prove each element of the privilege." *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998) (internal citation and quotation omitted) (rejecting attorney-client privilege for an advisor to the President who also served as a policy advisor).

The attorney-client privilege does not protect any and all communications between a client and a lawyer. Attorney-client privilege "is narrowly construed by the D.C. Circuit because of its adverse effects on the full disclosure of truth." *United States v. Philip Morris Inc.*, 212 F.R.D. 421, 424 (D.D.C. 2002). Communications between an attorney and client are protected by the attorney-client privilege, but the facts underlying the communications are not protected. *See Upjohn*, 449 U.S. at 395. Both clients and lawyers, on occasion, can waive the attorney-client privilege.

The D.C. Circuit's strict definition of privilege carries over to the waiver of privilege, placing the burden of protecting privileged communications squarely on the proponent of the privilege. *See SEC v. Lavin*, 111 F.3d 921, 929 (D.C. Cir. 1997). To protect the attorney-

client privilege, the holder must "zealously protect the privileged materials, taking all reasonable steps to protect their disclosure." *Id*. Once the privilege is waived, it is waived for all purposes.

### III. ANALYSIS

#### A. Work-Product Privilege

Work-product privilege is dependent on a finding that the documents were created "in anticipation of litigation." *Tax Analysts*, 117 F.3d at 620. This factor has both a temporal and objective component. WMATA argues that litigation was anticipated because the Bondi Report and the interviews that occurred as a part of its preparation were triggered by WMATA's receipt of the Bolden Letter from Banneker, which threatened legal action. WMATA also provides a declaration from former-Cadwalader attorney Emily J. Rockwood which states that she was involved in some of the interviews during the investigation and she "was aware of the possibility that litigation would be brought against WMATA by Banneker Ventures, LLC in relation to the Florida Avenue Project." WMATA Mem., Ex. C, Declaration of Emily J. Rockwood [Dkt. 104-5] ¶ 5 (Rockwood Decl.). Ms. Rockwood also notes that the interview memoranda were "intended to be internal work product for use by the Cadwalader legal team" and that any citations to the memoranda in the final Bondi report were "intended for reference by the Cadwalader team." *Id*. ¶ 8.

Banneker argues that work-product protection does not apply to the interview memoranda because WMATA did not reasonably anticipate litigation. Banneker cites to the length of time that passed between the Bolden Letter and WMATA's retention of Cadwalader (over 2 years), during which time no action was taken with respect to Banneker's claims in the Bolden Letter. *See* Bondi Report at 7 n.1 ("Although Metro's General Counsel responded in 2010 to some allegations raised in an April 27, 2010 letter from A. Scott Bolden, an attorney for Banneker Ventures, she did not interview witnesses, did not collect and review documents from

7

the parties involved, and did not examine allegations of Board Member misconduct when formulating her response."). Banneker also notes that WMATA's internal documents discussing the hiring of Cadwalader and release of the Bondi Report, as well as counsel's statements during depositions, indicate that the investigation conducted by Cadwalader was for internal WMATA business purposes. Specifically, the purpose of the investigation was to determine if Board Members were complying with their mandate or if additional procedures and rules needed to be put in place, and to respond to public outcry for accountability. *See* Bondi Report at 2 ("Our investigation focused on, and was limited to, evaluating the conduct of Metro Board Members related to the development of the Florida Avenue property."); Opp'n, Ex. F, Washington Post Editorial [Dkt. 105-7] (indicating WMATA was launching an independent review of the Florida Avenue project); *id.*, Ex. K, WMATA Board Resolution 2012-26 [Dkt. 105-12] (stating that Cadwalader's investigation "reveal[ed] the need for additional examination, clarifying and strengthening of the Standards of Conduct policies governing the Board, as well as other matters of policy, procedure and agency conduct"); *id.*, Ex. L, Cadwalader Recommendations to the WMATA Board Concerning Governance and the Code of Ethics [Dkt. 105-13] (explaining Cadwalader was engaged "to provide general governance recommendations, and to evaluate the Code of Ethics for Members of the WMATA Board of Directors"); WMATA Board Resolution 2012-25 (authorizing public release of the Bondi Report).

Answering the question of whether the interview memoranda were created "in anticipation of litigation," and, therefore, work product, leads the Court to consider two things: first, the time that elapsed between the Bolden Letter and Cadwalader's retention and whether it would be reasonable to assume WMATA continued to believe litigation was possible; and second, the intent behind the investigation conducted by Cadwalader.

8

While there is no standard or rule regarding how close in time potential litigation must be, after considering the specific sequence of events in this case, the Court determines the timing of the Cadwalader interviews suggests they were not conducted when litigation was anticipated. WMATA argues that the Bolden Letter triggered anticipation of litigation, which the Court does not question. At the time WMATA received the Bolden Letter it was reasonable to anticipate litigation. What the Court finds troubling is the length of time that passed from receipt of the Bolden Letter to retention of Cadwalader and the lack of any action indicating anticipation of litigation in the years between those two events. Without evidence of intervening action by WMATA with respect to the Bolden Letter, the Court finds that the Cadwalader investigation cannot be reasonably linked to the anticipation of litigation initiated by the Bolden Letter. The fact that litigation resulted shortly after the public disclosure of the Bondi Report does not show that WMATA retained Cadwalader in reasonable anticipation of that litigation. The Court finds the timing does not support a finding of work product.

The Court also considers the evidence surrounding the investigation and finds that WMATA again falls short in meeting the motivational element of the work-product doctrine. WMATA has not established that the interview memoranda "were prepared for the purpose of assisting an attorney in preparing for litigation, and not some other reason." *In re Veiga*, 746 F. Supp. 2d at 34. "[N]ot all documents generated from an internal investigation are protected by the work[-]product doctrine simply because an organizations' internal investigation coexists with a present or anticipated lawsuit. Documents that would have been created in the ordinary course of business irrespective of litigation are not protected by the work[-]product doctrine." *Duran v. Andrew*, No. 09-730, 2010 WL 1418344, at *4-5 (D.D.C. April 5, 2010) (listing examples of investigations that could have both legal and business reasons, such as investigations into

harassment policies or the removal of an individual as Chief Executive Officer). "Where a document would have been created 'in substantially similar form' regardless of the litigation, work[-]product protection is not available." *FTC v. Boehringer Ingelheim Pharmaceuticals*, 778 F.3d 142, 149 (D.C. Cir. 2015).

The evidence presented supports a finding that absent any anticipated litigation, WMATA would have conducted the same investigation to evaluate its business practices and revise the Standards of Conduct for the Board of Directors. The Board specifically noted that the investigation was aimed at "formulat[ing] and recommend[ing]" changes to the "policies, standards and procedures" of the Board of Directors, a business—not litigation—goal. WMATA Board Resolution 2012-26 at 1. The Court acknowledges Ms. Rockwood's declaration that states that she "was aware of the possibility of litigation" and that the memoranda "were intended to be internal work product for use by the Cadwalader legal team," Rockwood Decl. ¶¶ 5, 8; however, the contemporaneous statements made by WMATA regarding the investigation do not indicate that the investigation was conducted as a result of anticipated litigation, but instead to determine if changes were necessary to the Board of Directors' Standards of Conduct. This factor too compels the conclusion that the investigative report and supporting memoranda are not covered by work-product protection.

The Court finds that the interview memoranda were not created in anticipation of litigation and the work-product doctrine does not apply. Because WMATA cannot claim attorney-client privilege over the 21 memoranda regarding interviews conducted with the 15 non-WMATA personnel, the Court will order WMATA to produce the 21 interview memoranda describing interviews with 15 non-WMATA personnel.

### B. Attorney-Client Privilege

The attorney-client privilege protects confidential communications between attorneys and their clients made for the purpose of obtaining or providing legal advice. *See In re Sealed Case*, 737 F.2d at 98-99. The parties do not dispute that with respect to the interviews conducted with current or former WMATA employees or members of the WMATA Board of Directors, Cadwalader was engaged in protected attorney-client communications. Banneker argues, however, that WMATA has waived the attorney-client privilege by disclosing portions of the interview memoranda to the public in the Bondi Report. WMATA's Motion for Protective Order and Reply ignore the potential waiver of attorney-client privilege through the public disclosure of the Bondi Report and instead focus on refuting subject matter waiver due to the disclosure of another attorney-client document during negotiations for the Florida Avenue Project.

The Court begins by noting that attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts." *Upjohn*, 449 U.S. at 395. Thus, Banneker could, through a well-written interrogatory, request the disclosure of all facts unearthed during the 51 witness interviews and WMATA would have no legitimate basis to refuse to respond. Banneker need not draft such an interrogatory, however, because the Court finds WMATA has waived the attorney-client privilege with respect to the interview memoranda.

The Bondi Report was the product of a months' long investigation by Cadwalader and included factual and legal findings and conclusions related to the Florida Avenue Project and the adequacy of the Standards of Conduct of the WMATA Board of Directors. As originally commissioned, the Bondi Report was intended to be an internal document for WMATA's purposes and not slated for public disclosure. Upon receipt of the Bondi Report, the WMATA

11

Board decided to release it to the public in its entirety. By disclosing the Bondi Report, WMATA chose to disclose the legal and factual conclusions that were contained in the report and, therefore, waived any claim of attorney-client privilege that existed with respect to the Bondi Report itself. The Court must now consider whether the public disclosure of the Bondi Report also resulted in subject-matter waiver of the attorney-client privilege covering the interview memoranda used to compile the report.

"[W]aiver of the attorney-client privilege for a document is not confined to that document alone, but extends to all other documents involving the same subject matter as well." *Bowles v. National Ass'n of Home Builders*, 224 F.R.D. 246, 257 (D.D.C. 2004). "This 'implied waiver' or 'subject matter waiver' rule arises out of the concern that a party will selectively disclose documents to obtain a tactical advantage." *Id*. "Rule 502 provides that a waiver resulting from a disclosure of protected information in a federal proceeding extends to undisclosed protected material 'only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together.'" *United States Airline Pilots v. Pension Ben. Guar. Corp.*, 274 F.R.D. 28, 31 (D.D.C. 2011) (quoting Fed. R. Evid. 502).

The Court finds that the waiver of privilege as to the Bondi Report was intentional, *see* WMATA Board Resolution 2012-26; and the disclosed and undisclosed communications and information concern the same subject matter. The Bondi Report disclosed counsel's legal and factual conclusions about the events during negotiations with Banneker for the Florida Avenue Project and the WMATA Board of Directors' Standards of Conduct—the exact subject of the interviews conducted and summarized in the interview memoranda. In fact, the Bondi Report cites extensively to the interview memoranda throughout the entirety of the

document.[1]  The Court notes multiple references to at least 23 different witness interviews. Additionally, WMATA has not argued that the interview memoranda contain information outside the scope of the investigation or Bondi Report.

Finally, the Court finds that fairness dictates the Bondi Report and interview memoranda should be considered together.  The D.C. Circuit strictly defines attorney-client privilege and requires that any party seeking to invoke the privilege must "zealously protect the privileged materials."  *Lavin*, 111 F.3d at 929.  WMATA has not zealously protected the information contained in the interview memoranda.  Instead, WMATA has permitted direct citation and reference to confidential communications to be disclosed publically in the Bondi Report.  WMATA has also used the Bondi Report to its advantage in this litigation.  Fairness dictates that if WMATA is able to use the Bondi Report and facts disclosed in that report to support its claims and defenses, then Banneker is entitled to the remaining facts and information contained in the interview memoranda that were not included in the Bondi Report.  The intent of subject matter waiver is to prevent a party from selectively disclosing information and documents that would otherwise be privileged to gain a tactical advantage.  WMATA cannot both benefit from the disclosure of the Bondi Report and prevent further disclosure of the remaining information in the interview memoranda.

However, to the extent the interview memoranda contain subjects not covered by the Bondi Report (subjects other than the Florida Avenue Project, role of WMATA Board Members, Standards of Conduct applicable to WMATA Board Members, and Councilmember

---

[1] Ms. Rockwood notes in her declaration that the references to the interview memoranda in the Bondi Report were intended only for use by Cadwalader.  *See* Rockwood Decl. ¶ 8.  However, WMATA failed to remove the references and citations from the version of the Bondi Report that was made available to the public.

Jim Graham's actions related to the Florida Avenue Project) WMATA may redact that information from the interview memoranda before production and the Court will issue a protective order preventing the disclosure of any topics not covered by the Bondi Report. The Court specifically notes that the Bondi Report does not contain any recommendations or opinions on the credibility of the interviewees, so that material and other comments, if any, as to a lawyer's mental impressions may be redacted from the memoranda before production.

## IV.  CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part WMATA's Motion for Protective Order. A memorializing Order accompanies this Opinion.


Date: May 16, 2017                                        /s/
                                              ROSEMARY M. COLLYER
                                              United States District Judge